Bryan Weir (SBN: 310964)
Thomas R. McCarthy*
Tyler R. Green*
Cameron T. Norris*
Alexa R. Baltes*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423

Harmeet K. Dhillon (SBN: 207873)
Mark P. Meuser (SBN: 231335)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
(415) 433-1700
(415) 520-6593 (fax)

*Application for admission
pro hac vice forthcoming

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE; and CALIFORNIA REPUBLICAN PARTY,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, in his official capacity as Governor of California; and ALEX PADILLA, in his official capacity as California Secretary of State,<br><br>Defendants. | No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs, the Republican National Committee, National Republican Congressional

Committee, and California Republican Party, bring this action against Defendants, Gavin Newsom,

in his official capacity as Governor of California, and Alex Padilla, in his official capacity as

1

Secretary of State of California, to have Governor Newsom's Executive Order N-64-20 declared unlawful, to enjoin its enforcement, and to obtain all other appropriate relief. Plaintiffs allege as follows:

## INTRODUCTION

1.     The U.S. Constitution entrusts state legislatures to set the time, place, and manner of congressional elections and to determine how the state chooses electors for the presidency. California's legislature has enacted valid laws to that end.

2.     In a direct usurpation of the legislature's authority, Governor Newsom issued an executive order purporting to rewrite the entire election code for the November 2020 election. This brazen power grab was not authorized by state law and violates both the Elections Clause and Electors Clause of the U.S. Constitution. The Governor's Order is invalid and must be enjoined.

3.     Moreover, in his haste, the Governor created a system that will violate eligible citizens' right to vote. By ordering that vote-by-mail ballots be automatically sent to every registered voter—including inactive voters, voters with invalid registrations, voters who have moved, voters who have died, and voters who don't want a ballot—he has created a recipe for disaster. No State that regularly conducts statewide all-mail elections automatically mails ballots to inactive voters because it invites fraud, coercion, theft, and otherwise illegitimate voting. Fraudulent and invalid votes dilute the votes of honest citizens and deprive them of their right to vote in violation of the Fourteenth Amendment.

4.     Finally, the Governor reserved for himself the sole discretion to choose if and where in-person voting will occur. Such unbridled discretion, which leads to arbitrary and disparate treatment of individual voters, violates the Equal Protection Clause of the Fourteenth Amendment.

5.     For all these reasons and more, Executive Order N-64-20 is illegal and must be enjoined.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction because this action arises under the Constitution and laws of the United States. 28 U.S.C. §§ 1331 & 1343.

7.     Venue is proper because a substantial part of the events giving rise to the claims

2

Complaint for Declaratory and Injunctive Relief

occurred in this District, and the Defendants reside in this District. *Id.* § 1391.

**PARTIES**

8.     Plaintiff Republican National Committee (RNC) is a national political party with its principal place of business at 310 First Street S.E., Washington D.C., 20003.

9.     The RNC organizes and operates the Republican National Convention, which nominates a candidate for President and Vice President of the United States.

10.     The RNC represents over 30 million registered Republicans in all 50 states, the District of Columbia, and the U.S. territories. It is comprised of 168 voting members representing state Republican Party organizations.

11.     The RNC works to elect Republican candidates to state and federal office. In November 2020, its candidates will appear on the ballot in California for most federal and state offices. In elections for the U.S. House of Representatives, for example, the Cook Political Report lists seven California races as "competitive"—including two "toss ups."

12.     The RNC has a vital interest in protecting the ability of Republican voters to cast, and Republican candidates to receive, effective votes in California elections and elsewhere. The RNC brings this suit to vindicate its own rights in this regard, and in a representational capacity to vindicate the rights of its member voters and candidates.

13.     The RNC also has an interest in preventing the Governor's sweeping and unilateral changes to California election law. Major or hasty changes confuse voters, undermine confidence in the electoral process, and create incentive to remain away from the polls. Thus, the Governor's order forces the RNC to divert resources and spend significant amounts of money educating voters on those changes and encouraging them to vote regardless.

14.     Plaintiff National Republican Congressional Committee (NRCC) is a qualified national party committee devoted to increasing the number of Republicans in the U.S. House of Representatives. The NRCC is organized under Section 527 of the Internal Revenue Code.

15.     The NRCC supports the election of Republicans to the House through direct financial contributions to candidates and Republican Party organizations; technical and research assistance to Republican candidates and party organizations; voter registration, education, and

3

Complaint for Declaratory and Injunctive Relief

1    turnout programs; and other party-building activities.

2         16.    The NRCC has the same interests in this case, and seeks to vindicate those interests

3    in the same ways, as the RNC.

4         17.    Plaintiff California Republican Party (CAGOP) is a political party in California with

5    its principal place of business at 1001 K Street, 4th Floor, Sacramento, CA 95814. The Republican

6    State Central Committee (RSCC) is the CAGOP's governing body. The RSCC and the CAGOP

7    exercise their "federal and state constitutional rights, as set forth in the First and Fourteenth

8    Amendments to the United States Constitution, and Article IV, Section 5 ... to represent and speak

9    for [their] members [and] to endorse and to nominate candidates for all partisan elective offices."

10    Section 1.04.01 of the CAGOP Bylaws.

11         18.    The CAGOP represents over 4.9 million registered Republican voters in California

12    as of February 18, 2020.

13         19.    The CAGOP has the same interests in this case, and seeks to vindicate those interests

14    in the same ways, as the RNC and NRCC.

15         20.    Defendant Gavin Newsom is the Governor of California. He is charged with the

16    "executive power" of the State, including the responsibility to "see that the law is faithfully

17    executed." Cal. Const. art. V, §1. He is sued in his official capacity.

18         21.    Defendant Alex Padilla is the California Secretary of State. Secretary Padilla is

19    California's chief elections officer and oversees all elections within California. His duties include

20    ensuring that all election laws and campaign disclosure requirements are enforced, certifying the

21    official lists of candidates for elections, and certifying election results. He is sued in his official

22    capacity.

23    **BACKGROUND**

24    **I.**    **The Perils of Hastily Moving to By-Mail Voting Without the Necessary Safeguards**

25         22.    Creating opportunities for ineligible voters to cast ballots invites fraud and

26    undermines the public's confidence in the integrity of elections—all of which violate the right to

27    vote.

28         23.    According to the Commission on Federal Election Reform—a bipartisan

4

commission chaired by former President Jimmy Carter and James Baker, and cited extensively by the U.S. Supreme Court—absentee voting[*] is "the largest source of potential voter fraud." *Building Confidence in U.S. Elections* 46, https://bit.ly/3dXH7rU (*Carter-Baker Report*). Many well-regarded commissions and groups of diverse political affiliation agree that "when election fraud occurs, it usually arises from absentee ballots." Michael T. Morley, *Election Emergency Redlines* 2, https://bit.ly/3e59PY1 (Morley, *Redlines*). Such fraud is easier to do and harder to detect. As one federal court put it, "absentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004).

24. "Absentee balloting is vulnerable to abuse in several ways." For one, ballots are sometimes "mailed to the wrong address or to large residential buildings" and "might get intercepted." *Carter-Baker Report* 46. For another, absentee voters "who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation." *Id.* And "[v]ote buying schemes are far more difficult to detect when citizens vote by mail." *Id.* For example, "[i]ndividuals can sign and sell their absentee ballot," or "[o]ne spouse can coerce the other to sign the ballot and hand it over to them to vote fraudulently."

25. This risk of abuse is magnified by the fact that "many states' voter registration databases are outdated or inaccurate." Morley, *Redlines* 2.

26. A 2012 study from the Pew Center on the States—which the U.S. Supreme Court cited in a recent case—found that "[a]pproximately 24 million—one of every eight—voter registrations in the United States are no longer valid or are significantly inaccurate"; "[m]ore than 1.8 million deceased individuals are listed as voters"; and "[a]pproximately 2.75 million people have registrations in more than one state."

27. Similarly, a 2010 study by the Caltech/MIT Voting Technology Project found that roughly 9% of listed registration records in the United States are invalid." On top of those invalid records, "in the typical state 1 in 65 records is duplicative, meaning that the same registrant is listed multiple times." The same study found that "[i]n the typical state, 1 in 40 counted votes in the 2008

[*] The terms "absentee" and "by-mail" are used interchangeably for purposes of this complaint.

Complaint for Declaratory and Injunctive Relief

general election cannot be matched to a registrant listed as having voted" and that "1 in 100 listed registrants is likely to be deceased."

28.    These discrepancies result from bureaucratic failures, intentional fraud, and inadvertent mistakes.

29.    Because of these widespread inaccuracies, a state that sends ballots to all registered voters will necessarily send ballots to persons with fake registrations, invalid registrations, or outdated registrations. Placing hundreds of thousands of ballots "outside of both election officials' control and the hands of voters who are supposed to be casting them raises a serious threat to both the actual and perceived integrity of the electoral system." Morley, *Redlines* 3.

30.    These risks are compounded by the practice of ballot harvesting—that is, coordinated efforts to have third parties collect absentee ballots from voters and drop them off at polling places or elections centers.

31.    Ballot harvesters are usually third parties—campaign workers, union members, political activists, paid personnel, volunteers, or others. They go door-to-door and offer to collect and turn in ballots for voters. "In some documented cases, the workers collecting the ballots have entered into voters' homes to help them retrieve and fill out their ballots."

32.    "Ballot harvesting gives third parties who may be completely unknown to both the voter and election officials the opportunity to potentially tamper with absentee ballots" in any one of a number of ways. Morley, *Redlines* 5. For instance, "[h]arvesters may pressure voters into giving them blank ballots or casting their votes a certain way," or, "[w]hen a voter has voted for the 'wrong' candidate, the harvester may surreptitiously change the vote, include additional votes to void the ballot, or simply dispose of the ballot rather than returning it." *Id.*

33.    These forms of misconduct are incredibly difficult to detect. The practice is "especially concerning when third parties who are not related to the voter—and who may not even be known to the voter—are permitted to harvest unlimited numbers of ballots, frequently without having to identify themselves to election officials or note their identity on the ballots' envelopes." Morley, *Redlines* 4.

34.    To be sure, vote-by-mail can be a legitimate feature of a state's election process,

Complaint for Declaratory and Injunctive Relief

when coupled with adequate procedural safeguards to deter fraud. But given the many risks discussed above, in most states it is an *alternative* implemented carefully and slowly and *only with* such safeguards in place.

35.     One procedural safeguard is the practice of mailing ballots only to reasonably identifiable voters. The few states that routinely conduct elections entirely by mail do not send ballots to all registered voters. Rather, they limit automatic mailing of ballots only to *active* registered voters. *E.g.*, Utah Code §20A-3-302(2)(b)(i) (may only be sent to "active voters"); Rev. Code of Wash. §29A.40.010 (may only be sent to "active registered voters"); Ore. Rev. Stat. §254.470 (may only be sent to "active electors"); Colo. Rev. Stat. § 1-7.5-107(3)(a)(I) ("shall mail to each active registered elector"); Haw. Rev. Stat. § 11-102(b) ("The clerk shall not mail a ballot package to any voter in the county register who is identified as having an outdated or non-deliverable mailing address."). Active voters are typically defined as voters who have voted recently and election officials have no reason to think have moved.

36.     Other safeguards include laws requiring election officials to match a voter's signature on an absentee ballot envelope to the signature on the voter's registration, require a witness signature on the ballot envelope, or require the voter to provide some identifying information when returning their ballot. Many states also regulate ballot harvesting by prohibiting or severely limiting a third party's ability to collect and return another person's absentee ballot. *See, e.g.*, Ind. Code § 3-14-2-16(4); Conn. Gen. Stat. § 9-140b(a); N.M. Stat. Ann. § 1-6-10.1; Ga. Code Ann. § 21-2-385(a); Mo. Rev. Stat. § 115.291(2); Nev. Rev. Stat. Ann. § 293.330(4); Okla. Stat. tit. 26, § 14-108(C); Ohio Rev. Code Ann. § 3509.05(A); Tex. Elec. Code Ann. § 86.006(a).

37.     Federal law also recognizes the risks of voting by mail and thus requires certain first-time voters to present identification. *See* 52 U.S.C. § 21083(b).

38.     In reaction to COVID-19, several states have altered, or tried to alter, their ordinary election practices to expand vote-by-mail for 2020 elections.

39.     Much of the push toward all-mail voting has been driven by litigation initiated by the Democratic Party. The Democratic National Committee, state Democratic parties, and several affiliated groups have filed lawsuits across the country to force a hurried transition to no-excuse

7

mail-in voting, eliminate voter-identification requirements, and remove other existing safeguards. Democrats pushed these changes long before COVID-19 because they believe that the resulting free-for-all will help their electoral prospects. Unable to persuade legislatures to adopt these changes, Democrats have turned to the courts, arguing that COVID-19 means that their preferred changes are now *mandated* by the Constitution. Indeed, according to the Democrats' top lawyer, "If [these lawsuits] gain 1 percent of the vote [for Democrats], that would be among the most successful tactics that a campaign could engage in."

40.     But COVID-19 does not warrant throwing out longstanding safeguards that protect the integrity of elections. In fact, it makes those safeguards *more* important. "[E]ven when voter registration records are accurate, voters may not be staying at their addresses of record. If stay-at-home orders remain in place, voters may be staying with family or friends for the duration of the quarantine." Morley, *Redlines* 3. "Thus, automatically mailing out millions of ballots to addresses where voters may not be located will lead to millions of unaccounted-for ballots, facilitates ballot theft, and can lead to inadvertent or intentional double voting." *Id.*

41.     These concerns have been realized in jurisdictions that switched to mail-in voting for their Spring 2020 elections.

42.     For example, Clark County, Nevada is currently administering the state's first ever all-mail primary. The Las Vegas Review-Journal reported that, within the first week of voting, photographic evidence surfaced of numerous ballots "tossed in trash cans and littering apartment mailbox areas."

43.     On May 8, 2020, one Clark County voter found "about a dozen ballots pinned to the complex's bulletin board or otherwise thrown around." Over the next few days, he found many more in nearby trash cans.

44.     In a different apartment complex, another voter saw ballots "sticking out of residents' mailboxes and 'at least a dozen' were sitting in nearby garbage cans."

45.     Another resident received a ballot at her home addressed to her deceased mother.

46.     A U.S. Postal Service worker serving the area witnessed the breadth of the problem. She recounted that, over the course of multiple days, she saw an "influx of absentee ballots"—as a

8

many as 100 in a single day—that were "'no good,'" often because they had been sent to recipients who had moved or died. "In all, she said there were thousands [of ballots] sitting in crates with no additional safeguards and marked to be sent back to the county."

47.    The New Jersey media has reported that similar problems took root in Paterson, New Jersey in the May 12 election for Second Ward City Council—the "first election in state history that was contested only by mail-in voting."

48.    More than 800 mail-in ballots were set aside in Paterson due to suspicion that they were gathered illegally.

49.    Hundreds of mail-in ballots were collected from *single* mailboxes. In one case, 366 ballots were picked up from the same mailbox.

50.    In some cases, "large quantities of mail-in ballots were fastened together with a rubber-band and dropped at the same location."

51.    There have been reports of Paterson voters not receiving their ballots as well as reports of "letter carriers leaving massive numbers of ballots in a bin at a particular apartment building."

52.    In addition, one candidate reported that many people's "votes were paid for and still others who had no idea that they voted or who they voted for because someone filled out a mail-in ballot for them."

**II.    California Is Ill-Equipped to Rapidly Shift to Vote-By-Mail Elections.**

53.    California has had persistent problems updating its voter rolls.

54.    In early 2019, the State and the County of Los Angeles were forced to settle a lawsuit after Judicial Watch exposed that L.A. County had on its voter rolls more than 1.5 million potentially ineligible voters—meaning that "more than one out of every five LA County registrations likely belong[ed] to a voter who has moved or is deceased." *California and Los Angeles County to Remove 1.5 Million Inactive Voters from Voter Rolls – Settle Judicial Watch Federal Lawsuit*, Judicial Watch (Jan. 3, 2019), https://bit.ly/2WOrmxW.

55.    That lawsuit uncovered that neither California nor L.A. County had been removing inactive voters from the voter rolls for the past 20 years. *Id.* Relying on data from the Election

Assistance Commission, an independent federal agency, Judicial Watch found that L.A. County had a registration rate of 112% of its adult citizen population and that the entire state of California had a registration rate of about 101% of its age-eligible citizenry. *See Judicial Watch, Inc. v. Logan*, Complaint 7, https://bit.ly/3cPYXwK.

56.     While the settlement exposed the problem and led to some superficial fixes, it did not solve the problem.

57.     For instance, following the settlement, San Diego County removed 500,000 voter registrations from its rolls, but as recently as November 2019, federal data indicates that San Diego still has a registration rate of 117%. *NVRA Notices 2019 California*, https://bit.ly/3e4aKaY.

58.     Similarly, as of December 12, 2019, Judicial Watch determined that Orange County had not removed any voter registrations in the last two-year reporting period; maintained 380,000 inactive voter registrations on the County's rolls (about one in every five registrations); and had an unusually high registration rate of 96*%.*

59.     Most recently, the Election Integrity Project California (EIPCa) reported that, as of February 18, 2020, 13 California counties—a combined area that represents roughly 46% of the state's total population—have more registered voters than eligible citizens.

60.     EIPCa also found that, according to data produced on February 18, 2020, L.A. County has 206,728 registrants who have neither voted nor updated their registrations since November 2008 or before, and 8,158 persons who have two active voter registrations in their names.

61.     The Secretary of State has admitted that several voters cast two ballots in the 2020 primary.

62.     Last year it became clear that some 1,500 individuals, including noncitizens, were mistakenly registered to vote because of California's new automatic voter registration law. Those particular registrations were canceled, but the blunder raised "questions about what other mistakes had been made." Indeed, the LA Times reported that an independent audit found that California's motor voter program, which was launched in April 2018, led to 83,684 duplicate voter registrations and more than twice that number for political party mistakes.

10

63. California's record of failing to comply with the federal requirement to create and maintain a "centralized, interactive computerized statewide voter registration list" is well known. 52 U.S.C. § 21083(a)(1)(A). This federally mandated system was also a key recommendation of the Commission on Federal Election Reform. California's distinction as the last state to comply with this requirement after nearly two decades of trying has led to the ongoing problem of duplicate registrations and other inaccuracies in California's voter rolls. Those inaccuracies are uniquely exploitable under the state's plans to mail a ballot to every registered voter.

64. In addition to neglect and inadvertence, California has done little to comply with federal requirements to prevent intentional, fraudulent expansion of voter rolls.

65. For example, in a press release on February 19, 2020, the District Attorney for L.A. County reported that a 62-year-old man pleaded guilty "for his role in a scheme where money and cigarettes were allegedly offered to homeless people on Skid Row in exchange for [hundreds of] false and forged signatures on ballot petitions and voter registration forms." https://bit.ly/2LJGINB. The offenses are alleged to have taken place during the 2016 and 2018 election cycles. *Id.*

66. One California man concerned that voter registration was "open online, with no in-person trip or photo ID … required" registered his four dogs, and attempted to register his deceased father, to vote over the course of many years. He began registering his dogs to vote in 1996 and they each received verification of their registration status, complete with identification numbers. He called to tell authorities what he was doing, but the Monterey County District Attorney's Office did not stop him until 2018, when they charged him with a felony after he began the process of registering his deceased father.

67. California's bloated registration rolls and lack of oversight and due diligence present enormous risks of voter fraud and general-election illegitimacy. "[E]ven if [California] ha[s] record turnout for the 2020 election, it is reasonable to assume that a substantial number of voters will remain uninterested in participating. Automatically mailing vote-by-mail ballots to tens of millions of people who do not wish to receive or cast them would irrevocably undermine the integrity of the electoral process. It would create a substantial risk of ballots being given away, sold, traded, collected by activists, or stolen from trashcans or mailboxes." Morley, *Redlines* 3-4.

Complaint for Declaratory and Injunctive Relief

68.     Finally, California has some of the most permissive ballot-harvesting practices in the nation. In 2016, then-Governor Jerry Brown signed AB1921, making it legal for anyone to collect and turn in an absentee or mail-in ballot of another. California "allows, and even encourages, partisan activists to 'cross the threshold' into voters' homes to help them retrieve and fill out their ballots."

69.     California refused to walk back its permissive ballot harvesting laws even during the peak of the coronavirus pandemic. That decision is directly at odds with the alleged current justification for all-mail elections—reducing human interaction during the COVID pandemic.

**III.     California's Existing Vote-by-Mail Laws**

70.     As a general matter, the California Legislature has chosen *not* to conduct all-mail elections, except in limited circumstances—or to automatically send vote-by-mail ballots to voters.

71.     California law contains two sets of provisions governing mail-based voting.

72.     The first set, California Election Code §§ 3000-26, allows voters to cast vote-by-mail ballots as an alternative to in-person voting in any election. Importantly, a voter must submit an application in order to receive a vote-by-mail ballot. Cal. Elec. Code § 3001(a)-(b). The application may be submitted in written form, *id.* §3001, or electronically through a website, *id.* § 3007.5. Local election officials also have discretion to accept applications for vote-by-mail ballots by phone. *Id.* § 3007.8(a). And voters may request "permanent vote by mail status." *Id.* §3201.

73.     The application process protects the integrity of the vote-by-mail process by helping verify the identity of the voter who requests the ballot and ensuring that the same eligible voter who requests the ballot ultimately receives it.

74.     State law specifies the information that a vote-by-mail ballot application must contain. *Id.* § 3006; *see also id.* § 3007 (requiring the Secretary of State to prepare a uniform application form). The uniform application, consistent with state and federal law, asks for the applicant's date of birth as an added measure of security. An election official generally may not send a vote-by-mail ballot to a voter in an ordinary election unless the voter submits a written application. "[C]ounty elections official shall begin mailing [vote-by-mail ballots] to qualified

12

applicants for vote by mail ballots, including voters who are permanent vote by mail voters." *Id.* § 3001(b). Before sending a vote-by-mail ballot to a voter, election officials must confirm that the information contained on the application and signature (for written requests) matches the information in the voter's registration file. *Id.* § 3009(a). If a voter lives in a precinct with less than 250 registered voters, however, election officials can eliminate the polling place for that precinct and instead automatically mail vote-by-mail ballots to all registered voters in that jurisdiction without receiving a written application. *Id.* § 3005(a).

75.    The second set of provisions governing mail-in voting, California Election Code §§ 4000-07, governs elections conducted "wholly by mail." An election may be conducted wholly by mail if a local governing body authorizes it; the election is held on a statutorily specified date; and the election either involves fewer than 1,000 voters or concerns certain special tax, assessment, expenditure, or water-related issues. *Id.* § 4000.

76.    Small cities with a population under 100,000 residents may also conduct special elections to fill vacancies exclusively by mail. *Id.* § 4004(c)(2).

77.    Counties are more broadly permitted to hold any election as an all-mail election provided that they affirmatively choose to opt-in and comply with various procedural safeguards. *Id.* §§ 4005, 4007.

78.    These restrictions on all-mail elections deter fraud and abuse. California law also treats all-mail elections as an alternative, not the norm—available only in special circumstances.

IV.    **California's Reponses to COVID-19 and Governor Newsom's Issuance of Executive Order N-64-20**

79.    On March 4, 2020, Governor Newsom proclaimed a state of emergency in California due to COVID-19.

80.    On March 19, 2020, Governor Newsom issued Executive Order N-33-20, better known as the "Stay-at-Home Order." By that order, Governor Newsom commanded "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors."

81.    On April 14, 2020, Governor Newsom issued California's "Roadmap to Modify the

13

Stay-at-Home Order." In a press release announcing the roadmap's release, Governor Newsom highlighted the State's "progress in flattening the curve" and underscored its "increased preparedness of our health care delivery system," explaining that the State's COVID-19 interventions "have yielded positive results."

82.     On April 28, 2020, Governor Newsom identified the four phases of California's plan to reopen its economy, as part of his Update on California's Pandemic Roadmap. Governor Newsom explained that, at that time, the State was in Phase 1.

83.     Governor Newsom described Phase 2 as the reopening of lower risk workplaces, with some adaptations. In particular, Phase 2 would involve the reopening of retail businesses, manufacturing, and offices (when telework is not possible), as well as more public spaces. Phase 2 would also involve the reopening of schools and childcare facilities with adaptations.

84.     Governor Newsom described Phase 3 as the reopening of "higher risk environments with adaptations and limits on size of gatherings." These so-called higher risk workplaces necessitate close proximity between people and would include personal care businesses (such as hair and nail salons and gyms), entertainment venues (such as movie theaters and sports without live audiences), and in-person religious services.

85.     Governor Newsom described Phase 4 as the reopening of all other businesses—that is, the end of the Stay-at-Home Order.

86.     On May 4, 2020, Governor Newsom issued an "Update on California's Pandemic Roadmap," announcing that the State would move to Phase 2 of its reopening plan.

87.     On May 7, 2020, Dr. Mark Ghaly, California Secretary of Health and Human Services, said that data showing stable hospitalization rates gave authorities confidence to move to Phase 2.

88.     On May 8, 2020, the State moved to Phase 2. It took "the first significant step in reopening its economy … by loosening restrictions for certain businesses."

89.     In his daily press conference on May 8, 2020, Governor Newsom emphasized that Phase 3 "may not even be more than a month away."

90.     On the same day that Governor Newsom highlighted all the progress that has been

14

made toward overcoming the pandemic in just a few short months, the Governor issued Executive Order N-64-20, which relies on the current state of emergency to rewrite California's election laws for an election that is six months away.

91. Executive Order N-64-20 orders the *automatic* distribution of vote-by-mail ballots for the November 3, 2020 general election to *every* person registered to vote in California.

92. The Executive Order acknowledges that it conflicts with the state's validly enacted election law; Governor Newsom simply issued the order "[n]otwithstanding any limitation on the distribution of vote-by-mail ballots in Elections Code sections 1500 and 4000-4007, or any other provision of state law."

93. In addition, Executive Order N-64-20 claims for Governor Newsom the discretionary power to decide whether and how in-person voting will be made available for the November election, and "how other details of the November election will be implemented."

94. Despite rewriting the election code for an election six months away, California continues to make significant progress towards reopening.

95. On May 18, Governor Newsom gave a news conference in which he indicated that California's move to Phase 3 was just around the corner. He explained that professional sports, hair salons, and churches may open as early as the first week of June. He did not explain how Executive Order N-64-20 could be justified in light of such progress.

96. This inconsistency, coupled with Executive Order N-64-20's timing amid a nation-wide push by the Democratic Party for the same measures, reveals that the Order is less about protecting the health of Californians and more about protecting the electoral prospects of the Governor's political party.

**V.     The Elections Clause and the Electors Clause of the U.S. Constitution Reserve for State *Legislatures* the Power to Regulate Elections.**

97. The Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." Art. I, § 4, cl. 1 (emphasis added). Likewise, the Electors Clause of the U.S. Constitution states that "[e]ach State shall appoint, in such Manner as *the Legislature* thereof

Complaint for Declaratory and Injunctive Relief

1   may direct, a Number of Electors" for President." Art. II, § 1, cl. 2 (emphasis added).

2   98. The Legislature is "'the representative body which ma[kes] the laws of the people.'"

3   *Smiley v. Holm*, 285 U.S. 355, 365 (1932). Regulations of congressional and presidential elections,

4   thus, "must be in accordance with the method which the state has prescribed for legislative

5   enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135

6   S. Ct. 2652, 2668 (2015).

7   99. Because the U.S. Constitution reserves for state *legislatures* the power to set the

8   time, place, and manner of holding elections for Congress and the President, state *executive* officers

9   have no authority to unilaterally exercise that power, much less conflict with existing legislation.

10   100. Nor could the authority to ignore existing legislation be delegated to an executive

11   officer. While the Elections Clause "was not adopted to diminish a State's authority to determine

12   its own lawmaking processes," *Ariz. State Legislature*, 135 S. Ct. at 2677, it does hold states

13   accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668;

14   *Smiley*, 285 U.S. at 365.

15   101. In California, the Governor is not the Legislature and thus cannot exercise legislative

16   power. "The powers of state government are legislative, executive, and judicial. Persons charged

17   with the exercise of one power may not exercise either of the others except as permitted by this

18   Constitution." Cal. Const Art. III, §3. "As an executive officer, [the Governor] is forbidden to

19   exercise any legislative power or function except as in the Constitution expressly provided." *Lukens*

20   *v. Nye*, 105 P. 593, 594 (Cal. 1909). Far from providing the Governor the power to exercise the

21   legislative power to regulate elections, the California Constitution expressly instructs that "[t]he

22   *Legislature* shall prohibit improper practices that affect elections." Cal. Const. Art. II, §4 (emphasis

23   added).

24   102. Therefore, under no construction may an executive order by the Governor be

25   considered legislation or something that can override existing legislation. "[T]he Governor is not

26   empowered, by executive order or otherwise, to amend the effect of, or to qualify the operation of

27   existing legislation." 63 Cal. Op. Att'y Gen. 583 (1980).

28   103. Even if the Legislature could, under the California Constitution, give the Governor

16

carte blanche to override duly enacted election laws, the statutes cited by Governor Newsom as the source of authority for Executive Order N-64-20 do not purport to do so.

104.    Governor Newsom claims the authority to discount valid legislation from California Government Code Sections 8567, 8571, and 8627.

105.    Section 8567 allows the Governor to issue "orders and regulations" that "have the force and effect of law." But these orders are not themselves legislation, and they cannot contradict existing legislation.

106.    Section 8627 allows the Governor to commandeer state "agencies" and exercise the State's "police power." But it gives him no legislative authority or the power to contradict existing statutes.

107.    Section 8571 allows the Governor, "during a … state of emergency," to "suspend any regulatory statute, or statute prescribing the procedure for conduct of state business … where the Governor determines and declares that strict compliance … would in any way prevent, hinder, or delay the mitigation of the effects of the emergency." The act of suspending laws, however, is "executive," not legislative. *Cf. Hendricks v. Hanigan*, 2002 WL 397648, at *9 (Cal. Ct. App. Mar. 14, 2002).

108.    Even if the California Legislature could delegate to the Governor the power to override its legislative power to regulate elections and the process of selecting electors, and even if § 8571 reflected such a delegation, Governor Newsom's Order does not fall within the scope of that statute. It exceeds the scope of § 8571 in at least four ways.

109.    First, § 8571 limits the Governor's power to suspend statutes to "regulatory statute[s]" and "statute[s] prescribing the procedure for conduct of state business." Election laws are neither.

110.    "Generally, a 'regulatory statute' is the result of the exercise of the state's police power to enact regulations to promote the public health, morals or safety, and the general well-being of the community." *See Com. v. CSX Trans., Inc.*, 639 A.2d 1213, 1214 (Pa. Super. Ct. 1994). That is certainly true in California. *See, e.g.*, *Rosenblatt v. Cal. State Bd. of Pharmacy*, 158 P.2d 199, 202 (Cal. 1945) (using licensing laws as examples of "regulatory statutes"); *Williams v.*

17

1  *Kapilow & Son, Inc.*, 164 Cal. Rptr. 176, 180 (Ct. App. 1980) (similar); *People v. Simon*, 886 P.2d

2  1271, 1289 (Cal. 1995) (using "public welfare" as a synonym for "regulatory statute"). To that end,

3  regulatory statutes govern the issuing of licenses and the regulation of business and public utilities

4  so as to "'protect the public from incompetence and dishonesty'" and ensure quality. *MW Erectors,*

5  *Inc. v. Niederhauser Ornamental & Metal Works Co.*, 115 P.3d 41, 55 (Cal. 2005); *see Fascination,*

6  *Inc. v. Hoover*, 246 P.2d 656, 662 (Cal. 1952); *Rosenblatt*, 158 P.2d at 202; *Motor Transit Co. v.*

7  *R.R. Comm'n of Cal.*, 209 P. 586, 589 (Cal. 1922). Election laws are not regulatory statutes.

8      111.    Nor are election laws statutes "prescribing the procedure for conduct of state

9  business" during an emergency. In emergencies, California law gives the Governor powers, such

10  as §§ 8571, 8567, and 8627, to get rid of roadblocks that slow government responsiveness to a

11  particular crisis, thus ensuring "the most efficient and effective response." *See Macias v. California*,

12  897 P.2d 530, 538 (Cal. 1995); *see also Planning & Conserv. League v. Dep't of Fish & Game*, 67

13  Cal. Rptr.2d 650, 659-60 (Ct. App. 1997) (discussing § 8571 and the "need to promptly and

14  effectively respond to an emergency"). Specifically, § 8571 allows the Governor to cut through red

15  tape by suspending *procedures* that would ordinarily and directly slow or delay government action.

16  For example, during a time of severe electrical shortages that constituted a state of emergency, the

17  Governor relied on § 8571 to suspend competitive bidding requirements so that the Department of

18  Water Resources could "enter into contracts and arrang[e] for the purchase and sale of electric

19  power with public and private entities and individuals as may be necessary to assist in mitigating

20  the effects of th[e] emergency" without hindrance. *See Hendricks*, 2002 WL 397648, at *10.

21      112.    The entire election code is not a "procedure" that functions as an administrative

22  hurdle over which the state must ordinarily climb in order to act in the interest of public health. It

23  cannot be suspended under § 8571. Indeed, the fact that Governor Newsom could not merely

24  *suspend* the election laws, but also had to affirmatively replace them with a brand new regime—

25  power not granted by § 8571—is evidence that the elections laws are not a mere "procedure"

26  covered by the statute.

27      113.    Moreover, *federal* elections are not "state business" under §8571. State business

28  refers to the functioning of *state* government. *See, e.g.*, Cal. Govt. Code § 19851(a) (permitting

18

1    overtime "where it is necessary to carry on the state business properly during a manpower

2    shortage"); Cal. Govt. Code § 11005.5 (regulating acquisition of property to be used "for the

3    conduct of state business").

4         114.    Second, § 8571 allows the Governor to suspend statutes only "[d]uring … a state of

5    emergency."

6         115.    While California is presently in a declared state of emergency, Governor Newsom's

7    Executive Order purports to suspend laws that have no effect for many months. Those laws, in other

8    words, will not be suspended "during" the state of emergency.

9         116.    Further, under § 8571, Governor Newsom was required to find that COVID-19 will

10   present "extreme peril to the safety of persons within the State" in November, or that it will "require

11   the combined forces of a mutual aid region or regions to combat" in November. Cal. Gov't Code

12   § 8558(b); *see Martin v. Mun. Court*, 196 Cal. Rptr. 218, 221 (Ct. App. 1983) ("The Governor must

13   state the circumstances of the emergency found to exist and that the emergency is found to be

14   beyond local control measures."); *Calif. Corr. Peace Officers Ass'n v. Schwarzenegger*, 77 Cal.

15   Rptr. 3d 844, 856 (Ct. App. 2008) ("the proclamation" must at least "set[] forth circumstances that

16   support the implied finding" of an emergency). Governor Newsom has made no such finding.

17        117.    Governor Newsom's own decisions establish that California will not still be under

18   a state of emergency in November. Under his direction, the state is currently in the process of

19   reopening. Governor Newsom recently announced that the State has moved to Phase 2 of the 4-

20   phase plan to fully reopen and will begin moving to Phase 3 as early as the first week of June.

21        118.    In any event, Governor Newsom did not find that California will be in a state of

22   emergency in November.

23        119.    Third, in order to exercise the limited power granted by § 8571 to suspend statutes,

24   the Governor must "determine[] and declare[] that strict compliance" with the suspended laws

25   would "prevent, hinder, or delay the mitigation of the effects of the emergency." While this

26   language grants the Governor discretion, it does not grant him a blank check.

27        120.    The power to "determine and declare" carries an obligation to draw conclusions

28   based on reasoned analysis. *See, e.g.*, *Zee Med. Distrib. Ass'n, Inc. v. Zee Med., Inc.*, 94 Cal. Rptr.2d

1    829, 833 (Ct. App. 2000); *Mueller v. Bd. of Ret. Of Los Angeles Cty. Emp. Ret. Ass'n*, 10 Cal.

2    Rptr.2d 45, 54 (Ct. App. 1992), *reh'g denied and opinion modified*, (Aug. 18, 1992); *Mercury Cas.*

3    *Co. v. Chu*, 178 Cal. Rptr.3d 144, 149 (2014); *People v. Mahoney*, 91 P.2d 1029, 1032 (Cal. 1939).

4    California has specifically determined that even when acting under a grant of emergency power

5    that allows an executive officer to do "whatever … he may deem necessary," exercises of that

6    power "must be reasonable and are subject to judicial review." *Verreos v. City & Cty. of San*

7    *Francisco*, 133 Cal. Rptr. 649, 655-56 (Ct. App. 1976).

8        121.    Governor Newsom's conclusory assertion that strict compliance with existing

9    election laws in November would hinder mitigation of COVID-19 was arbitrary and capricious.

10       122.    The Executive Order contains a boilerplate statement that "various statutes specified

11   in this Order would prevent, hinder, or delay" mitigation, but it does not state or even intimate that

12   any election laws—save those that pertain to in-person voting—threaten to spread COVID-19. And

13   even under the unilateral regime imposed by Executive Order N-64-20, in-person voting will still

14   be available, contradicting the notion that it cannot be done safely and effectively.

15       123.    Even during the height of the pandemic, Wisconsin was able to hold in-person

16   elections while also preserving voters' safety. On election day in Wisconsin, an estimated 413,000

17   people voted in person. "Experts said a surge [in coronavirus cases] tied to the election would have

18   appeared in statewide data at the end of April, given the incubation period of the coronavirus. But,

19   no surge appeared." The most reliable study of the Wisconsin election found that the rate of new

20   cases of COVID-19 actually *decreased* after the election.

21       124.    Moreover, the Executive Order simply does not acknowledge that California already

22   has a system set up for people to vote by mail. Voters must simply submit an application in order

23   to receive a vote-by-mail ballot. Cal. Elec. Code §§ 3001(a)-(b), 3003. Voters generally have until

24   the seventh day prior to the election to apply for a vote-by-mail ballot, *id.* § 3001(a), which means

25   that for the November 3, 2020 election, voters would have until October 27, 2020.

26       125.    To the extent that Governor Newsom determined the ordinary process of applying

27   for a vote-by-mail ballots would cause people to act in a way that hindered the mitigation of the

28   heath crisis, he could have ordered that vote-by-mail *applications* (not ballots) be sent to all

Complaint for Declaratory and Injunctive Relief

registered voters *without suspending any statute.*

126.    Fourth, § 8571 allows the Governor to suspend state statutes, not the state Constitution. *See Peace Officers*, 77 Cal. Rptr. 3d at 857. Because the California Constitution unambiguously instructs that "[*t]he Legislature* shall prohibit improper practices that affect elections," Cal. Const. Art. II 4, section 8571 should not be read to allow the Governor to suspend election-integrity measures. *See People v. Garcia*, 391 P.3d 1153, 1160 (Cal. 2017) ("[A] statute should not be construed to violate the Constitution if any other possible construction remains available.").

127.    The Legislature cannot give the Governor the power to frustrate its constitutional mandate. Indeed, the Supreme Court has never held "that a state legislature may prescribe regulations on the time, place, and manner of holding federal elections in defiance of provisions of the State's constitution." *Ariz. State Legislature*, 135 S. Ct. at 2673.

128.    In sum, the Elections Clause and the Electors Clause both vest the state Legislature with the power to legislate the manner of elections and the selection of electors; that power cannot be delegated in blanket fashion. But in any event, none of the statutes cited by Executive Order N-64-20 purports to delegate to the Governor the power to legislate. And to the extent that § 8571 grants the Governor power to *suspend* certain statutes, the Executive Order's wholesale rewriting of the state's election code does not fall within its reach.

## VI.    The Fourteenth Amendment to the U.S. Constitution Prohibits Practices that Promote Fraud and Dilute Valid Votes.

129.    According to the Supreme Court, the Fourteenth Amendment of the U.S. Constitution protects the "the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 77 U.S. 533, 554 (1964). "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555 n.29 (quoting *South v. Peters,* 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

130.    Both direct denials and practices that otherwise promote fraud and dilute the

Complaint for Declaratory and Injunctive Relief

effectiveness of individual votes, thus, can violate the Fourteenth Amendment. *See id.* at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

131.    *"Every voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962).

132.    Fraudulent votes "debase[]" and "dilute" the weight of *each* validly cast vote. *See Anderson*, 417 U.S. at 227. When it comes to "'dilut[ing]' the influence of honest votes in an election,'" whether the dilution is "'in greater or less degree is immaterial'"; it is a violation of the Fourteenth Amendment. *Id.* at 226.

133.    The Fourteenth Amendment does not tolerate actions such as those in Executive Order N-64-20 because automatically sending *ballots* (as opposed to applications for ballots) to *all* persons (or rather, to all *names*) registered to vote makes fraud and other forms of illegal voting inevitable.

134.    Ample evidence from Nevada, New Jersey, and other jurisdictions demonstrates that voter fraud—or even inadvertent double voting or non-fraudulent illegal voting—is guaranteed when hundreds of thousands of ballots are indiscriminately distributed, regardless of whether a real, eligible, present, or desiring person exists to receive them.

135.    What has proven true in other jurisdictions will take on new and worse dimensions in California, given its notoriously deficient voting rolls and loose oversight.

136.    When citizens are denied the right to vote in this way, the validity of the electoral process crumbles. Voters lose their constitutional rights. Candidates are injured by invalid election returns. And parties must divert time and resources to educate voters, get out of the vote, and encourage voters not to lose their faith in the system.

**VII.    The Equal Protection Clause of the Fourteenth Amendment Prohibits the Arbitrary and Indiscriminate Treatment of Similarly Situated Voters.**

137.    The Equal Protection Clause of the U.S. Constitution requires States to "'avoid

1  arbitrary and disparate treatment of the members of its electorate.'" *Charfauros v. Bd. of Elections*,

2  249 F.3d 941, 951 (9th Cir. 2001) (quoting *Bush v. Gore*, 531 U.S. 98, 105 (2000)); *see also Dunn*

3  *v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to

4  participate in elections on an equal basis with other citizens in the jurisdiction."); *Gray v. Sanders*,

5  372 U.S. 368, 380 (1963) ("The idea that every voter is equal to every other voter in his State, when

6  he casts his ballot in favor of one of several competing candidates, underlies many of [the Supreme

7  Court's] decisions.").

8         138.    "[T]reating voters differently" thus "violate[s] the Equal Protection Clause" when

9  the disparate treatment is the result of arbitrary, ad hoc processes. *Charfauros*, 249 F.3d at 954.

10  Indeed, a "minimum requirement for nonarbitrary treatment of voters [is] necessary to secure the

11  fundamental right" to vote. *Bush*, 531 U.S. at 105.

12        139.    The use of "standardless" procedures can violate the Equal Protection Clause. *Bush*,

13  531 U.S. at 103. "The problem inheres in the absence of specific standards to ensure … equal

14  application" of even otherwise unobjectionable principles. *Id.* at 106. Any voting system that

15  involves discretion by decisionmakers about how or where voters will vote must be "confined by

16  specific rules designed to ensure uniform treatment." *Id.* at 106.

17        140.    Executive Order N-64-20, by declaring an ongoing discretionary power to determine

18  if and where in-person voting will be available without any neutral criteria for making that

19  determination, fails to establish standards or rules that will ensure uniform treatment.

20        141.    Such unbridled discretion allows the Governor to put polling places in arbitrary

21  locations, locations favorable to his political party, or only in certain localities.

22        142.    This is not a hypothetical concern. In the special election held in California's 25th

23  District earlier this month, the L.A. County Registrar strategically opened a new vote center at the

24  eleventh hour in an area that primarily votes Democratic—without opening any new vote centers

25  in areas that predominately vote Republican. Doling out opportunities and accessibility for voting

26  predicated on party affiliation is a clear violation of the Equal Protection Clause.

27

28

Complaint for Declaratory and Injunctive Relief

# CAUSES OF ACTION

## COUNT I
### Violation of the Elections Clause (42 U.S.C. § 1983)

143.    Plaintiffs incorporate all their prior allegations.

144.    Executive Order N-64-20 changes the time, place, and manner in which Californians will participate in the November 3, 2020 congressional election.

145.    Defendants are not "the Legislature," and therefore have no power under the Elections Clause to determine the time, place, or manner of congressional elections. *See* U.S. Const. art. I, §4.

146.    The State Legislature could not, and did not, delegate to the Governor the power to suspend ballot-integrity laws on the books.

147.    Even on its own terms, § 8571 does not authorize the actions taken in Executive Order N-64-20.

148.    The Executive Order thus violates the Elections Clause of the U.S. Constitution.

149.    Defendants have acted and will continue to act under color of state law to violate the Elections Clause.

150.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing Executive Order N-64-20.

## COUNT II
### Violation of the Electors Clause (42 U.S.C. § 1983)

151.    Plaintiffs incorporate all their prior allegations.

152.    Executive Order N-64-20 changes the manner in which California will appoint electors during the November 3, 2020 presidential election.

153.    Defendants are not "the Legislature," and therefore have no power under the Electors Clause to determine the manner in which Californians will appoint electors. *See* U.S. Const. art. II, §1.

154.    The State Legislature could not, and did not, delegate to the Governor the power to suspend ballot-integrity laws on the books.

155.     Even on its own terms, § 8571 does not authorize the actions taken in Executive Order N-64-20.

156.     The Executive Order thus violates the Electors Clause of the U.S. Constitution.

157.     Defendants have acted and will continue to act under color of state law to violate the Electors Clause.

158.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing Executive Order N-64-20.

**COUNT III**
**Violation of the Right to Vote (42 U.S.C. § 1983)**

159.     Plaintiffs incorporate all their prior allegations.

160.     Executive Order N-64-20, which upends validly enacted election law and requires automatic mailing of ballots to all registered voters—especially given California's rampant invalid voter registration and ineffective safeguards—makes voter fraud and other ineligible voting inevitable.

161.     Dilution of honest votes, to any degree, by the casting of fraudulent or illegitimate votes violates the right to vote. *Reynolds*, 377 U.S. at 555; *Anderson*, 417 U.S. at 226-27; *Baker*, 369 U.S. at 208.

162.     Defendants' new, unauthorized voting system facilitates fraud and other illegitimate voting practices, and therefore violates the Fourteenth Amendment to the U.S. Constitution.

163.     Defendants have acted and will continue to act under color of state law to violate the Fourteenth Amendment.

164.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing Executive Order N-64-20.

**COUNT IV**
**Violation of the Equal Protection Clause (42 U.S.C. § 1983)**

165.     Plaintiffs incorporate all their prior allegations.

Complaint for Declaratory and Injunctive Relief

166.     The Equal Protection Clause imposes a "minimum requirement for nonarbitrary treatment of voters" and forbids voting systems and practices that distribute election resources in "standardless" fashion, without "specific rules designed to ensure uniform treatment." *Bush*, 531 U.S. at 105-06; *Brunner*, 548 F.3d at 477-78.

167.     Executive Order N-64-20 reserves for Defendants the discretion to determine "the extent to which in-person voting opportunities are made available in connection with the November 3, 2020 General Election." There are no standards or rules to ensure uniform treatment.

168.     Executive Order N-64-20 thus violates the Equal Protection Clause.

169.     Defendants have acted and will continue to act under color of state law to violate the Equal Protection Clause of the Fourteenth Amendment.

170.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing Executive Order N-64-20.

**WHEREFORE,** Plaintiffs ask this Court to enter judgment in their favor and provide the following relief:

a.  A declaratory judgment that Executive Order N-64-20 violates the Elections Clause, the Electors Clause, and the Fourteenth Amendment.

b.  A permanent injunction prohibiting Defendants from implementing and enforcing Executive Order N-64-20;

c.  A temporary restraining order and preliminary injunction granting the relief specified above during the pendency of this action;

d.  Plaintiffs' reasonable costs and expenses, including attorneys' fees; and

e.  All other preliminary and permanent relief that Plaintiffs are entitled to, and that the Court deems just and proper.

Dated: May 24, 2020                                    Respectfully submitted,

Complaint for Declaratory and Injunctive Relief

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

 _/s/ Bryan K. Weir_
Bryan K. Weir (SBN: 310964)
Thomas R. McCarthy*
Tyler R. Green*
Cameron T. Norris*
Alexa R. Baltes*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423

Harmeet K. Dhillon (SBN: 207873)
Mark P. Meuser (SBN: 231335)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
 (415) 433-1700
 (415) 520-6593 (fax)

*Application for admission
 pro hac vice forthcoming

27

Complaint for Declaratory and Injunctive Relief