Bryan K. Weir (SBN: 310964)
Tyler R. Green*
Cameron T. Norris*
Alexa R. Baltes*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423

Harmeet K. Dhillon (SBN: 207873)
Mark P. Meuser (SBN: 231335)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
(415) 433-1700
(415) 520-6593 (fax)

*Admitted pro hac vice

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE; and CALIFORNIA REPUBLICAN PARTY, <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, in his official capacity as Governor of California; and ALEX PADILLA, in his official capacity as California Secretary of State, <br><br> Defendants. | No.  2:20-cv-01055-MCE-CKD <br><br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 1

    A.   California's laws regarding vote by mail ........................................................... 1

    B.   COVID-19, California's response and recovery, and Executive Order N-64-20 ............ 2

    C.   The perils of hastily moving to vote by mail without the necessary safeguards ............. 3

LEGAL STANDARD ....................................................................................................... 9

ARGUMENT ................................................................................................................... 10

I.    Plaintiffs are Likely to Succeed on the Merits Because Executive Order N-64-20 violates the Elections Clause and the Electors Clause. ............................................... 10

    A.   The Elections and Electors Clauses reserve for state legislatures the power to regulate elections. ............................................................................................... 10

    B.   Even if the California Legislature could delegate the constitutional power to regulate elections, it has not done so. ........................................................................ 11

    C.   To the extent that § 8571 grants the Governor some limited power to suspend procedures, Executive Order N-64-20 far exceeds that authorization. ........................... 12

II.    The Remaining Preliminary Injunction Factors Favor the Plaintiffs. ...................... 15

CONCLUSION ................................................................................................................ 17

# TABLE OF AUTHORITIES

Cases

*Am. Beverage Ass'n v. City & Cty. of San Francisco,*
916 F.3d 749 (9th Cir. 2019) .................................................................................................16

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
135 S. Ct. 2652 (2015)...........................................................................................................10

*Burdick v. Takushi,*
504 U.S. 428 (1992) ...............................................................................................................16

*Calif. Corr. Peace Officers Ass'n v. Schwarzenegger,*
163 Cal.App.4th 802 (2008)..........................................................................................13, 15

*City of Morgan Hill v. Bay Area Air Quality Management Dist.,*
118 Cal.App.4th 861 (2004) ..................................................................................................13

*Com. v. CSX Trans., Inc.,*
639 A.2d 1213 (Pa. Super. Ct. 1994).....................................................................................12

*Crawford v. Marion Cty. Election Bd.,*
553 U.S. 181 (2008) ...........................................................................................................4, 16

*Elrod v. Burns,*
427 U.S. 347 (1976) ...............................................................................................................16

*Eu v. San Francisco Cty. Democratic Cent. Comm.,*
489 U.S. 214 (1989) ...............................................................................................................17

*Fascination, Inc. v. Hoover,*
39 Cal.2d 260 (1952) .............................................................................................................12

*Fish v. Kobach,*
840 F.3d 710 (10th Cir. 2016) ..............................................................................................16

*Griffin v. Roupas,*
385 F.3d 1128 (7th Cir. 2004) ...........................................................................................4, 16

*Hendricks v. Hanigan,*
2002 WL 397648 (Cal. Ct. App. Mar. 14, 2002) ............................................................12, 13

*Lair v. Bullock,*
697 F.3d 1200 (9th Cir. 2012) ..............................................................................................15

*Lukens v. Nye,*
156 Cal. 498 (1909) ...............................................................................................................11

*Martin v. Mun. Court,*
148 Cal.App.3d 693 (1983) ...................................................................................................13

*Macias v. California,*
  10 Cal.4th 844 (1995) ............................................................................................................12

*Melendres v. Arpaio,*
  695 F.3d 990 (9th Cir. 2012) ................................................................................................16

*Miracle v. Hobbs,*
  2020 WL 2097280 (9th Cir. May 1, 2020) ...........................................................................17

*Motor Transit Co. v. R.R. Comm'n of Cal.,*
  189 Cal. 573 (1922) ..............................................................................................................12

*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co.,*
  36 Cal.4th 412 (2005) ...........................................................................................................12

*People v. Garcia,*
  2 Cal.5th 792 (2017) .............................................................................................................15

*People v. Simon,*
  9 Cal. 4th 493, 519 (1995) ....................................................................................................12

*Project Vote v. Blackwell,*
  455 F. Supp.2d 694 (N.D. Ohio 2006) ..................................................................................15

*Purcell v. Gonzalez,*
  549 U.S. 1 (2006) ............................................................................................................15, 17

*Reynolds v. Sims,*
  377 U.S. 533 (1964) ..............................................................................................................16

*Rosenblatt v. Cal. State Bd. of Pharmacy,*
  69 Cal.App.2d 69 (1945) .......................................................................................................12

*Short v. Brown,*
  893 F.3d 671 (9th Cir. 2018) ...............................................................................................2, 9

*Smiley v. Holm,*
  285 U.S. 355 (1932) ...................................................................................................10, 11, 16

*Texas Democratic Party v. Abbott,*
  No. 20-50407, Slip Op. (5th Cir. June 4, 2020) .....................................................................4

*Valle del Sol, Inc. v. Whiting,*
  732 F.3d 1006 (9th Cir. 2013) ..............................................................................................16

*Verreos v. City & Cty. of San Francisco,*
  63 Cal.App.3d 86 (1976) .......................................................................................................14

*Williams v. Kapilow & Son, Inc.,*
  105 Cal.App.3d 156 (1980) ...................................................................................................12

Statutes

52 U.S.C. § 21083(a)(1)(A) ...................................................................................................7

Cal. Elec. Code § 3001 ...................................................................................................1, 15

Cal. Elec. Code § 3003 .......................................................................................................15

Cal. Elec. Code § 3005(a). .................................................................................................1

Cal. Elec. Code § 3007.5 ....................................................................................................1

Cal. Elec. Code § 3007.8 ....................................................................................................1

Cal. Elec. Code § 3009(a) ..................................................................................................1

Cal. Elec. Code § 4005 ...................................................................................................1, 15

Cal. Elec. Code § 4007 ...................................................................................................1, 15

Cal. Gov't Code § 8567 ..................................................................................................3, 11

Cal. Gov't Code § 8571 ...............................................................................................passim

Cal. Gov't Code § 8627 ..................................................................................................3, 11

Cal. Gov't Code § 8558(b) .................................................................................................13

Colo. Rev. Stat. § 1-7.5-107(3)(a)(I) ..................................................................................6

Conn. Gen. Stat. § 9-140b(a) .............................................................................................5

Ga. Code Ann. § 21-2-385(a) .............................................................................................5

Haw. Rev. Stat. § 11-102(b) ..............................................................................................6

Ind. Code § 3-14-2-16(4) ...................................................................................................5

Mo. Rev. Stat. § 115.291 ...................................................................................................5

N.M. Stat. Ann. § 1-6-10.1 ................................................................................................5

Nev. Rev. Stat. Ann. § 293.330 .........................................................................................5

Ohio Rev. Code Ann. § 3509.05(A) ...................................................................................5

Okla. Stat. tit. 26, § 14-108 ...............................................................................................5

Ore. Rev. Stat. § 254.470 ...................................................................................................6

Rev. Code of Wash. § 29A.40.010 .....................................................................................6

Tex. Elec. Code Ann. § 86.006(a).......................................................................................5

Utah Code § 20A-3a-202(2)(b)(i) ..................................................................................6

Other Authorities

63 Cal. Op. Att'y Gen. 583 (1980) ...........................................................................11

Alix Martichoux, *Phase 3: Gov. Newsom Teases Next Stage
    of Reopening California Businesses Is Closer Than We Thought*,
    ABC7 (May 8, 2020), bit.ly/3gAGjeF .................................................................2

Angie Crouch, *LA County School Reopening Plan
    Includes Wearing Face Masks at All Times*,
    NBC (May 27, 2020), bit.ly/3ddZ99n ..................................................................3

Brian Anderson, *Deleted Texts and 'Show Stopper Defects':
    California Tech Official Raced to Launch Motor Voter*,
    Sacramento Bee (May 8, 2019), bit.ly/3gNgNTD.................................................7

Brian Anderson, *Six Californians Who Shouldn't Have Been
    Registered Voted Last Year Due to 'DMV Errors'*,
    Sacramento Bee (Aug. 9, 2019), bit.ly/3eHCy5f .................................................9

*Building Confidence in U.S. Elections*,
    bit.ly/3dXH7rU (*Carter-Baker Report*)................................................................4

*California and Los Angeles County to Remove 1.5 Million Inactive
    Voters from Voter Rolls – Settle Judicial Watch Federal Lawsuit*,
    Judicial Watch (Jan. 3, 2019), bit.ly/2WOrmxW ................................................8

*California DMV Says 1,500 Registered to Vote in Error*,
    CBS Sacramento (Oct. 8, 2018), cbsloc.al/2ApM52h...........................................7

Complaint, *Judicial Watch, Inc. v. Logan*,
    No. 17-8948, Doc. 1 (C.D. Cal. Dec. 13, 2017) ..................................................8

David Wildstein, *Source: Law Enforcement Probing Paterson VBM Ballots*,
    New Jersey Globe (May 11, 2020), bit.ly/2TmegWo ..........................................7

Election Integrity Project California, bit.ly/2zCZ2G0...................................................8

*Eric Holder: Here's How the Coronavirus Crisis
    Should Change U.S. Elections—For Good*,
    TIME (Apr. 14, 2020), bit.ly/3eAiW2W ..............................................................4

Executive Order N-33-20 (Mar. 19, 2020), bit.ly/3cjOBEe .........................................2

Executive Order N-64-20 (May 8, 2020), bit.ly/2ZQ81ht........................................2, 3

Executive Order N-67-20 (June 3, 2020), bit.ly/2XX8rA9 .....................................3, 14

Gavin Newsom, Twitter (May 25, 2020), bit.ly/2XeOl5k............................................3

Gavin Newsom, Twitter (May 26, 2020), bit.ly/2A14ulU ............................................................3

*Inaccurate, Costly, and Inefficient*,
   The Pew Center on the States (2012), bit.ly/3g3SdgT ...................................................5

John Myers et al., *Newsom Eases Reopening Rules,*
   *Allowing More Counties to Restart Their Economies*,
   LA Times (May 18, 2020), lat.ms/2TW7lDs ...............................................................3

John Myers, *All of California's Voters Are Now in One Online Database*,
   LA Times (Mar. 1, 2016), lat.ms/2XivEh1 ...................................................................7

John Myers, *Nearly 84,000 Duplicate Voter Records Found*
   *in Audit of California's 'Motor-Voter' System*,
   LA Times (Aug. 9, 2019), lat.ms/3cqEZbb ...................................................................7

Jon Passantino, *California Reopening Begins Friday:*
   *Here's What You Need to Know*,
   CNN (May 8, 2020), cnn.it/2yLQqMz ........................................................................2

Jonathan Dienst, *Close Results in Paterson Vote Plagued By Fraud Claims;*
   *Over 3K Ballots Seemingly Set Aside*,
   NBC (May 21, 2020), bit.ly/3dp3whW ........................................................................6

Kate Cimini, *California Man Who Registered Dogs,*
   *Dead Father to Vote, Sentenced to Probation*,
   The Californian (Aug. 16, 2019), bit.ly/36eb2tl ..........................................................8

Katy Grimes, *California Election Integrity in Jeopardy*
   *with Vote-by-Mail Ballots to Every Voter*,
   California Globe (Mar. 16, 2020), bit.ly/3g3IlUm ......................................................8

Letter from Constituent Affairs for Secretary of State Alex Padilla
   (Apr. 7, 2020), bit.ly/3eN2fSj.........................................................................................9

Lisa Lerer, *Washington: Where Everyone Votes By Mail*,
   NY Times (Apr. 15, 2020), nyti.ms/2ZRfmNZ........................................................5, 6

*Local Governments Are Deciders for Counties*
   *Moving Further in Phase 3 of Reopening, Newsom Says*,
   ABC (May 29, 2020), abc30.tv/2XLg8t5 ...................................................................3

Madlin Mekelburg, *Fact Check: Did Wisconsin See Spike*
   *in Coronavirus After Election?*,
   Statesman (May 17, 2020), bit.ly/2MeBKsn ............................................................14

*Mail-In Ballot Fraud Is More Than an Embarrassment for Paterson;*
   *It's a Roadblock to Problem Solving*,
   Insider NJ (May 14, 2020), bit.ly/3bLaXOV ..........................................................6, 7

*Man Pleads Guilty to Voter Fraud Scheme on Skid Row*,
   District Attorney Los Angeles County (Feb. 19, 2020), bit.ly/3dwxiBD .................8

Marc E. Elias, Twitter (May 3, 2020), bit.ly/2XiI74A ............................................................4

Michael T. Morley, *Election Emergency Redlines*, bit.ly/3e59PY1 ..................................4, 5, 6, 9

Notice of Final Settlement, *Judicial Watch, Inc. v. Logan*,
  No. 17-8948, Doc. 96-1 (C.D. Cal. Jan. 3, 2019), at Ex. A ........................................8

*NVRA Notices 2019 California*,
  Letter Re: Orange County, (Dec. 12, 2019), bit.ly/3e4aKaY ......................................8

*NVRA Notices 2019 California*,
  Letter Re: San Diego County, (Nov. 15, 2019), bit.ly/3e4aKaY .................................8

*Pacific Grove, Calif. Man Registers Dog to Vote*,
  KSBW8 (Aug. 26, 2013), bit.ly/3e7sBht..........................................................9

Proclamation of a State of Emergency (Mar. 4, 2020), bit.ly/36OySMn ...................................2

Rory Appleton, *Primary Underway, But Argument
  Over Mail-In Election Continues*,
  Las Vegas Review-Journal (May 19, 2020), bit.ly/2z3DHVV .....................................6

*Susan Crabtree, Amid Covid Mail-In Push,
  CA Officials Mum on Ballot Harvesting*,
  Real Clear Politics (Apr. 24, 2020), bit.ly/3gDIONb..............................................9

*Update on California's Pandemic Roadmap*
  (Apr. 28, 2020), bit.ly/3eLohov..................................................................2

*Voting Integrity in California*, A Report of the California Advisory Committee
  to the United States Commission on Civil Rights,
  (June 2017), bit.ly/2XIIqLX .....................................................................7


Constitutional Provisions

Cal. Cons. art. V, § 1 ................................................................................10

Cal. Const. art. II, § 4 ...........................................................................11, 15

Cal. Const. art. III, § 3 ............................................................................10

Cal. Const. art. IV, § 1 .............................................................................10

U.S. Const. art. I, § 4, cl. 1 .......................................................................10

U.S. Const. art. II, § 1, cl. 2 ......................................................................10

1

**INTRODUCTION**

2     As California recovers from the COVID-19 pandemic, Governor Newsom has decided to

3 use the virus as an opportunity to rewrite California's election laws—for an election that is still five

4 months away. If that sounds like an illegal power grab, it is. Executive Order N-64-20 usurps the

5 Legislature's authority over California elections to the detriment of California voters and the

6 integrity of the November election. The Order violates the U.S. Constitution and should be

7 preliminarily enjoined**.**

8

**BACKGROUND**

9     **A.     California's laws regarding vote by mail**

10     As a general matter, the California Legislature—vested by both the U.S. Constitution and

11 the California Constitution with the power to regulate elections—has chosen *not* to conduct all-mail

12 elections, except in limited circumstances. It likewise has chosen *not* to automatically send vote-by-

13 mail ballots to all persons who are registered to vote. California law contains two sets of provisions

14 governing mail-based voting.

15     The first set, California Election Code §§ 3000-26, allows voters to cast vote-by-mail ballots

16 as an alternative to in-person voting in any election. Importantly, except in very small precincts, a

17 voter who wants to receive a vote-by-mail ballot must submit an application. *Id.* § 3001; *id.*

18 § 3005(a). The application may be submitted in written form, *id.* § 3001, or electronically through a

19 website, *id.* § 3007.5. And local election officials may accept applications for vote-by-mail ballots

20 by phone. *Id.* § 3007.8. The application protects the integrity of the vote-by-mail process by

21 verifying the voter's identity and ensuring that the voter who requests the ballot ultimately receives

22 it. The application also asks, as an added measure of security, for the applicant's date of birth. Before

23 sending a vote-by-mail ballot to a voter, officials must confirm that the information and signature

24 (for written requests) on the application matches the information in the voter's registration file. *Id.*

25 § 3009(a).

26     The second set of provisions governs elections conducted "wholly by mail." *Id.* §§ 4000-07.

27 Counties may hold all-mail elections if they affirmatively opt-in and comply with various procedural

28 safeguards. *Id.* §§ 4005, 4007. These safeguards ensure that participating counties can handle the

1  administrative complexities of all-mail elections and also deter fraud and abuse. *See Short v. Brown*,

2  893 F.3d 671, 679 (9th Cir. 2018) (explaining that the legislature did not "foist[] a new system on

3  all fifty-eight counties" to "'reduce election- and campaign-related disorder'"). Thus, while county-

4  by-county mail-in elections are available, they are not the default and are only conducted in limited

5  circumstances after careful consideration by local election officials.

6      **B.**    **COVID-19, California's response and recovery, and Executive Order N-64-20**

7      On March 4, 2020, Governor Newsom proclaimed a state of emergency in California due to

8  COVID-19, and on March 19, he ordered all non-essential Californians to "stay at home."

9  Proclamation of a State of Emergency, bit.ly/36OySMn; Executive Order N-33-20, bit.ly/3cjOBEe.

10  On April 28, the Governor presented a four-phase plan to reopen California and noted that the state

11  was currently in Phase 1. *Update on California's Pandemic Roadmap*, bit.ly/3eLohov. Phase 2

12  would involve the reopening of schools, childcare facilities, and some workplaces—including retail

13  businesses, manufacturing, and offices—with adaptations. *Id.* Phase 3 would involve the reopening

14  of "higher risk environments"—such as hair and nail salons, gyms, movie theaters, sports, and in-

15  person religious services—with adaptations and size limits. *Id.* Phase 4 would include the reopening

16  of all other businesses. *Id.*

17      On May 8, Governor Newsom began moving the state to Phase 2. Jon Passantino, *California*

18  *Reopening Begins Friday: Here's What You Need to Know*, CNN (May 8, 2020), cnn.it/2yLQqMz.

19  Dr. Mark Ghaly, California Secretary of Health and Human Services, supported that decision. *Id.* In

20  his daily press conference on May 8, Governor Newsom emphasized that Phase 3 "may not even be

21  more than a month away." Alix Martichoux, *Phase 3: Gov. Newsom Teases Next Stage of Reopening*

22  *California Businesses Is Closer Than We Thought*, ABC7 (May 8, 2020), bit.ly/3gAGjeF.

23      Nevertheless, on the same day that California boasted such progress and achievement,

24  Governor Newsom issued Executive Order N-64-20—the subject of this lawsuit. The Order relies

25  on the *current* state of emergency to rewrite California's election laws for the *November* 3, 2020

26  election. *See* Executive Order N-64-20 (May 8, 2020), bit.ly/2ZQ81ht. The Order demands the

27  *automatic* distribution of vote-by-mail ballots for the November 3, 2020 general election to "*every*

28  Californian who is eligible to vote"—which, read literally, includes active and inactive voters alike.

*Id.* (emphasis added). The Order acknowledges that it conflicts with the state's validly enacted election laws, but pointing to California Government Code §§ 8567, 8571, and 8627 as authority, Governor Newsom issued the Order "notwithstanding any [state-law] limitation on the distribution of vote-by-mail ballots." *Id.* In addition, Executive Order N-64-20 claims for Governor Newsom the discretionary power to decide whether and how in-person voting will be available for the November election and "how other details of the November election will be implemented." *Id.*[1]

California's recovery from COVID-19 continues apace. On May 18, Governor Newsom stated at a news conference that Phase 3 was just around the corner. He explained that professional sports, hair salons, and churches could open as early as the first week of June. John Myers et al., *Newsom Eases Reopening Rules, Allowing More Counties to Restart Their Economies*, LA Times (May 18, 2020), lat.ms/2TW7lDs. Beating his own expectations, Governor Newsom tweeted on May 25 that "[c]ounties can now begin reopening houses of worship and in-store shopping for retail." Gavin Newsom, Twitter (May 25, 2020), bit.ly/2XeOl5k. And on May 26, he tweeted that "[s]tarting today, many counties across California can choose to reopen hair salons and barbershops—with serious modifications in place." Gavin Newsom, Twitter (May 26, 2020), bit.ly/2A14ulU. County and local officials—who are tasked with reopening under Phase 3, *see Local Governments Are Deciders for Counties Moving Further in Phase 3 of Reopening, Newsom Says*, ABC (May 29, 2020), abc30.tv/2XLg8t5—are likewise seeing major progress. For example, schools in Los Angeles County are expected to reopen this fall. *See* Angie Crouch, *LA County School Reopening Plan Includes Wearing Face Masks at All Times*, NBC (May 27, 2020), bit.ly/3ddZ99n.

**C.    The perils of hastily moving to vote by mail without the necessary safeguards**

Executive Order N-64-20 is part of a broader push to advance the electoral prospects of the Governor's political party. Indeed, in reaction to COVID-19, much of the push toward all-mail voting has been driven by litigation initiated by the Democratic Party. The Democratic National

---

[1] On June 3, in response to this litigation, Governor Newsom issued another Executive Order. *See* Executive Order N-67-20, bit.ly/2XX8rA9. In it, he promises that ballots will not be sent to inactive voters. *Id.* § 1. He also provides some guidance for establishing in-person polling locations. *Id.* § 3. The second executive order does not, however, explain how the Governor has the power to unilaterally rewrite the State's election laws.

1    Committee, state Democratic parties, and several affiliated groups have filed lawsuits across the

2    country to force a hurried transition to no-excuse mail-in voting and to remove existing safeguards.

3    Democrats pushed for these changes long before COVID-19. Unable to persuade legislatures,

4    Democrats turned to the courts (or, in this instance, to the executive branch). *See, e.g.*, *Eric Holder:*

5    *Here's How the Coronavirus Crisis Should Change U.S. Elections—For Good*, TIME (Apr. 14,

6    2020), bit.ly/3eAiW2W ("Coronavirus gives us *an opportunity* to revamp our electoral system …."

7    (emphasis added)). According to the Democrats' top lawyer, "If [these lawsuits] gain 1 percent of

8    the vote [for Democrats], that would be among the most successful tactics that a campaign could

9    engage in." Marc E. Elias, Twitter (May 3, 2020), bit.ly/2XiI74A.

10        But COVID-19 is no basis to throw out longstanding safeguards that protect the integrity of

11   elections. In fact, it makes those safeguards *more* important. "As Justice Stevens noted, 'the risk of

12   voter fraud' is 'real.'" *Texas Democratic Party v. Abbott*, No. 20-50407, Slip Op. at 36 (5th Cir.

13   June 4, 2020) (Ho, J., concurring) (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181,

14   196 (2008) (plurality op. of Stevens, J.)). It is widely agreed that voting by mail is "the largest source

15   of potential voter fraud." *Building Confidence in U.S. Elections* 46, bit.ly/3dXH7rU (*Carter-Baker*

16   *Report*); *see also Texas Democratic Party*, Slip Op. at 36 (Ho, J. concurring) ("[C]ourts have

17   repeatedly found that mail-in ballots are particularly susceptible to fraud."). Well-regarded,

18   bipartisan commissions and groups agree that "when election fraud occurs, it usually arises from

19   absentee ballots." Michael T. Morley, *Election Emergency Redlines* 2, bit.ly/3e59PY1 (Morley,

20   *Redlines*).[2] Such fraud is easier to conduct and harder to detect. Ballots are sometimes "mailed to

21   the wrong address or to large residential buildings" and "might get intercepted." *Carter-Baker*

22   *Report* 46. Absentee voters "who vote at home, at nursing homes, at the workplace, or in church are

23   more susceptible to pressure, overt and subtle, or to intimidation." *Id.* And "[v]ote buying schemes

24   are far more difficult to detect when citizens vote by mail." *Id.* After all, voting by mail "is to voting

25   in person as a take-home exam is to a proctored one." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th

26   Cir. 2004).

27   _____

28       [2] The terms "absentee" and "by-mail" are used interchangeably for purposes of this
     memorandum.

This risk of abuse is magnified by the fact that "many states' voter registration databases are outdated or inaccurate," Morley, *Redlines* 2—a problem with which California is all too familiar, *see infra* 7-9. A 2012 study from the Pew Center on the States found that "[a]pproximately 24 million—one of every eight—voter registrations in the United States are no longer valid or are significantly inaccurate"; "[m]ore than 1.8 million deceased individuals are listed as voters"; and "[a]pproximately 2.75 million people have registrations in more than one state." *Inaccurate, Costly, and Inefficient*, The Pew Center on the States, at 1, bit.ly/3g3SdgT. These inaccuracies result from bureaucratic failures, intentional fraud, and inadvertent mistakes.

Because of these widespread inaccuracies, a state that sends ballots to all registered voters will necessarily send ballots to persons with fake registrations, invalid registrations, or outdated registrations. Placing large numbers of ballots "outside of both election officials' control and the hands of voters who are supposed to be casting them raises a serious threat to both the actual and perceived integrity of the electoral system." Morley, *Redlines* 3. That threat is compounded by the practice of ballot harvesting—coordinated efforts to have third parties collect absentee ballots from voters and drop them off. "Ballot harvesting gives third parties who may be completely unknown to both the voter and election officials the opportunity to potentially tamper with absentee ballots" in a number of ways. *Id.* at 5. "Harvesters may pressure voters into giving them blank ballots or casting their votes a certain way," or, "[w]hen a voter has voted for the 'wrong' candidate, the harvester may surreptitiously change the vote, include additional votes to void the ballot, or simply dispose of the ballot rather than returning it." *Id.*

These risks explain why, in most states, by-mail voting is a limited alternative to in-person voting and supported by numerous safeguards. *See, e.g.*, Ind. Code § 3-14-2-16(4); Conn. Gen. Stat. § 9-140b(a); N.M. Stat. Ann. § 1-6-10.1; Ga. Code Ann. § 21-2-385(a); Mo. Rev. Stat. § 115.291; Nev. Rev. Stat. Ann. § 293.330; Okla. Stat. tit. 26, § 14-108; Ohio Rev. Code Ann. § 3509.05(A); Tex. Elec. Code Ann. § 86.006(a). And the few states that routinely conduct all-mail elections did not "just flip a switch." *See* Lisa Lerer, *Washington: Where Everyone Votes By Mail*, NY Times (Apr. 15, 2020), nyti.ms/2ZRfmNZ. The transition to all-mail elections requires entirely new systems to track and count ballots, new equipment, and massive training and voter-education efforts.

Washington, for example, planted the seeds for broad by-mail voting more than a decade before a five-year transition to 100% mail-in voting. *See id*. Moreover, *every* state that conducts by-mail elections limits automatic mailing of ballots only to *active* registered voters. *See, e.g.*, Utah Code § 20A-3a-202(2)(b)(i); Rev. Code of Wash. § 29A.40.010; Ore. Rev. Stat. § 254.470; Colo. Rev. Stat. § 1-7.5-107(3)(a)(I); Haw. Rev. Stat. § 11-102(b). These precautions reflect sensible concerns that "automatically mailing out millions of ballots to addresses where voters may not be located will lead to millions of unaccounted-for ballots, facilitates ballot theft, and can lead to inadvertent or intentional double voting." Morley, *Redlines* 3.

These concerns have materialized in jurisdictions that made hasty switches to mail-in voting for their Spring 2020 elections. For example, after caving to litigation filed by the Democratic Party, Clark County, Nevada is currently administering the state's first ever all-mail primary. Within the first week of voting, there were reports of ballots being mailed to the deceased and photographic evidence of piles of ballots "tossed in trash cans and littering apartment mailbox areas." Rory Appleton, *Primary Underway, But Argument Over Mail-In Election Continues*, Las Vegas Review-Journal (May 19, 2020), bit.ly/2z3DHVV. A postal worker reported an "influx of absentee ballots"—as many as 100 in a single day—that were "no good," often because they had been sent to recipients who had moved or died. *Id.* She reported "thousands [of ballots] sitting in crates with no additional safeguards and marked to be sent back to the county." *Id.*

Paterson, New Jersey experienced similar problems in its May 12 election for City Council—the "first election in state history that was contested only by mail-in voting." *Mail-In Ballot Fraud Is More Than an Embarrassment for Paterson; It's a Roadblock to Problem Solving*, Insider NJ (May 14, 2020), bit.ly/3bLaXOV (*Mail-In Ballot Fraud*). Amidst suspicion of illegal tactics, including ballot harvesting, *id.*, thousands of ballots—nearly one in five—were disqualified, *see* Jonathan Dienst, *Close Results in Paterson Vote Plagued By Fraud Claims; Over 3K Ballots Seemingly Set Aside*, NBC (May 21, 2020), bit.ly/3dp3whW. Election law professor Rick Hasen concluded that "[t]here is a genuine absentee ballot fraud scandal going on in Paterson." *Id.* Indeed, hundreds of ballots were found together in *single* mailboxes—in one case 366 ballots were picked up from the same mailbox. David Wildstein*, Source: Law Enforcement Probing Paterson VBM*

1  *Ballots*, New Jersey Globe (May 11, 2020), bit.ly/2TmegWo. In addition, many people's "votes

2  were paid for" and others "had no idea that they voted or who they voted for because someone filled

3  out a mail-in ballot for them." *Mail-In Ballot Fraud*.

4        If Executive Order N-64-20 is not enjoined, these problems will infect California's

5  November election. California has had notorious and persistent problems with its voter rolls, starting

6  with an abysmal record of failing to comply with federal requirements to create and maintain a

7  "centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A).

8  This requirement of the Help America Vote Act (HAVA) was passed in reaction to the 2000 election,

9  but California failed to comply until 2016, becoming the last state to do so. *See* John Myers, *All of*

10  *California's Voters Are Now in One Online Database*, LA Times (Mar. 1, 2016), lat.ms/2XivEh1;

11  *Voting Integrity in California*, A Report of the California Advisory Committee to the United States

12  Commission on Civil Rights, 3 (June 2017), bit.ly/2XlIqLX. But, in California, an online database

13  has done little to ensure accurate, up-to-date voter rolls.

14        In April 2018, California began automatically registering voters through a new motor-voter

15  program, but it soon became clear that large numbers of noncitizens were being registered to vote.

16  *See California DMV Says 1,500 Registered to Vote in Error*, CBS Sacramento (Oct. 8, 2018),

17  cbsloc.al/2ApM52h. An independent audit found that the State's initially well-intentioned attempts

18  to make registration easier resulted in nearly 84,000 duplicate voter records and more than twice

19  that number with political party mistakes—mistakes that California Secretary of State Alex Padilla

20  acknowledged "threatened to undermine public confidence in the program." John Myers, *Nearly*

21  *84,000 Duplicate Voter Records Found in Audit of California's 'Motor-Voter' System*, LA Times

22  (Aug. 9, 2019), lat.ms/3cqEZbb. These errors stemmed at least in part from Defendant Padilla's

23  decision to rush implementation of the motor-voter program in order to increase voter turnout at an

24  upcoming election. *See* Brian Anderson, *Deleted Texts and 'Show Stopper Defects': California Tech*

25  *Official Raced to Launch Motor Voter*, Sacramento Bee (May 8, 2019), bit.ly/3gNgNTD ("Secretary

26  of State Alex Padilla wanted to move faster. He pushed for Motor Voter to be rolled out ahead of

27  the June primaries to boost turnout for a high-interest midterm election.").

28        Just in the last year, the State and L.A. County were forced to settle a lawsuit after Judicial

1   Watch exposed that L.A. County had on its voter rolls more than 1.5 million potentially ineligible

2   voters. In other words, "more than one out of every five LA County registrations likely belong[ed]

3   to a voter who has moved or is deceased." *California and Los Angeles County to Remove 1.5 Million*

4   *Inactive Voters from Voter Rolls – Settle Judicial Watch Federal Lawsuit*, Judicial Watch (Jan. 3,

5   2019), bit.ly/2WOrmxW; *see also* Notice of Final Settlement, *Judicial Watch, Inc. v. Logan*, No.

6   17-8948, Doc. 96-1 (C.D. Cal. Jan. 3, 2019), at Ex. A. That lawsuit uncovered that neither California

7   nor L.A. County had been removing inactive voters from the voter rolls for the past 20 years. *Id.*

8   Relying on data from an independent federal agency, Judicial Watch found that L.A. County had a

9   registration rate of 112% of its adult citizen population and that the entire state of California had a

10  registration rate of about 101%. *See* Complaint, *Judicial Watch, Inc. v. Logan*, No. 17-8948, Doc. 1

11  at 7 (C.D. Cal. Dec. 13, 2017).

12      The settlement did not solve the problem. As recently as November and December 2019,

13  Judicial Watch brought to light obvious and widespread errors in the voting records across

14  California. *See e.g.*, *NVRA Notices 2019 California*, Letter Re: San Diego County, 2 (Nov. 15, 2019),

15  bit.ly/3e4aKaY (San Diego County has a registration rate of 117%); Letter Re: Orange County, 3

16  (Dec. 12, 2019) (Orange County has not removed voter registrations in two years, maintains 380,000

17  inactive voter registrations on the rolls, and has an unusually high registration rate of 96%). And

18  most recently, the Election Integrity Project of California reported that, as of February 18, 2020, 13

19  California counties (representing roughly 46% of the state's total population) have more registered

20  voters than eligible citizens. *See* Katy Grimes, *California Election Integrity in Jeopardy with Vote-*

21  *by-Mail Ballots to Every Voter*, California Globe (Mar. 16, 2020), bit.ly/3g3IlUm; *see also* Election

22  Integrity Project California, bit.ly/2zCZ2G0.

23      In addition to neglect and inadvertence, California has failed to prevent intentional,

24  fraudulent expansion of voter rolls. Registration-buying schemes spanning multiple election cycles

25  and registrations of fictious, non-human voters are just the tip of the iceberg. *See Man Pleads Guilty*

26  *to Voter Fraud Scheme on Skid Row*, District Attorney Los Angeles County (Feb. 19, 2020),

27  bit.ly/3dwxiBD; Kate Cimini, *California Man Who Registered Dogs, Dead Father to Vote,*

28  *Sentenced to Probation*, The Californian (Aug. 16, 2019), bit.ly/36eb2tl; *Pacific Grove, Calif. Man*

*Registers Dog to Vote*, KSBW8 (Aug. 26, 2013), bit.ly/3e7sBht. The Secretary of State's office recently admitted that, no doubt due to California's poor voting records, several voters likely cast two ballots in the 2020 primary. *See* Letter from Constituent Affairs for Secretary of State Alex Padilla (Apr. 7, 2020), bit.ly/3eN2fSj. Illegitimate voting is a recurring problem, as Defendant Padilla has acknowledged. *See* Brian Anderson, *Six Californians Who Shouldn't Have Been Registered Voted Last Year Due to 'DMV Errors'*, Sacramento Bee (Aug. 9, 2019), bit.ly/3eHCy5f.

Finally, California has some of the most permissive ballot-harvesting practices in the nation. In 2016, then-Governor Jerry Brown signed AB1921, authorizing anyone to collect and turn in a mail-in ballot of another. California "allows, and even encourages, partisan activists to 'cross the threshold' into voters' homes to help them retrieve and fill out their ballots." *Susan Crabtree*, *Amid Covid Mail-In Push, CA Officials Mum on Ballot Harvesting*, Real Clear Politics (Apr. 24, 2020), bit.ly/3gDIONb.

Combined with California's bloated registration rolls, lack of oversight, and failure to conduct due diligence, Executive Order N-64-20 invites voter fraud and ensures that ineligible voters will cast ballots. "[E]ven if [California] ha[s] record turnout for the 2020 election, it is reasonable to assume that a substantial number of voters will remain uninterested in participating. Automatically mailing absentee ballots to [millions] of people who do not wish to receive or cast them would irrevocably undermine the integrity of the electoral process." Morley, *Redlines* 3-4.

## **LEGAL STANDARD**

Plaintiffs are entitled to a preliminary injunction if "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *Short*, 893 F.3d at 675. "The Ninth Circuit weighs these factors on a sliding scale." *Id.* When there are "'serious questions going to the merits'—that is, less than a 'likelihood of success' on the merits—a preliminary injunction may still issue so long as 'the balance of hardships tips sharply in the plaintiff's favor' and the other two factors are satisfied." *Id.*

1

**ARGUMENT**

2     **I.      Plaintiffs are Likely to Succeed on the Merits Because Executive Order N-64-20**

3             **violates the Elections Clause and the Electors Clause.[3]**

4             The Elections Clause and the Electors Clause of the U.S. Constitution vest the state

5     Legislature with the power to control federal elections. None of the statutes cited by Executive Order

6     N-64-20 delegate this power to the Governor. By asserting and exercising a unilateral power over

7     elections, Executive Order N-64-20 violates the Elections and Electors Clauses.

8                     **A.       The Elections and Electors Clauses reserve for state legislatures the power to**

9                             **regulate elections.**

10            The Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner

11    of holding Elections for Senators and Representatives, shall be prescribed in each State by *the*

12    *Legislature* thereof." Art. I, § 4, cl. 1 (emphasis added). Likewise, the Electors Clause states that

13    "[e]ach State shall appoint, in such Manner as *the Legislature* thereof may direct, a Number of

14    Electors" for President. Art. II, § 1, cl. 2 (emphasis added). Because the Constitution reserves for

15    state legislatures the power to control the manner of federal elections, state executive officers have

16    no authority to unilaterally exercise that power.

17            In this context, "the Legislature" refers to the body with state "lawmaking authority." *Ariz.*

18    *State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2667-68 & n.17 (2015); *see*

19    *also Smiley v. Holm*, 285 U.S. 355, 365 (1932). In California, the "legislative power" is vested in

20    the Legislature. Cal. Const. art. IV, § 1.

21            The Governor of California is not the Legislature and has no independent legislative power.

22    In California, "[t]he powers of state government are legislative, executive, and judicial," and

23    "[p]ersons charged with the exercise of one power may not exercise either of the others except as

24    permitted by this Constitution." Cal. Const. art. III, § 3. The Governor is charged with the "executive

25    power" of the State." *Id.* art. V, § 1. Thus, "[a]s an executive officer, [the Governor] is forbidden to

26

27            [3] In their complaint, Plaintiffs also allege violations of the Fourteenth Amendment.
      Plaintiffs stand by those claims but, for the sake of efficiency, are seeking a preliminary injunction

28    based only on their claims under the Elections and Electors Clauses.

1    exercise any legislative power or function except as in the Constitution expressly provided." *Lukens*

2    *v. Nye*, 156 Cal. 498, 501 (1909). He "is not empowered, by executive order or otherwise, to amend

3    the effect of, or to qualify the operation of existing legislation." 63 Cal. Op. Att'y Gen. 583 (1980).

4         Far from providing the Governor the authority to exercise the legislative power to regulate

5    elections, the California Constitution expressly instructs that "[*t*]*he Legislature* shall prohibit

6    improper practices that affect elections." Cal. Const. art. II, § 4 (emphasis added). That power is

7    subject to the Governor's veto, as in the ordinary course of lawmaking, but nothing more. Because

8    the California Constitution expressly entrusts the Legislature to maintain the integrity of elections,

9    the Legislature cannot delegate to the Governor the power to amend, repeal, or suspend validly

10   enacted election-integrity laws. *See Smiley*, 285 U.S. at 368 (the legislative power to control

11   elections must be consistent with the "manner … in which the Constitution of the state has provided

12   that laws shall be enacted").

13        **B.      Even if the California Legislature could delegate the constitutional power to**

14             **regulate elections, it has not done so.**

15        Even if the Legislature could, under the California Constitution, give the Governor carte

16   blanche to override duly enacted election laws, the statutes cited in Executive Order N-64-20 do not

17   purport to do so. California Government Code §§ 8567, 8571, and 8627 all stop well short of that.

18        Section 8567 allows the Governor to issue "orders and regulations" that "have the force and

19   effect of law." And section 8627 allows the Governor to commandeer state "agencies," exercise the

20   State's "police power," and refers back to the order power of § 8567. But such orders and

21   regulations, as the terms suggest, are not legislation and cannot be reasonably confused with "the

22   method which the state has prescribed for legislative enactments." *Smiley*, 285 U.S. at 367.

23        Section 8571, for its part, allows the Governor, "during a … state of emergency," to "suspend

24   any regulatory statute, or statute prescribing the procedure for conduct of state business … where

25   the Governor determines and declares that strict compliance … would in any way prevent, hinder,

26   or delay the mitigation of the effects of the emergency." The power to suspend legislation is not the

27   same as the power to "enact[]" legislation. *Smiley*, 285 U.S. at 367. Suspending laws via § 8571 is

28   an "executive," not legislative, power. *Cf. Hendricks v. Hanigan*, 2002 WL 397648, at *9 (Cal. Ct.

1    App. Mar. 14, 2002). Thus, § 8571 does not allow the Governor to regulate via affirmative

2    legislation the manner of federal elections, even during an emergency.

3        **C.      To the extent that § 8571 grants the Governor some limited power to suspend**

4             **procedures, Executive Order N-64-20 far exceeds that authorization.**

5        Even if the California Legislature could delegate to the Governor the power to override

6    certain legislation, and even if § 8571 reflected such a delegation, Governor Newsom's Order does

7    not fall within the scope of that statute. It exceeds the scope of § 8571 in at least four ways.

8        First, § 8571 limits the Governor's power to suspend statutes to "regulatory statute[s]" and

9    "statute[s] prescribing the procedure for conduct of state business." Election laws are neither.

10   "Generally, a 'regulatory statute' is the result of the exercise of the state's police power to enact

11   regulations to promote the public health, morals or safety, and the general well-being of the

12   community." *Com. v. CSX Trans., Inc.*, 639 A.2d 1213, 1214 (Pa. Super. Ct. 1994). That is certainly

13   true in California. *See, e.g.*, *Rosenblatt v. Cal. State Bd. of Pharmacy*, 69 Cal.App.2d 69, 72-73

14   (1945) (using licensing laws as examples of "regulatory statutes"); *Williams v. Kapilow & Son, Inc.*,

15   105 Cal.App.3d 156, 162 (1980) (similar); *People v. Simon*, 9 Cal. 4th 493, 519 (1995) (using

16   "public welfare" as a synonym for "regulatory" statute). To that end, regulatory statutes govern the

17   issuing of licenses and the regulation of business and public utilities to "protect the public from

18   incompetence and dishonesty." *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co.*,

19   36 Cal.4th 412, 436 (2005); *see Fascination, Inc. v. Hoover*, 39 Cal.2d 260, 262, 270 (1952);

20   *Rosenblatt*, 69 Cal.App.2d at 73; *Motor Transit Co. v. R.R. Comm'n of Cal.*, 189 Cal. 573, 580

21   (1922). Election laws are not regulatory statutes.

22       Nor are election laws statutes "prescribing the procedure for conduct of state business"

23   during an emergency. As an initial matter, *federal* elections are not "state business" under § 8571.

24   State business refers to the functioning of *state* government. Nor is the election code the kind of

25   "procedure" referenced in § 8571. In emergencies, California laws like §§ 8571, 8567, 8627 and

26   others empower the Governor to get rid of roadblocks that slow government responsiveness to a

27   crisis, ensuring "the most efficient and effective response." *See Macias v. California*, 10 Cal.4th

28   844, 856 (1995). Specifically, § 8571 allows the Governor to cut through red tape by suspending

1  *procedures* that would directly slow government action. For example, during a time of severe

2  electrical shortages that constituted a state of emergency, the Governor relied on § 8571 to suspend

3  competitive bidding requirements so that the Department of Water Resources could more efficiently

4  enter into contracts for electrical power. *See Hendricks*, 2002 WL 397648, at *10; *see also City of*

5  *Morgan Hill v. Bay Area Air Quality Management Dist.*, 118 Cal.App.4th 861, 877-78 (2004)

6  (relying on the combined power of §§ 8571 and 8567 to issue an order "intended to expedite the

7  processing of applications for power plants" in response to a state of emergency caused by an

8  electricity shortage). The entire election code is not a "procedure" that functions as an administrative

9  hurdle over which the state must ordinarily climb in order to act in the interest of public health.

10  Indeed, the fact that Governor Newsom could not merely *suspend* the election laws, but also had to

11  affirmatively replace them with a brand-new regime—power not granted by § 8571—is evidence

12  that the election laws are not a mere "procedure" covered by the statute.

13  Second, § 8571 allows the Governor to suspend statutes only "[d]uring … a state of

14  emergency." While California is presently in a declared state of emergency, Governor Newsom's

15  Executive Order purports to suspend laws that have no effect for many months. Section 8571 does

16  not allow the Governor to cite a *current* crisis as a basis to suspend any law at any time in the future.

17  If the Legislature meant to give the Governor such awesome power, it would have said so.

18  At the very least, Governor Newsom was required to find that COVID-19 will present

19  "extreme peril to the safety of persons within the State" in November, or that it will "require the

20  combined forces of a mutual aid region or regions to combat" in November. Cal. Gov't Code

21  § 8558(b); *see Martin v. Mun. Court*, 148 Cal.App.3d 693, 697 (1983) ("The Governor must state

22  the circumstances of the emergency found to exist and that the emergency is found to be beyond

23  local control measures."); *Calif. Corr. Peace Officers Ass'n v. Schwarzenegger*, 163 Cal.App.4th

24  802, 820 (2008) ("the proclamation" must at least "set[] forth circumstances that support the implied

25  finding" of an emergency). But Governor Newsom made no such finding.[4]

26  _____

27  [4] In his second executive order, Governor Newsom realized the blunder, but he was unable
to correct it. Rather than completely contradicting Executive Order N-64-20's admission that
COVID-19's future impact was "unknown," or his several pronouncements about California's

28  progress in overcoming the effects of the virus, *see supra* 2-3, Governor Newsom settled for

Third, to suspend statutes under § 8571, the Governor must "determine[] and declare[] that strict compliance" with the suspended laws would "prevent, hinder, or delay the mitigation of the effects of the emergency." While this language grants the Governor discretion, it does not grant him a blank check. The power to "determine and declare" carries an implicit obligation to draw conclusions based on reasoned analysis. California has specifically determined that even when acting under a grant of emergency power that allows an executive officer to do "whatever … he may deem necessary," exercises of that power "must be reasonable and are subject to judicial review." *Verreos v. City & Cty. of San Francisco*, 63 Cal.App.3d 86, 97 (1976).

If Governor Newsom were to find today that strict compliance with existing election laws in November would hinder mitigation of COVID-19, that finding would be arbitrary and capricious. The Executive Order contains a boilerplate statement that "various statutes specified in this Order would prevent, hinder, or delay" mitigation, but it does not state or even intimate that any election laws—save those that pertain to in-person voting—threaten to spread COVID-19. And even under the unilateral regime imposed by Executive Order N-64-20, in-person voting will still be available, contradicting the notion that it cannot be done safely and effectively.[5]

Governor Newsom's own statements and decisions establish that California is *not* likely to still be under a state of emergency in November. Under his direction, the state is currently in the process of moving to Phase 3 of its four-phase plan to fully reopen. It strains credulity to think that, with precautions, people can safely go to the mall today, get their hair cut tomorrow, and go to church Sunday, but that a state of emergency will prevent them from voting in person five months from now. *See supra* 2-3. Perhaps that is why Governor Newsom did not even attempt to make a finding that the November election will take place "during" the current state of emergency.

conclusory language that experts believe COVID-19 will remain a threat to public health in November. *See* N-67-20. Which experts, what kind of threat, why that threat will rise to the level of an emergency, why he nevertheless authorized widespread in-person voting, or why the threat requires him to mail ballots instead of applications for ballots, he does not say.

[5] Wisconsin recently held an in-person election during the height of the pandemic while also preserving voter safety. *See* Madlin Mekelburg, *Fact Check: Did Wisconsin See Spike in Coronavirus After Election?*, Statesman (May 17, 2020), bit.ly/2MeBKsn. And Governor Newsom's June 3 Executive Order allows extensive in-person voting. *See* N-67-20 § 3.

1    Moreover, the Executive Order simply does not acknowledge that California already has a

2    system set up for people to vote by mail. Counties may opt-in, *see* Cal. Elec. Code §§ 4005, 4007,

3    or voters may simply submit an application to receive a vote-by-mail ballot, *id.* §§ 3001, 3003. To

4    the extent that Governor Newsom feared the ordinary process of applying for vote-by-mail ballots

5    would hinder the mitigation of the heath crisis, he could have ordered that vote-by-mail *applications*

6    (not ballots) be sent to all registered voters *without suspending any statute*. When existing laws

7    sufficiently, and without any identifiable hinderance, provide an effective means of achieving

8    emergency response efforts, the Governor's decision to suspend those laws and replace them with

9    new laws is objectively unreasonable.

10    Fourth, § 8571 allows the Governor to suspend state statutes, not the state Constitution. *See*

11    *Peace Officers*, 163 Cal.App.4th at 820. Because the California Constitution unambiguously

12    instructs that "[*t*]*he Legislature* shall prohibit improper practices that affect elections," Art. II, § 4,

13    section 8571 should not be read to allow the Governor to suspend election-integrity measures, *see*

14    *People v. Garcia*, 2 Cal.5th 792, 804 (2017) ("[A] statute should not be construed to violate the

15    Constitution if any other possible construction remains available."). Thus, Executive Order N-64-

16    20, which suspends the entire election code as it relates to mail-in voting—including election-

17    integrity measures—exceeds the authorization granted by § 8571 (or § 8571 is unconstitutional and,

18    thus, grants the Governor no power).

19    **II.      The Remaining Preliminary Injunction Factors Favor the Plaintiffs.**

20    Executive Order N-64-20, alone or as modified, will do irreparable damage to the integrity

21    of the November election. Major, hasty changes to election laws threaten to confuse voters,

22    undermine confidence in the electoral process, and create "incentive[s] to remain away from the

23    polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006); *see also Project Vote v. Blackwell*, 455 F.

24    Supp.2d 694, 707-08 (N.D. Ohio 2006) (that people "will continue to be dissuaded from engaging

25    in an important [election-related] activity" constitutes an "irreparable injury"). And "[o]nce the

26    election is over, it cannot be reversed"; "any consequences flowing from the disruption in

27    equilibrium in the … laws would also be irreversible." *Lair v. Bullock*, 697 F.3d 1200, 1215 (9th

28    Cir. 2012).

The damage to the individual, fundamental rights of Plaintiffs' voting members is also irreparable. The power delegated to state legislatures by the Elections and Electors Clauses is the power "to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right [to vote]." *See Smiley*, 285 U.S. at 366. In the process of usurping that authority, Executive Order N-64-20 washes away many of the procedures and safeguards that the California Legislature implemented, inviting illegitimate practices that will dilute the votes of honest voters in violation of the Constitution. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Because Executive Order N-64-20 violates constitutional rights, "no further showing of irreparable injury is necessary." *See Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016); *Melendres*, 695 F.3d at 1002.

Plaintiffs have also satisfied the final two preliminary injunction factors. This case does *not* pit election integrity against the freedom to vote. *Cf. Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992). That balance is "quintessentially a legislative"—not executive—judgment, *see Griffin*, 385 F.3d at 1131, and the Legislature already allows *every* registered voter to receive a vote-by-mail ballot by simply applying and satisfying minimal safeguards. The Executive Order does not meaningfully expand the right to vote, but it does diminish the integrity of the November election and threaten to dilute lawful votes.

Finally, granting a preliminary injunction is in the public interest. It is not "equitable or in the public's interest to allow the state … to violate the requirements of federal law." *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). And "it is *always* in the public interest to prevent the violation of a party's constitutional rights." *Am. Beverage Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (emphasis added).

More specifically, there is a "compelling [public] interest in preserving the integrity of [the] election process"—both actual and perceived. *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989); *Crawford*, 553 U.S. at 197 (plurality op. of Stevens, J.) ("[P]ublic confidence in the integrity of the electoral process has independent significance, because it

encourages citizen participation in the democratic process."). Radical, abrupt, and complex changes to election law undermine integrity, *see Purcell*, 549 U.S. at 4-5, especially where the changes transparently threaten an increased risk of illegitimate voting. "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Id.* at 4; *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (recognizing "the public interest in orderly elections"); *Miracle v. Hobbs*, 2020 WL 2097280, at *2 (9th Cir. May 1, 2020) (recognizing that "the public interest is served by … guarantees of a fair and fraud-free election").

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

Dated: June 5, 2020

*/s/ Bryan K. Weir*
Bryan K. Weir (SBN: 310964)
Tyler R. Green*
Cameron T. Norris*
Alexa R. Baltes*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423

Harmeet K. Dhillon (SBN: 207873)
Mark P. Meuser (SBN: 231335)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
(415) 433-1700
(415) 520-6593 (fax)

*Admitted pro hac vice

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed this pleading with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all counsel registered in this case. I certify that I have been in contact with counsel for Defendants, who have not yet entered an appearance, and will transmit this filing via email to them at the below contact information.

John W. Killeen
California Department of Justice
1300 I Street, 17th Floor
Sacramento, CA 95814
John.Killeen@doj.ca.gov
(916) 210-6045


Dated:   June 5, 2020                 */s/ Bryan K. Weir*
                                       Bryan K. Weir
                                       CONSOVOY MCCARTHY PLLC
                                       1600 Wilson Boulevard
                                       Suite 700
                                       Arlington, VA 22209
                                       (703) 243-9423