# Exhibit S

# Voting Integrity in California

## Issues and Concerns in the 21st Century

A Report of the California Advisory Committee to the
United States Commission on Civil Rights

June 2017

This report is the work of the California Advisory Committee to the U.S. Commission on Civil Rights. The report, which may rely on studies and data generated by third parties, is not subject to an independent review by Commission staff. State Advisory Committee reports to the Commission are wholly independent and generally reviewed by Commission staff only for legal and procedural compliance with Commission policies and procedures. **Neither an editorial nor legal sufficiency review was completed on this report. This report may or (may not) comply with the Commission's standards for form, legal citations, or methodology**. Advisory Committee reports are not subject to Commission approval, fact-checking, or policy changes. The views expressed in this report and the findings and recommendations contained herein are those of a majority of the Advisory Committee members and do not necessarily represent the views of the Commission or its individual members, nor do they represent the policies of the U.S. Government.

**State Advisory Committees to the U.S. Commission on Civil Rights**

By law, the U.S. Commission on Civil Rights has established an advisory committee in each of the 50 states and the District of Columbia. The committees are composed of state citizens who serve without compensation. The committees advise the Commission of civil rights issues in their states that are within the Commission's jurisdiction. More specifically, they are authorized to advise the Commission in writing of any knowledge or information they have of any alleged deprivation of voting rights and alleged discrimination based on race, color, religion, sex, age, disability, or national origin, or in the administration of justice; advise the Commission on matters of their state's concern in the preparation of Commission reports to the President and the Congress; receive reports, suggestions, and recommendations from individuals, public officials, and representatives of public and private organizations to committee inquiries; forward advice and recommendations to the Commission, as requested; and observe any open hearing or conference conducted by the Commission in their states.

**California Advisory Committee to the
U.S. Commission on Civil Rights***

Percy Duran, *Chair*
Los Angeles

Velma Montoya, *Vice-Chair***
Hollywood

James Bolton
Altadena

Nancy Eisenhart **
Woodland Hills

Debra Fong
Pasadena

Javier Gonzalez
San Jose

Susan Jester
San Diego

Jonathan Melrod
Sebastopol

Brian Moriguchi
Stevenson Ranch

Ralph Rossum
Claremont

Rachel Sigman
South Lake Tahoe

Robin Toma
Los Angeles

Betty Wilson **
Los Angeles

** Members of the voting rights sub-committee

**Letter of Transmittal**

**California Advisory Committee to the
U.S. Commission on Civil Rights**

The California Advisory Committee to the U.S. Commission on Civil Rights submits this report, *Voting Integrity in California: Issues and Concerns in the 21st Century*, as part of its responsibility to examine and report on civil rights issues in the state under the jurisdiction of the Commission.

On July 23, 2002, Congress passed the Help America Vote Act (HAVA) of 2002[1] to reform the nation's voting process. Under HAVA, states are required to implement programs and procedures in the following areas: (1) provisional voting; (2) voter information; (3) statewide voter registration databases; (4) updated and upgraded voting equipment; (5) voter registration identification procedures; and (6) administrative complaint procedures.[2] To help meet these requirements, HAVA provides the states with funds– a portion of which are to be disseminated to specific counties to assist local entities meet the provisions of the Act. HAVA has provided more than $380 million in federal funding to California to help improve the state's administration of elections.[3]

An assessment of all 50 states' election performances in 2012 and 2014 by an independent non-profit organization reported that California performed well below the national average. California's low performance prompted the California Advisory Committee to undertake an examination questioning the implementation of HAVA, and the integrity of the voting process in California.

A public hearing was held on August 28, 2015, at the Central Library of the City of Los Angeles. The scope of the hearing was the general compliance by the State with HAVA. Invited presenters included, among others, the California Secretary of State, the California State Auditor, election officials in Los Angeles and San Diego Counties, representatives from the Pew Charitable Trust, Everyone Counts, the Election Integrity Project, and the public.[4]

Based upon its research and public hearing, the California State Advisory Committee concludes and recommends the following:

**Conclusions**

1.  Insufficient training in election laws for poll workers and on-site election officials pursuant to witnesses Linda Paine and Ruth Weiss of the Election Integrity Project[5];

---

[1] Help America Vote Act of 2002 ("HAVA"), 42 U.S.C. § 15301 et seq., *available at* http://www.eac.gov/assets/1/workflow_staging/Page/41.PDF.

[2] Ibid.

[3] California Office of the Secretary of State, Audit of the administration of the federal Help America Vote Act of 2002 at https://www.bsa.ca.gov/reports/summary/2012-112.pdf, August 2013 (last accessed Nov. 22, 2014).

[4] A listing of all presenters at the August 28, 2015, public hearing is in Appendix 1, and the complete transcript of the proceedings is posted on the Commission's website at www.usccr.gov.

[5] Linda Paine and Ruth Weiss, Election Integrity Project, Testimony before the California Advisory Committee to the U.S. Commission on Civil Rights, Transcript, Hearing on Help America Vote Act, Los Angeles, CA, Aug. 28, 2015, pp. 158-191 (hereafter referred to as Help America Vote Act (HAVA) Transcript), *available at* https://www.justice.gov/crt/text-proposed-regulations.

Training materials[6] fail to provide for the implementation of California Election Code §14216, voter self-identification, which states:

> "Any person desiring to vote shall announce his or her name and address in an audible tone of voice, and when one of the precinct officers finds the name in the index, the officer shall in a like manner repeat the name and address. The voter shall then write his or her name and residence address . . . " .

2. Disabled voters face unnecessary obstacles, according to testimony by Lillibeth Navarro, representative of Communities Actively Living Independent and Free;

3. VoteCal, the mandated statewide voter database, is not ready (SOS testimony);

4. Explanations about the decision-making process of the Secretary of State for potential voting system developers are required after doubts raised from materials provided by State Auditor Elaine Howle, which state:

> "The Office paid $4.6 million to develop a replacement database – Vote Cal - but terminated a critical contract because the vendor failed to provide key deliverables. In its second attempt to hire a new vendor to complete the VoteCal project, the Office appears to have limited the bidder competition to only one bidder, raising concerns for future success."[7]

5. The methodology used to report HAVA expenditures in California's spending plan has not been explained, according to the testimony of State Auditor Elaine Howle;

6. Deceased, inactive and ineligible voters remain on voter lists;

7. The delayed and multi-stage human handling of vote-by-mail ballots creates openings for tampering or mishandling, according to Ruth Weiss's testimony and EIP's written testimony;

8. In 2012, California cast forty percent of the provisional ballots in the nation.[8]  Though the official intent is to allow for convenient voting and options that support participation, inadequate poll worker training in following the law likely contributes to the indiscriminate use of provisional ballots;

9. Prohibitive costs to citizens to purchase voter roll data;

---

[6] Ibid., p. 177.
[7] Ibid., p. 46
[8] See *supra* note 5 p. 171.

10. Indiscriminate use of Permanent Absentee Voting;

11. Statewide voting and election irregularities in many counties, both large and small, require further investigation;[9]

12. Antiquated election laws prohibit the introduction of modern voting technology, according to testimonies of SOS and Everyone Counts;

13. Inadequate utilization of online voting with military-grade encryption for military and overseas voters, according to Pew testimony;

14. Citizens have concerns about the new "Motor Voter Law "AB 1461, its implementation and confidentiality.  A good third of the eighty-plus Post-Hearing written testimonies were about this bill.


**Recommendations:**

1.  Training for Election Officials and Poll Workers

    a.  Include awareness and knowledge of applicable election laws (HAVA, NVRA, California Election codes, and the U.S. Constitution) and of the poll workers' authorities;
    b.  Increase length of training time of election workers;
    c.  Verify that an election official or poll worker completed recommended online training instruction;
    d.  Establish citizen oversight ensure training materials correspond to the law;
    e.  Train poll workers to follow California Election Code §14215, asking voters to state their names and addresses - in their own words -to avoid voter impersonation.

2.  Citizen Oversight

    a.  Provide expert citizen election integrity oversight for the pending VoteCal statewide voter registration database;
    b.  To ensure instructions to poll workers and election officials correspond to election laws, provide expert citizen oversight of training procedures and materials, and voting and election materials.

3.  The Disabled Voter

    a.  Legislation required to assure that current and future digital or computerized voting systems are accessible and will accommodate voters with disabilities;
    b.  Poll workers shall be provided training, communication, and  accommodations for voters with disabilities;
    c.  All polling sites shall be accessible to voters with disabilities.

[9] Testimony of Mark Sonnenklar, Business Attorney, HAVA Transcript, p. 109.

4. Office of the Secretary of State

   a. Appoint a non-partisan citizen election integrity and oversight organization with authority to assess VoteCal, its methods, and test results;
   b. Clarify the state's current standards for voting, election processes, voting equipment and systems and assure procedures and equipment are in compliance with state and federal disability laws;
   c. Clarify the process by which the Secretary of State verifies that the person applying to vote, whether through online registration, DMV registration, or in-person registration, is eligible to vote;
   d. Inform public agencies that only those agencies mandated to examine and verify proof of citizenship shall process voter registration applications;
   e. Create and advertise the complaint procedure by which citizen complaints about the administration of elections are addressed and rectified;
   f. Recommend to the California legislature an upgrade of all coded obstacles to the modernization of California's election process and voting systems (Election Code Article 4, Sections §19217, §9217, §19250 (a),§14223 (b));
   g. Recommend each California county standardize its forms and costs for citizen organizational purchases of voter data;
   h. Verify that every poll location is accessible to voters with disabilities;
   i. Clearly state the methodology used to report prior HAVA expenditures in the HAVA spending plan.

5. County Registrars of Voters

   a. To prevent inaccurate voter turnout statistics and possible election results, follow HAVA and California Election Code procedures for the distribution of provisional ballots;
   b. To ensure  voters' privacy and ballot integrity during handling, redesign absentee ballot forms and improve current processing procedures for security;
   c. To prevent impersonation and fraud, timely remove deceased, inactive and ineligible voters from voter lists according to HAVA's suggestions;
   d. Establish standard fee schedules for citizen groups requesting public documents and lists;
   e. Verify that every poll location is accessible for voters with disabilities;
   f. In accord with election laws, train election officials and poll workers in the handling of provisional, absentee, and in-person ballots;
   g. Clarify the procedures by which registrars of voters process and rectify election complaints;
   h. Provide citizen oversight of training manuals and materials, poll worker training, and at election polls and voting centers;
   i. Train poll workers and election officials in the proper use of California Election Code §14216, which, without a voter ID requirement, provides for self-identification.

6. Upgrade Outdated Election Laws (Legislation Required)

    a.  Modernization requirements -
        1.  Upgrade outdated California Election Codes (Article 4, Sections §19217, §9217, §19250 (a),and §14223 (b)):
            i.  Permit digital and telephone access for voter systems;
          ii.  Allow connectivity to the internet;
        iii.  Allow electronic transmission of election data through exterior communication networks;
        iv.  Allow wireless communications or wireless data transfers;
         v.  Allow a remote server to store any voter's identifiable selections and tabulate votes using military grade encryption;
        2.  Reconsider the requirements of federal qualification and accessible voter verified paper audit trails for voting systems;

    b.  Upgrade  and revise the Military and Overseas Voter Empowerment Act of 2009 (MOVE) to incorporate military grade encryption for secure online voting;
    c.  Allow poll workers to redact voters' street addresses when posting precinct voter lists near poll entrances to prevent harvesting of data used for voter impersonation.

7.  California's "Motor Voter" Law – AB1461

    a.  Pass AB 2067 amending AB 1461 to -
        1.  Create a clear, mandated procedure by which the citizenship status of all potential registrants will be verified prior to uploading information to the Secretary of State;
        2.  Establish oversight provisions;
        3.  Authorize ongoing education and/ training for Department of Motor Vehicles (DMV) personnel

This report was approved as amended by the members of the California Advisory Committee by a vote of 6- yes, and 0 - no with no abstentions on Wednesday, June 1, 2016.


Respectfully,
Percy Duran, *Chair*
California Advisory Committee

# Table of Contents

| | | |
|---|---|---:|
| **I. INTRODUCTION** | | **1** |
| **A.** | **California Advisory Committee to U.S. Commission on Civil Rights** | **1** |
| **B.** | **Help America Vote Act of 2002** | **1** |
| **C.** | **Non-Government Reports on Election Integrity** | **4** |
| 1. | Pew Charitable Trusts' Election Performance Index Report | 4 |
| 2. | Election Integrity Project Report | 6 |
| **D. Public Hearing on Election Administration in California** | | **7** |
| **II. BACKGROUND** | | **8** |
| 1. Ballot Integrity and Voter Registration | | 8 |
| 2. Election Administration | | 9 |
| 3. Expanding Access to Elections | | 9 |
| **B. State Differences in Accessibility to the Right to Vote** | | **10** |
| 1. State Variance in Voter Identification Laws | | 10 |
| 2. Ex-Felon Voting Rights | | 11 |
| 3. Mail Ballots and Provisional Voting | | 11 |
| **III. STATE COMPLIANCE WITH HAVA** | | **12** |
| **A. 2005 Memorandum of Agreement with Department of Justice** | | **12** |
| **B. State Auditor Report on State Compliance with HAVA** | | **13** |
| **C. California Secretary of State Comment on Election Administration** | | **16** |
| 1. Statewide Voter Registration Improvement Efforts: Database | | 16 |
| 2. Improvements to Voter Registration | | 17 |
| **IV. ELECTION ADMINISTRATION IN LOS ANGELES COUNTY CALIFORNIA** | | **19** |
| **A. Voter Responsibility of Los Angeles County Clerk and Registrar** | | **19** |
| **B. Comment on Election Administration by Los Angeles County Registrar** | | **20** |
| 1. Establishment of a Statewide Voter Registration Database | | 20 |
| 2. Duplicate Voter Registration in Los Angeles County | | 21 |
| 3. Provisional Voting in Los Angeles County | | 22 |
| 4. Election Official Training in Los Angeles County | | 23 |
| **V. ELECTION ADMINISTRATION IN SAN DIEGO COUNTY CALIFORNIA** | | **25** |
| **A. Voter Responsibility of San Diego County Clerk and Registrar** | | **25** |

**B. Comment on Election Administration by San Diego County Registrar**          **26**
    1. Establishment of a Statewide Voter Registration Database          26
    2. Duplicate Voter Registrants in San Diego County          27
    3. Provisional Voting in San Diego County          28
    4. Election Official Training in San Diego County          29

**VI. ORGANIZATION AND PUBLIC COMMENT ON ELECTION ADMINISTRATION**          **31**

**A. Comment on Election Administration from the Pew Charitable Trusts, Election Integrity Project, Everyone**
**Counts, Communities Actively Living Independent and Free, and Mark Sonnenklar**          **31**
    1. The Pew Charitable Trusts          31
    2. The Election Integrity Project          35
    3. Everyone Counts          36
    4. Communities Actively Living Independent and Free          38
    5. Mark Sonnenklar          39

**COMMITTEE FINDINGS AND CONCLUSIONS**          **41**

**APPENDIX I. PRESENTERS AT THE PUBLIC HEARING ON AUGUST 28, 2015, AND PUBLIC COMMENTERS**          **45**

**A.**    **Invited Presenters (in order of presentation)**          **45**

**B.**    **Citizens Making Public Comments (in order of presentation)**          **45**

**C.**    **Summary of Post-Hearing Public Comments**          **46**

**APPENDIX II. DISSENT FROM CALIFORNIA ADVISORY COMMITTEE MEMBER**          **47**

**Figures**
    a.   **Figure 1: Map of Los Angeles County California**          **24**
    b.   **Figure 2: Map of San Diego County California**          **30**
    c.   **Figure 3: Pew EPI Index for California**          **33**

**Tables**
    a.   **Table 1: California Population by Percent by Race/Ethnicity, 2000 and 2014**          **2**
    b.   **Table 2: Rate of Irregularities by County**          **7**
    c.   **Table 3: Los Angeles County, California, Adult Population**          **20**
    d.   **Table 4: San Diego County, California, Adult Population**          **26**

# I. Introduction

## A.  California Advisory Committee to U.S. Commission on Civil Rights

The U.S. Commission on Civil Rights (Commission) is an independent, bipartisan agency established by Congress and directed to study and collect information relating to denial of the right to vote because of race, color, religion, sex, age, disability, national origin, or in the administration of justice.[10]  The Civil Rights Act of 1957[11] created the U.S. Commission on Civil Rights. Since then, Congress has reauthorized or extended the legislation creating the Commission several times; the last reauthorization was in 1994 pursuant to the Civil Rights Commission Amendments Act of 1994.[12]

Established as an independent, bipartisan, fact-finding federal agency, its mission is to inform the development of national civil rights policy and enhance enforcement of federal civil rights laws. The Commission pursues this mission by studying alleged deprivations of voting rights and alleged discrimination based on race, color, religion, sex, age, disability, or national origin, or in the administration of justice. The Commission plays a vital role in advancing civil rights through objective and comprehensive investigation, research, and analysis on issues of fundamental concern to the federal government and the public.[13]

The Commission has established an advisory committee in each of the 50 states and the District of Columbia. These state advisory committees are composed of state citizens who serve without compensation and advise the Commission of civil rights issues in their states that are within the Commission's jurisdiction. More specifically, they are authorized to advise the Commission in writing of any knowledge or information they have of any alleged deprivation of voting rights and alleged discrimination based on race, color, religion, sex, age, disability, or national origin and other matters under the jurisdiction of the Commission.

## B.  Help America Vote Act of 2002

On July 23, 2002, a bipartisan Congress passed the Help America Vote Act (HAVA) of 2002[14] to assess compliance and suggest reforms to the nation's voting process. HAVA made recommendations for improvements to voting systems and voter access[15] and established:

1) new mandatory minimum standards for states to follow in several key areas of election administration;[16]
2) funding to help states meet these new standards, replace voting systems and improve election administration;.[17]

---

[10] Civil Rights Act of 1957, Pub.L. 85–315, 71 Stat. 634, *et seq*, (1957).

[11] Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000d, *et seq*.

[12] Civil Rights Commission Amendment Acts of 1994, as amended, 42 U.S.C. 1975, *et seq*.

[13] U.S. Commission on Civil Rights at www.usccr.gov.

[14] Help America Vote Act of 2002 ("HAVA"), 42 U.S.C. § 15301 et seq., *available at* http://www.eac.gov/assets/1/workflow_staging/Page/41.PDF.

[15] United States Election Assistance Commission at http://www.eac.gov/about_the_eac/help_america_vote_act.aspx (last accessed Nov. 22, 2014). http://doodle.com/poll/947m69wbxmgrs8uz

[16] Ibid., HAVA, §§ 101-906 (2002), *available at* http://www.eac.gov/assets/1/workflow_staging/Page/41.PDF.

[17] Ibid.

3) the Election Assistance Commission (EAC) to assist the states regarding HAVA compliance and to distribute HAVA funds to the states.[18] EAC is also charged with creating voting system guidelines and operating the federal government's first voting system certification program.[19]

Under HAVA, states are required to implement programs and procedures in the following areas: (1) provisional voting; (2) voter information; (3) statewide voter registration databases; (4) updated and upgraded voting equipment (5) voter registration identification procedures; and (6) administrative complaint procedures.[20] To help meet these requirements, HAVA provides the states with funds– a portion of which are to be disseminated to specific counties to assist local entities meet the provisions of the Act. HAVA has provided more than $380 million in federal funding to California to help improve the state's administration of elections

An assessment of election performances between states in 2012 and 2014 by an independent non-profit organization reported that California performed well below the national average.  The effectiveness and implementation of HAVA and the integrity of the voting process is of particular concern in California because of the growth and reported difficulty of voter access of various potential voter populations, including Latinos, Asian-Americans, and the voters with disabilities.

**Table 1: California Population by Percent by Race/Ethnicity, 2000 and 2014**

|  | Percent of population | |
|---|---|---|
|  | 2000 | 2014 |
| White | 46.6 | 38.8 |
| African American | 6.4 | 5.8 |
| Asian | 11.1 | 13.0 |
| American Indian | 1.0 | 0.8 |
| Latino | 32.3 | 39.0 |
| Two or more races | 2.6 | 2.6 |

Source: California Advisory Committee from Census data.

With respect to provisional voting, many eligible citizens in the United States are denied the right to cast ballots and have them counted on Election Day. Many voters are turned away from polls because their names do not appear on a list of registered voters for varied reasons– at times the responsibility of the individual voter.  To correct this problem, the "fail-safe" provisional voting requirements in the HAVA require election officials to first provide aid to those individuals who are not listed on the official list of registered voters by helping them locate their proper polling place, and, if not resolved, then to provide  provisional ballots. After an election, once in-person and absentee ballots are counted, and the appropriate election officials determine that the individual is eligible to vote, the provisional ballot is counted.

---

[18] HAVA, § 201, *available at* http://www.eac.gov/assets/1/workflow_staging/Page/41.PDF.
[19] United States Election Assistance Commission at http://www.eac.gov/about_the_eac/help_america_vote_act.aspx (last accessed Nov. 22, 2014).
[20] Ibid.

A key component of HAVA regarding statewide voter registration databases is that each state must establish a statewide voter registration database.[21] This database must include the name, address, birthdate and other registration information for every legally registered voter within each state. The state is also to assign a "unique identifier" to each applicant. The list is to be coordinated with other agency databases within each state, and accessible electronically to local election officials and individual voters. HAVA also regulates the maintenance of these lists, requiring states to ensure that the name of each voter appears on the list, and that the names of voters who are not registered, inactive (including the deceased), or ineligible, and duplicate names, be eliminated.

This section of HAVA further requires that voters provide either their driver's license number or social security number or the last four numbers of their Social Security number. In the case of applicants lacking any of the three items, the state is to assign a unique identifying numbers for each applicant.[22] States are required to establish agreements with their state motor vehicle agencies and the Commissioner of Social Security, through which identification numbers can be "matched" to verify accuracy and legitimacy of the voter registration application information.[23]

The effective date of HAVA's statewide registration database requirement was January 1, 2004, but was extended for good cause to January 1, 2006. California planned to implement a "bottom-up" system, with the counties maintaining the voter file and precinct and district boundaries, and transmitting this information to the state. The statewide system was not in place by the January 1, 2006, deadline nor implemented for another decade. During a state audit, the California Deputy Secretary of State for HAVA activities explained that in addition to its agreement with Justice, the Secretary of State (SOS) pursued VoteCal because its previous system—CalVote—was a failure.[24] With so many years of failing to create the mandated state-wide voter database (California is the only state without that compliance with HAVA), there were concerns about any state-wide system meeting the HAVA requirements of interactivity to allow local election official immediate electronic access to voter information as well as electronic transmission of voter registration data into the single system.

All 58 counties are now engaged in the process of VoteCal implementation prior to its expected June 2016 certification as the State's system of record. Even though all counties are actively engaged, many tasks must be completed before VoteCal can be certified. These include a mock election, on-going performance testing, and analyzing and monitoring the data in VoteCal. The VoteCal project team, with assistance from county election officials, intends to focus on these activities in the coming weeks.[25]

The current SOS is committed to the implementation of Vote Cal; the expectation is for June 2016 after VoteCal is successfully deployed to all counties and the SOS and the Election Audit

---

[21] HAVA, § 303(a).
[22] Ibid.
[23] Daniel Tokaji, Moritz College of Law, available at
http://moritzlaw.osu.edu/electionlaw/ebook/part5/hava.html#_edn11 (last accessed Nov. 22, 2014).
[24] California Office of the Secretary of State, Audit of the Administration of the Federal Help America Vote Act of 2002 at https://www.bsa.ca.gov/reports/summary/2012-112 (last accessed Nov. 22, 2014).
[25] Testimony of Alex Padilla, California Secretary of State, *VoteCal News*, available at
http://www.sos.ca.gov/elections/voter-registration/votecal-project/news/ (last accessed May 27, 2016).

Committee (EAC) test and validate that VoteCal is fully and accurately functional, VoteCal will be declared certified as the official system of record for voter registration in California, almost 11years after the passing of HAVA.[26]

Other issues raised by HAVA mandates reflect that the 21st century is experiencing a new era in voting.  Electronic voting systems are being scrutinized for integrity and reliability. Expensive, antiquated purpose-built hardware-based systems and manual and paper processes are being transformed with systems designed to result in increased accessibility and improved accuracy for all elections, as well as enhanced security, increased auditability, and significant cost savings.

Apart from HAVA, it is important to understand the legislation with respect to other Federal voting rights legislation, such as the Voting Rights Act of 1965 (VRA);[27] the National Voting Registration Act of 1993 (NVRA) that requires state governments to offer voter registration opportunity to eligible citizens who apply for or renew a driver's license or seek public assistance;[28] and the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) that requires states and U.S. territories to allow certain U.S. citizens to register and vote by absentee ballot in federal elections.[29] Along with HAVA, these respective Federal Acts need to be understood in context with the California Election Code[30] and the California Code of Regulations, such as Title 24, which is the building code section. So, although it is an important piece of legislation in its own right, focusing solely on HAVA may not provide the full breadth and extent of what election officials at the state and local level confront in their obligations to conducting fair and impartial elections.

### C.  Non-Government Reports on Election Integrity

### 1.  Pew Charitable Trusts' Election Performance Index Report

The Pew Charitable Trusts' (Pew) Elections Performance Index, or EPI, reports comparisons between all states regarding election effectiveness.  The Pew EPI profile analyzes 17 key indicators of election administration and scores each state's performance by indicator.

The EPI is based on a snapshot in time and on data that is not always commonly collected or comparable across state lines.  The intent of the EPI is to draw policy level attention to election administration at the state level. By its nature the EPI is set up to more favorably reflect states with centralized election administration and states that have adopted policy changes advanced by Pew research, i.e, same day registration and participation in interstate data matching for file maintenance. The application of election laws are not indicators used in Pew analyses.

Pew reported that California's EPI average increased slightly from 2008 to 2012, but at a rate well below the national average. In 2008, 2010, 2012, and 2014, the state was the 49th lowest-performing states, and one of only six states in the bottom 25 percent in all four years. California

---

[26] Ibid.
[27] Pub. L. 89-110, codified at 42 U.S.C. §§ 1973 to 1973aa-6.
[28] Pub. L. 103-31, (52 U.S.C. § 20501 - 52 U.S.C. § 20511) (formerly 42 U.S.C. §§ 1973gg–1973gg-10),
[29] Pub. L. 99-410, codified at 42 U .S .C . § 1973ff.
[30] California Elections Code, Stats. 1994, Ch. 920, Sec. 2.

improved its average wait time to vote, which fell from nearly 14 minutes in 2008 to less than six minutes in 2012. The state also added online voter registration before the 2012 election, and by the end of that year, more than 900,000 Californians used the system to register or update their information.[31]

Decreases in other indicators, however, overwhelmed these improvements. The increase in California's rate of provisional ballots cast was the second-highest in the nation. In 2008, the rate was already the country's fourth-highest at 5.8 percent, and in 2012, when the state issued more than 1 million provisional ballots, the rate was 8.1 percent, the second-highest.

Pew measured California as the 49th worse election performing state of 50 using criteria such as:

1) Low turnout statistics
2) Mail Ballots unreturned
3) Mail ballots rejected
4) Military and Overseas Ballots rejected
5) Military and Overseas Ballots unreturned
6) Provisional ballots cast
7) Provisional ballots rejected
8) Registration or Absentee Ballot problems
9) Voter Information Lookup Tools Available (49th)
10) Disability or illness-related problems

Pew reports that California issues provisional ballots for many reasons.

- Almost 30 percent of the requested vote-by-mail ballots in California are not cast– the highest rate in the nation. Any voter who requests a mail ballot but then shows up at the polls on Election Day without it is required to cast a provisional ballot. This number contributes to the statistics regarding low turnout.
- When California voters have a registration problem (e.g., if they moved within the same county and did not update their address or if their eligibility is called into question), they are issued a provisional ballot.
- The state also had the greatest number and percent of rejected provisional ballots amongst all states. In 2012, more than 175,000 provisional ballots were rejected, equivalent to almost 1.4 percent of all ballots cast in the state. [32]

As noted above, the state's rate of unreturned mail ballots was the highest among all states in 2012, when it jumped to 29.4 percent from 16.2 percent in 2008, the fourth-largest increase in the country. California has permanent mail voting: Any registered voter can choose to automatically receive mail ballots for all future elections.[33]

---

[31] Pew Charitable Trusts, California Elections Performance Index, April 2014, at http://www.pewtrusts.org/~/media/Assets/2014/04/07/2012_Election_Performance_Index_California.pdf?la=en (last accessed Nov. 22, 2014).

[32] Pew Charitable Trusts, California Elections Performance Index, April 2014, *available at* http://www.pewtrusts.org/~/media/Assets/2014/04/07/2012_Election_Performance_Index_California.pdf?la=en (last accessed April 18, 2016).

[33] Ibid.

Another statistic in the Pew report concerned the voter with disabilities.  In 2012, California showed 13.6 percent of those responding to a census survey did not cast ballots due to an "illness or disability (own or family's)."[34]  The national average is 15.8 percent. The PEW Report found the following regarding the 2010 Census:

> Disabled and permanently ill voters face unique challenges, such as inaccessible polling places and voting technology that is difficult to use. Federal law mandates that all polling places must generally be accessible to physically disabled voters. The Help America Vote Act of 2002 requires that at least one voting machine in each precinct be equipped for physically disabled individuals.[35]

## 2. Election Integrity Project Report

The Election Integrity Project (EIP) identified over 60,000 irregularities in California's 2013 voter roll data provided by the counties.  Statistics for the deceased are based on 50 years of records. In addition to the Pew report on elections in California, the EIP emphasized the well-known fact that California is the only state without a federally-required single, uniform, official, centralized, interactive, computerized statewide voter registration list. The state entered into a Memorandum of Agreement (MOA) with the Department of Justice in 2005, which required it to expedite the development of a fully compliant database.[36]

The Election Integrity Project operates in three major capacities:  As a citizen training organization in election integrity, an election integrity research organization, and a non-partisan election oversight company.

Meanwhile, according to the EIP report, in a high tech state with 55 electoral college votes and 53 U.S. House seats, California's official state list was an agglomeration of 58 county lists and used 1993 technology. List maintenance deficiencies are illustrated in a chart which showed over 81,000 list irregularities (duplicate registrations, deceased, double voting) in just nine counties reported by EIP to election officials in 2013.

---

[34] Ibid.

[35] Ibid.

[36] U.S. Department of Justice Memorandum of Understanding with the State of California (Nov. 2, 2005), *available at* https://www.justice.gov/crt/text-proposed-regulations.

**Table 2: Rate of Irregularities by County**

| California County | # Registrants On Active List | # In-County Dups | # Deceased | # Cross-County Dups | # Unlawful Votes | Total Irregularities/ % Of Registrations |
|---|---|---|---|---|---|---|
| Fresno | 405,888 | 659 | 1,264 | 607 | 83 | 2,613/0.6% |
| Kern | 331,510 | 209 | 389 | 163 | 22 | 783/0.2% |
| Kings | 47,853 | 139 | 45 | 271 | 8 | 463/1.0% |
| Los Angeles | 4,818,730 | 37,675 | 14,958 | 5,330 | 2,389 | 60,352/**1.3%** |
| Nevada | 61,717 | 45 | 40 | NA | 3 | 88/0.1% |
| Riverside* | 932,892 | 2,877 | 214 | 1,251 | 120 | 4,462/0.5% |
| San Bernardino* | 862,237 | 3,349 | 418 | 1,251 | 329 | 5,347/0.6% |
| San Diego | 1,562,447 | 1,112 | 164 | 5,330 | 214 | 6,820/0.4% |
| Tulare | 145,738 | 178 | 51 | 451 | 15 | 695/0.5% |
| | | | | | Total/Straight Average | 81,623/0.6% |

Source: Election Integrity Project Report, 2014

Based in Los Angeles County, which is the nation's largest county, Election Integrity Project (EIP) reported a disturbingly high percent of irregularities – more than twice the rate of other large counties. EIP also submitted over 3,200 suspected unlawful voters (suspected double voters, deceased voters) to election officials.[37] In a state with no voter ID, inaccurate voter lists can result in voting fraud since duplicated and deceased persons are easy to impersonate.[38]

In California, however, obstacles to the most up-to-date, modern and secure election and voting systems exist in the very codes created to protect the voter. The best updated and upgraded election systems can only occur with an updating and upgrading of the election laws and codes concerning them.

## D. Public Hearing on Election Administration in California

A public hearing was held on August 28, 2015, at the Central Library of the City of Los Angeles. The scope of the hearing was the general compliance by the state with HAVA. Invited presenters included, among others, the California Secretary of State, the California State Auditor, election officials in Los Angeles and San Diego Counties, representatives from the Pew Charitable Trust, Everyone Counts, and the Election Integrity Project, and the public.[39]

---

[37] Testimony of Linda Paine and Ruth Weiss, HAVA Transcript, pp. 158-191.
[38] Ibid.
[39] A listing of all presenters at the August 28, 2015, public hearing is in Appendix 1, and the complete transcript of the proceedings is posted on the Commission's website at www.usccr.gov.

## II. Background

*Federal Commission on Election Reform Report*

The issues of concern before the California Advisory Committee with respect to the conduct of elections are also nationwide concerns. Ten years ago, the Commission on Federal Election Reform (CFER) was constituted to recommend ways to raise confidence in the electoral system. The prefatory comments by the Co-Chairs in the Commission's report on election integrity and growing lack of public confidence in the fairness of elections was sobering for the future of democracy in the nation.[40]

> Elections are the heart of democracy. They are the instrument for the people to choose leaders and hold them accountable. At the same time, elections are a core principal function upon which all other government responsibilities depend. If elections are defective, the entire democratic process is at risk.
>
> Americans are losing confidence in the fairness of elections. And while we do not face a crisis today, we need to address the problems of our electoral system. First, there appears to be a growing lack of confidence in the integrity and fairness of the election system. Second, certain identifiable segments of the population may face barriers in their right to vote.[41]

Of particular concern to the California Advisory Committee in its project on voting integrity in California, the CFER examined and commented on: (1) ballot integrity and voter registration, (2) election administration, and (3) expanding access to elections.

### 1. Ballot Integrity and Voter Registration

Undermining the integrity of the ballot, fraud can occur in several ways. Ineligible persons can vote. Eligible voters can vote multiple times and/or in multiple locations. Persons can cast votes on behalf of others or persons who are dead. But among the possible election frauds, "absentee ballots remain the largest source of potential voter fraud."[42]

Regarding voter registration, the CFER noted that "election systems cannot inspire public confidence if safeguards do not exist to deter or detect fraud or to confirm the identity of voters."[43] While there is no evidence of extensive fraud in U.S. elections or of multiple voting, as the Commission on Federal Election Reform reported, one potential source of fraud arises from inactive or ineligible voters left on voter registration lists.

A good registration list (accurate and up-to-date) ensures that citizens are only registered in one place– and is maintained in a manner that persons who move or die or who are inactive are

---

[40] Commission on Federal Election Reform, *Federal Election Commission report*, Letter from the Co-Chairs.
[41] Ibid.
[42] Ibid., p. 46.
[43] Ibid., pp. 4 and 18.

systematically removed from the voter registration list. A good registration list also identifies the same person being registered in two different locations. However, election officials still need to make sure that the person voting—whether in person or by mail ballot— is the same one as that voting.

## 2. Election Administration

The Commission on Federal Election Reform stated that a major source of public mistrust in the election process is the perception of partisanship in actions taken by election officials.[44] In California, similar to a majority of states, election administration comes under the authority of the Secretary of State. In recent years, both Republican and Democratic Secretaries of State have been accused of bias because of their discretionary actions.

For example, in Kansas legal action has been taken against the Secretary of State, Kris Kobach (R), for alleged voter suppression. The lawsuit challenged the state's dual voter registration system crafted by the Secretary of State that requires voters to provide proof-of-citizenship documents when they register to vote for the first time or after moving to Kansas.[45] In Oregon, citizen groups such as True the Vote have challenged the actions of Secretary of State Jeanne Atkins (D) regarding the accurate maintenance of voter registration lists.[46]

Poll workers are essential to effective election administration. Effective administration of elections requires that poll workers have the capability and training to carry out complex voting systems correctly, which often change with each election. As CFER reported, poll workers must administer an array of voting procedures in compliance with HAVA and other election laws, to include provisional ballots, checking voter identification, correctly counting votes, setting up voting machines, instructing voters on the use of voting equipment, and providing helpful and accurate service to a diversity of voters including persons with disabilities and non-English speakers.[47]

## 3. Expanding Access to Elections

This nation has a long and unfortunate history of denying the right to vote to certain groups of citizens. Despite ratification of the 15th Amendment to enfranchise former slaves, in the century following the Civil War Americans in many parts of the country were systematically denied the right to vote. State and local registration boards used poll taxes, literacy tests, felon disenfranchisement laws, and other impediments to deny minorities their legal right to vote. In the Voting Rights Act[48] was enacted after Congress determined that the existing federal anti-discrimination laws were not sufficient to overcome the resistance by state officials to enforcement of the 15th Amendment.

---

[44] Ibid., p. 49.
[45] Kira Lerner, *Judge shuts down Kris Kobach's attempt to disenfranchise voters in Kansas elections*, accessible at http://thinkprogress.org/politics/2015/08/27/3695987/kris-kobach-ruling-kansas.
[46] Shelby Sebens, *Too Nice for Fraud: Some Say OR Election System Vulnerable Despite Few Cases*, Wachdog.org, May 16, 2013, *available at* http://watchdog.org/85032/too-nice-for-voter-fraud-some-say-or-election-system-vulnerable-despite-few-cases/.
[47] Ibid., p. 52.
[48] Pub. L. 89-110, codified at 42 U.S.C. §§ 1973 to 1973aa-6.

Concerns about ballot integrity, voter registration, and the administration of election systems must not be co-opted into denying the right to vote to eligible citizens. CFER noted this challenge in building confidence in elections. While many states allow the representatives of candidates or political parties to challenge a person's right to register or vote or to challenge an inaccurate name on a voter roll. This practice of challenges may contribute to voter integrity, but it can have the effect of intimidating eligible voters, prevent them from casting their ballots, or otherwise disrupting the voting process.[49]

## B. State Differences in Accessibility to the Right to Vote

It is more and more a reality that there exists a great deal of diversity across the country with respect to voter registration and accessibility to the voting process. Where one lives affects the ease or difficulty in voting. And the Nation's federal structure encourages this as states are afforded latitude within the confines of adherence to the Constitution to institute voter policies in their states to include voter registration, voter identification and mail ballots, as well as ex-felon voting.

### 1. State Variance in Voter Identification Laws

In the 2000s, voter ID as an issue began to take center stage. The Commission on Federal Election Reform (aka the Carter-Baker Commission), in 2005 made a bipartisan recommendation for voter identification at the polls.[50]

In recent years, 34 states have introduced laws requiring voters to show photo identification at the polls.[51] And photo identification bills have been enacted in eight states—Alabama, Kansas, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, and Wisconsin—and passed by referendum in Mississippi.[52]

Independent studies reviewed by the Government Accountability Office (GAO) showed mixed effects of various forms of state voter ID requirements on turnout. All 10 studies examined general elections before 2008, and 1 of the 10 studies also included the 2004 through 2012 general elections. Five of these 10 studies found that ID requirements had no statistically significant effect on turnout; in contrast 4 studies found decreases in turnout and 1 found an increase in turnout that were statistically significant.

---

[49] Commission on Federal Election Reform, *Federal Election Commission report*, p. 47.
[50] Center for Democracy and Election Management, *Building Confidence in U.S. Elections: Report on the Commission on Federal Election Reform*, September 2005, p. 21, *available at* http://www.eac.gov/assets/1/AssetManager/Exhibit%20M.PDF.
[51] U.S. Government Accountability Office, *Issues Related to State-Issued Voter Identification Laws*, GAO-14-634: Published: Sep 19, 2014. Publicly Released: Oct 8, 2014 and re-issued February 27, 2015. The 34 states with introduced and/or enacted voter identification laws are: Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, and Wisconsin.
[52] Ibid.

## 2. Ex-Felon Voting Rights

In 41 of the 50 states ex-felons may vote, but there is wide variance among the states on this allowance. In two states, Maine and Vermont, even incarcerated felons may vote. In thirteen other states, former felons are allowed to vote soon as they are released from prison. The most common restriction on ex-felon voting rights withholds the right to vote until parole and/or all other terms of the sentence have been completed. Thirty-one (31) states have such provisions.

In 13 states, ex-felons may vote may vote upon release as long as they are not on parole.  In 18 states there is a similar restriction, and the e.g. restriction extends until all terms of the sentence including parole have been completed, e.g., restitution, community service. In three states, the right to vote for an ex-felon is withheld until a specified amount of time has elapsed. In Nebraska that period of time is 2 years; in Delaware and Wyoming the time period is 5 years.

Nine states have lifetime bans on ex-felons voting. In all nine of these states, however, it is possible for a person to obtain a form of clemency and have their voting rights restored. The process of clemency varies among the states. For example, in Mississippi, ex-felons are banned for life from voting, but under the state's Constitution may have their voting rights restored by a vote of two-thirds of both legislative houses. In seven other states with lifetime bans on ex-felon voting rights the clemency process is an executive decision. In four of these states, the Governor possesses the sole power to grant clemency. In Alabama, Arizona, and Nevada, executive clemency is under the authority of the state's correctional system. Florida is unique among the nine states with lifetime bans for ex-felons in that its clemency procedure resides with the state's cabinet.[53]

In California, citizens convicted of a felony are ineligible to vote while incarcerated and on parole. Voting rights are automatically restored upon completion of parole, and citizens on probation can vote. Ex-offenders should re-register to vote.

## 3. Mail Ballots and Provisional Voting

Different states have established alternatives for voters to cast a ballot other than at the polls on Election Day. Most states—35 and the District of Columbia—currently provide an opportunity for voters to cast a ballot prior to the election without an excuse, either by no-excuse absentee voting by mail or in-person early voting, or both. States vary in terms of the number of days and locations provided for early voting. In addition, states, as well as whether voting is available on a weekend, and whether the state allows voters who cast an absentee ballot without an excuse to be on a list to permanently receive a ballot by mail without an excuse.[54]

Under federal law, if a person comes to the polls and declares that he/she is a registered voter in the jurisdiction in which the individual desires to vote and that the individual is eligible to vote in an election for Federal office, but the name of the individual does not appear on the official list

---

[53] Tennessee Advisory Committee to the U.S. Commission on Civil Rights, *The Right to Vote and Ex-Felon Disenfranchisement in Tennessee, December* 2013, pp. 14-5.

[54] U.S. Government Accountability Office, *Elections: State Laws Addressing Voter Registration and Voting on or before Election Day,* GAO-13-90R: Oct 4, 2012.

of eligible voters for the polling place or an election official asserts that the individual is not eligible to vote, such individual shall be permitted to cast a provisional ballot.

> **(1)** An election official at the polling place shall notify the individual that the individual may cast a provisional ballot in that election.
> **(2)** The individual shall be permitted to cast a provisional ballot at that polling place upon the execution of a written affirmation by the individual before an election official at the polling place.[55]

# III. State Compliance with HAVA

## A. 2005 Memorandum of Agreement with Department of Justice

Following the enactment of HAVA, in 2005 California's initial statewide voter registration database was upgraded to the CalVoter system. CalVoter was implemented to comply with HAVA's requirement for a statewide voter registration system.

After CalVoter was online, the Secretary of State contacted the U.S. Department of Justice (Justice), which is the entity responsible for overseeing and enforcing HAVA, to determine the state's compliance under HAVA regarding a statewide voter registration database. Justice was notified that the state had in place a single list of all registered voters.

Justice, however, countered that the installed statewide system was not compliant with HAVA. Under HAVA, the statewide database of all registered voters must be accessible and connected to the state's 58 county election officials. The database also needed to be interconnected with other sources of voter information, such as state entities responsible for death notices and state correctional offices.[56] As a result, Justice determined that the state was in non-compliance with HAVA's voter database requirement.[57]

The Secretary of State then entered into discussions with Justice to learn what was necessary by the state for compliance. The result of those discussions was a Memorandum of Agreement (MOA) between Justice and the State of California.[58] Under the MOA, Justice agreed to not initiate legal action to comply and the State agreed to install "bridges" between the statewide database and required reporting entities. The State also agreed to report to Justice on a monthly basis with updates regarding the status of the project.[59]

---

[55] 52 U.S. Code § - Provisional voting and voting information requirements.

[56] Testimony of Susan Lapsley, Deputy Secretary of State, Office of the California Secretary of State, Testimony before the California Advisory Committee to the U.S. Commission on Civil Rights, Transcript, Hearing on Help America Vote Act, Los Angeles, CA, Aug. 28, 2015, pp. 36-38 (hereafter referred to as Transcript on Help America Vote Act), *available at* https://www.justice.gov/crt/text-proposed-regulations.

[57] Ibid., p.37.

[58] An "interim solution" to meet the requirements of Section 303 of HAVA for a statewide voter registration system was implemented pursuant to a Memorandum of Agreement (MOA) executed with the U.S. Department of Justice (US DOJ) – the enforcement authority for HAVA – on November 2, 2005.

[59] Ibid.

In 2013, the State Auditor completed its examination of the Secretary of State's compliance with HAVA. One recommendation from the examination was that the Secretary of State re-negotiate the MOA. The reasoning for the recommendation was that the MOA had been in effect for over six years, and the state was now close to implementing a compliant statewide voter database system.[60]

According to Agency officials, the Secretary of State did act on the recommendation and reach out to Justice and held conversations with the department about re-negotiating the MOA. Justice, however, declined to re-negotiate the MOA. The position of Justice was that the agency had deferred any sort of enforcement action against the state, so the state needed to comply and implement a statewide voter database compliant with HAVA.[61]

Subsequent to the discussions with Justice, the Secretary of State initiated procurement for a new statewide voter database called Vote-Cal. In July 2015, the new system did test pilot programs with two counties and followed with three additional test pilot programs in October 2015.[62] In 2016, the state gradually deployed to all 58 counties in a series of six "waves." [63]

## B. State Auditor Report on State Compliance with HAVA

The Bureau of State Audits investigates the financial management and effectiveness of state government agencies. This investigation includes audits that examine whether state agencies and programs are accomplishing what they were created to do; whether they are obeying the law; and whether state resources are being used properly. The California State Auditor's staff conducts their reviews in a nonpartisan manner, free from outside influence, including that of the Legislature, Governor, and the subjects of their audits and investigations.[64]

In 2013, the State Auditor released a report on the state's compliance with HAVA.[65] As reported by the Auditor, HAVA provided more than $380 million in federal funding to California to help improve the state's administration of elections by complying with requirements that are set out in three different sections of the Act. These three sections provide funding for activities such as educating voters, training election officials and poll workers, replacing punch card voting systems, and complying with HAVA Title III (Title III) requirements to include the development and deployment of a statewide computerized voter registration list.[66]

A significant problem noted in the audit was that the state had not effectively spent HAVA funds for new voting systems. Specifically, over $22 million in HAVA funds have been spent on

---

[60] California Auditor's Report 2011-2012, Aug. 2013, p.36, *available at* http://www.bsa.ca.gov/pdfs/reports/2012-112.pdf.
[61] Testimony of Susan Lapsley, Transcript on Help America Vote Act, pp. 37-38.
[62] California Secretary of State, Elections Division, at http://www.sos.ca.gov/elections/voter-registration/votecal-deployment-status.
[63] Ibid.
[64] AllGov California  http://www.allgov.com/usa/ca/departments/independent-agencies/bureau_of_state_audits?agencyid=212
[65] California State Auditor, *Secretary of State: It Must Do More to Ensure Funds Provided Under the Federal Help America Vote Act Are Spent Effectively*, Report 2012-112, August 2013 (hereafter Auditor HAVA report).
[66] Ibid., Executive Summary.

replacing voting systems with new systems that counties and voters cannot fully use.[67] Speaking to this concern, Elaine Howle, California State Auditor, said:

> As of June 30 of 2012, the State of California still had $130 million in HAVA money available, but it was tied up because … the State had not deemed itself compliant with Title III. Again, that is money the Legislature could have engaged in the process and provided some of those funds at the local level for training, for improving (voting) systems, those sorts of things. So we really felt that that was something the Secretary of State's Office needed to be pro-active about and reach out of to the Department of Justice and try to work with them to modify the agreement that they had entered into a few years before. The status of that, the Secretary of State's Office listened to us.[68]

The audit also noted that there appeared to be a lack of clarity by the state regarding buying voting systems and the manufacture of them, and what standards are applied by the Secretary of State for voting system approval. State law has required the Office to develop regulations that define this process since 1994. A survey of all 58 California counties found that a number of counties needed additional funding to replace their voting systems, and some county officials expressed concern about the process for voting system approval, highlighting both the conflicting guidance regarding which systems can be used and the lack of vendors developing new voting systems.[69] Addressing this issue, Howle said:

> One of the things we asked the Secretary of State's Office and…the County Registrar's was: "Is it clear what the expectations are?" What we found was the answer to that was "No," even though there was a statutory requirement in California State Law that there be specific voting standards and standards for the elections process and voting equipment and systems…. There needs to be very specific expectations laid out in regulation, and do that through a public process so the County Registrar's, the public can be engaged in that process. So once those regulations are established, everyone across the state -- vendors, citizens, county registrars -- understand what is expected as far as what a voting system should look like, what kind of capacity, functionality that system should have….

> What the Secretary of State's Office was required to do (dates) back to when this statute was enacted in 1994. So it had been a long time to establish (such) regulations. And the Secretary of State's Office took this recommendation very seriously and …started the rule-making process not long after our audit report went public in August of 2013. I am happy to announce, and I have to give the Secretary of State's Office credit, they completed the regulatory process, went through the appropriate state agency in Sacramento, and those recommendations became effective this year, April 1st of 2015.[70]

---

[67] Ibid.
[68] Testimony of Elaine Howle, Transcript on Help America Vote Act, p. 13.
[69] Auditor HAVA report, Executive Summary.
[70] Testimony of Elaine Howle, Transcript on Help America Vote Act, p. 7.

A third issue raised by the Auditor concerned the state's implementation of the National Voter Registration Act of 1993 (NVRA).[71] A key component of this law—sometimes referred to as the "Motor Voter" law—is the requirement that an application submitted for a driver's license simultaneously serve as an application to register to vote for an eligible citizen. However, visits by the Auditor to some California Department of Motor Vehicles (DMV) offices found that the driver's license application did not act as a simultaneous application for voter registration as required by law.[72] Howle noted for the Committee that the State of California must address this issue.

> The Secretary of State's Office needs to engage with the Department of Motor Vehicles and…figure out what we need to do to be able to accomplish this and allow it to be simultaneous. Because the intent of NVRA is to allow people (some ease) to register to vote. If you're going to register your car, you're going in to get a driver's license or ID card, you should be able register to vote very easily. And actually, it should be something that you do not even realize. It is a simultaneous process. So the recommendation that we made in the audit report to the Secretary of State's Office was to work with the Department of Motor Vehicles and develop a new process that would allow Californians to go into their local DMV, conduct business, and then, if they so choose, register to vote simultaneously with whatever transaction they were engaging in. In the response to our initial report and as they have provided status updates, the Secretary of State's Office, has reiterated that they really do not have a lot of control over the DMV.[73]

On October 10, 2015, the Governor signed into law a measure that will register citizen voters through the DMV. Under the program, after the Secretary of State certifies that certain enumerated conditions are satisfied, the DMV is required to electronically provide to the Secretary of State the records of each person issued an original or renewal of a driver's license or state identification card or who provides the department with a change of address, as specified. The person's motor vehicle records would then constitute a completed affidavit of registration and the person would be registered to vote, unless the person affirmatively declined to be registered to vote during a transaction with the Department or the Secretary of State determines that the person is ineligible to vote.[74]

California joins Oregon as the second state in the nation opting to register voters through its Department of Motor Vehicles. The California New Motor Voter Act, AB 1461, was sponsored by Secretary of State Alex Padilla and jointly authored by Assembly members Lorena Gonzalez (D-San Diego), Luis Alejo (D-Salinas), and Kevin McCarty (D-Sacramento).

Howle concluded by telling the Committee that many of the Audit's recommendations have been fully implemented by the Secretary of State. And with respect to voter registration, she said the audit found that although the state may have met the minimum requirements for designating voter registration agencies under the NVRA, it should designate more agencies:

---

[71] 52 U.S.C. § 20501 - 52 U.S.C. § 20511) (formerly 42 U.S.C. §§ 1973gg–1973gg-10).
[72] Auditor HAVA report, Executive Summary.
[73] Testimony of Elaine Howle, Transcript on Help America Vote Act, p. 15.
[74] Assembly Bill No. 1461 at https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201520160.

The last issue in the audit report that we talk about is designating additional agencies (in addition to the DMV) that can assist people who may want to register to vote. Back in 1994, Governor Wilson issued an Executive Order, identifying specific state agencies….One we identified specifically was unemployment offices. We felt that would be a location where there would be a lot of interaction with the public. The only agency that I know that, subsequent to our audit, has been identified as an agency to assist is Covered California. There are millions of people who have gone to the website who have enrolled in (health) insurance coverage through the exchange. So that was a good decision, by the Secretary of State's Office and has been a positive result for the state.[75]

## C. California Secretary of State Comment on Election Administration

The Elections Division of the Secretary of State oversees all federal and state elections within California. In every statewide election, California prepares voter information pamphlets in 10 languages for nearly 18 million registered voters. As the Chief Elections Officer for the largest state in the nation, the California Secretary of State tests and approves all voting equipment for security, accuracy, reliability and accessibility in order to ensure that every vote is counted as it was cast.[76]

The Secretary also ensures election laws and campaign disclosure requirements are enforced, certifies the official lists of candidates for elections, tracks and certifies ballot initiatives, compiles election returns and certifies election results, educates California citizens about their voting rights, and promotes voter registration and participation. HAVA was signed into law by President Bush to address irregularities in voting systems that came to light in 2000, and under HAVA, as previously noted, the office is pursuing the development of a statewide database of all registered voters that is connected and accessible to local election officials and the voter.[77]

## 1. Statewide Voter Registration Improvement Efforts: Database

The Secretary of State is pursuing the new VoteCal system to replace the older CalVoter system. When finalized in 2016, VoteCal will replace the current California voter registration database and provide a single, uniform, centralized voter registration database connecting the Secretary of State and all 58 county elections offices together. The new system intends to improve the voter registration process, provide a publicly available website which will allow voters to register online, and provide a single, official statewide database of voter registration information.[78] Susan Lapsley representing the California Secretary of State, told the Committee:

HAVA requires in Section C, that the state set up and maintained a computerized statewide voter registration list, including the name and registration information of every legally registered voter in the state. The statewide list must be the official list of all registered voters for said elections, and must be connected with other state

---

[75] Testimony of Elaine Howle, Transcript on Help America Vote Act, p. 18.
[76] Secretary of State, Elections Division, at http://www.sos.ca.gov/administration/about-agency.
[77] Ibid.
[78] Ibid.

agency databases to assist state and local officials in keeping them accurate and up to date. The state system must also provide a functional interface for counties because counties in California are the ones who administer elections.[79]

While the Secretary of State is responsible for the oversight of elections, it is really the 58 counties that administer elections. So in order to have a functional statewide system, we need to connect in with each of the 58 counties. So California has actually had a statewide system since 1995. Secretary Bill Jones established a statewide system at the time to look for duplicates and act as a tool for counties to be able to look at a comprehensive list. It was very rudimentary. Secretary Jones got no money to do it hardly. So it was kind of done in-house, and it was not a very robust system. Since 1995, that system was upgraded at times. However, it was done in 1995, so at this point, that was old technology. So Cal-Voter is currently the statewide system of record. We're moving towards Vote-Cal, and we anticipate having that in place and becoming the system of record by June of 2016.[80]

We are very close as of this speaking. There are currently seven counties that are live on Vote-Cal and five more, hopefully going live (shortly). The Vote-Cal project itself has seven phases. There's a planning, design, development, testing, pilot, and then deployment and maintenance operation. We have completed 3 of the phases. We're also done with the fourth phase, which is the testing phase. We just have one piece. I anticipate with that phase 4, we will be done with it, hopefully, in the next two weeks.[81]

We are also in the pilot phase. Counties I talk to that are live on this system are part of this pilot phase. We actually have started the deployment. Deploying these counties takes a lot of training, changes to their databases, changes to ours, productivity. So it's taken --like L.A. County, they're scheduled to go live in March of 2016. We've already started the process of bringing them aboard two weeks ago. So it's underway. And then the last phase is maintenance and operation of the system. So that's just the ongoing maintenance and continuing operation of the system. So that's where we're at with the statewide voter registration system.[82]

California is taking steps to advance such policy positions with same day registration which take effect once the statewide VoteCal database is fully implemented and certified as the official record of voters in the state. Provisional Ballot elements reflect a policy decision in California to allow for convenience voting and options that support voter participation that are administratively burdensome, but that compensate for the technical and regulatory inadequacies that are being addressed with the statewide database.

## 2. Improvements to Voter Registration

---

[79] Testimony of Susan Lapsley, Transcript on Help America Vote Act, pp. 36-37.
[80] Ibid.
[81] Ibid.
[82] Ibid.

The California Advisory Committee also heard about the commitment of the Secretary of State to increasing opportunities for California to participate in our democratic process. In recent years, there has been low voter turnout.  The Secretary of State is seeking to identify remedies to that issue insofar as California has the opportunity to think differently about the election process. Steve Reyes, General Counsel, Secretary of State, discussed some of the initiatives by the Secretary of State to improve citizen access to voting.

> In 2012, we went online with the California Online Voter Registration Website. For those who are not familiar with it, it's a new powerful tool to allow people, from their homes to their phone. To date, 1.8 million people have availed themselves of that choice. You can register for the first time. You can change background. You can change voter preferences, language preferences, political party preferences. Anything that is on that registration form can be changed.. In one month, I add that 800,000 people registered to vote for the first time, and a third of them were under 25. So that's providing an ongoing tool that exists.[83]

> With respect to voter registration, the Secretary has sponsored legislation that is designed to modernize our registration system when Californians interact in person or online or by mail with our Department of Motor Vehicles. That was the legislation that the state auditor was referencing, AB1461, which she described, and is true, has been moving very smoothly and quickly through the legislative process.[84]

In addition to voter registration reforms, Reyes discussed other voting administration improvements that were under consideration by the Secretary of State. These improvements included the establishment of voting centers and upgrading old and obsolete voting machines.

> Secretary of State Padilla has announced that he and his staff are working with the governor and our legislative leaders to help identify additional funding for new, modernized voting systems. As you may have heard, there have been a number of systems that are now reaching their end-of-life term. So they are at the final stages of usefulness. We want to make sure that we can provide a means for counties and folks to pay for and implement new voting systems in the State of California. Of course, that depends on funding to allow us to work with our counties to make sure they can identify systems that are appropriate and work for their particular needs. So Californians, we're heading toward a big election year.[85]

> Secretary Padilla has also been working closely with our county election officials and partners to introduce legislation on vote centers, which is a concept that would help modernize and think differently about the way we cast ballots. The idea behind vote centers is that you would have these community vote centers in various parts of a jurisdiction to allow folks, perhaps two weeks before an election, to cast ballots anywhere within the county. So no longer are you going to be tied

---

[83] Testimony of Steve Reyes, General Counsel, California Secretary of State, Transcript on Help America Vote Act, pp. 29-30.
[84] Ibid., p. 30.
[85] Ibid., p. 73.

necessarily to that polling place in your neighborhood. But you can go somewhere that is convenient to your work, where you drop your kids to school, and where you run your errands. These  type of systems will allow folks to cast ballots there, vote by mail, drop off their ballots, drive up and drop off their ballots in vote drop-off locations as well.[86]

# IV. Election Administration in Los Angeles County California

## A. Voter Responsibility of Los Angeles County Clerk and Registrar

The Los Angeles County Registrar's Office is responsible for the registration of voters, maintenance of voter files, conduct of federal, state, local and special elections and the verification of initiative, referendum and recall petitions. In January 1968, the Departments of Registrar of Voters and County Recorder were merged by the Board of Supervisors and further merged with the County Clerk in January 1991.[87]

Los Angeles County is the largest electoral jurisdiction in the country, with a population of nearly 10 million residents. The county spans 4,083 square miles, and includes 88 cities, as well as hundreds of municipal school and special districts. Each year, the office participates in approximately 200 elections for schools, cities and special districts. There are approximately 4.8 million registered voters, as well as 5,000 voting precincts established for countywide elections.

To place the immensity of the county in context, Dean Logan, Registrar-Recorder County Clerk for Los Angeles County, told the Committee that the county's electorate is larger than that of 42 of the 50 states in the country and reflects a greater cultural, economic, and demographic diversity than in any other electoral jurisdiction in the country. Additionally, the community served by the Los Angeles County registrar is highly mobile and current registration processes necessitate an individual having to complete a new registration form each time they have a change in residency.[88]

The Census reports that in 2014, the population of persons 18 and over—that is the number of persons of voting age—was 7,810,096.  Of those, 4,544,455 million (58.2 percent) are registered voters.  The actual voter participation rate in the county has not been high in recent years. In the 2014 mid-term elections, 1,518,835 persons voted. This is a participation rate of 33.4 percent.[89]

The 2014 mid-term election also prompted a media report of persons voting multiple times. In response to the report, an audit of voter registration records in Los Angeles County following the 2014 election found a few dozen voters with duplicate registration records, but did not find any cases where people had actually voted twice in the same election. County supervisors had asked for a review of voter records after KNBC News reported in November that at least 442 people—

---

[86] Ibid.
[87] Los Angeles County Recorder-Registrar/County Clerk, at http://www.lavote.net/about-us/background.
[88] Testimony of Dean Logan, Transcript on Help America Vote Act, p. 51.
[89] Table 2.

and possibly as many as 52,000—were registered to vote more than once in the county registrar's system.[90]

The Los Angeles County Auditor-Controller office reviewed a sampling of 100 voters with possible duplicate registrations. Many of the duplicate registrations were found to have been in the system for three or four years. Records from the registrar initially showed that three people had voted twice in a recent election, but a further review showed that there was not duplicate voting but rather registrar staff mistakes in entering voter information.[91]

**Table 3: Los Angeles County, California—Adult Population, Registered Voters, Number of Voters in 2014 Elections, 2014 Voter Participation**

|  | Number/percent |
|---|---|
| Adult population--persons 18+ years of age | 7,810,096 |
| Number of 18+ population registered to vote | 4,544,455 |
| Number of voters in 2014 mid-term election | 1,518,835 |
| Voter participation in 2014 mid-term elections | 33.4 |

Source: California Advisory Committee from Census data and Los Angeles County Recorder-Registrar data.

## B. Comment on Election Administration by Los Angeles County Registrar

Dean Logan told the Committee that he came prepared to discuss with the Committee issues regarding: (1) the establishment of a voter registration database, (2) duplicate voter registration and voting, (3) provisional voting, and (4) election official training.[92] With respect to the establishment of a voter registration database, a system should be in place for testing by the end of 2015. As to voter rolls, identifying duplicate records in a database of 4.8 million records is one of the more challenging processes for the county registrar office. Regarding provisional voting, it is to allow an unverified registered to vote. And the County's election training section works to deliver effective election training to election day workers.

### 1. Establishment of a Statewide Voter Registration Database

A requirement of HAVA is that each state must establish a statewide voter registration database to include the name and registration information for every registered voter within each states, and to assign a "unique identifier" to each voter.[93] The list is to be coordinated with other agency databases within each state, and accessible electronically to local election officials. Logan told the Committee:

---

[90] Abby Sewell, Los Angeles Times, *County audit finds duplicate voter records but no one who voted twice*, Feb. 9, 2015 at http://www.latimes.com/local/lanow/la-me-In-voting-record-audit-20150209-story.html.
[91] Ibid.
[92] Ibid.
[93] HAVA, § 303(a).

Los Angeles County, through its legislative advocacy, and my department, through its participation in national and statewide associations, is actively involved promoting the completion and implementation of (a) functional and robust statewide database…. Los Angeles County is slated for testing and implementation of the new system following the November 2015 local election. We already have a cross functional team from my office and the Secretary of State's Office, working on data readiness and preparing for that transition.[94]

In addition to working in partnership with the Secretary and other counties in California, L.A. County continues to advocate California's participation in interstate data exchanges to both improve voter list maintenance and to better identify eligible unregistered citizens for outreach and education. In anticipation of the completion of the new statewide database and further enhancement to update and modernize the voter registration process, L.A. County is continuing our efforts to enhance, improve and expand voter filing and maintenance and promote access to voter registration services through community outreach and education programs.[95]

## 2. Duplicate Voter Registration in Los Angeles County

The custody and maintenance of the county's 4.8 million voter records is the core function of the Registrar-Recorder County Clerk, and involves myriad processes and activities associated with ensuring that eligible citizens who have registered to vote are properly assigned to the appropriate jurisdiction and are provided information essential to their ability to exercise the voting franchise. Logan first told the Committee:

Our voter compilation is of numerous records from households that including members who have the same name as well as records with common names and birth dates, but different addresses and state identification numbers. It can be quite difficult to determine with certainty whether two records are associated with the same person. Additionally, the community we serve is highly mobile and current registration processes necessitate an individual having to complete a new registration form each time they have a change in residency. And that gets further complicated with the frequency of elections, and we have a proliferation of elections in Los Angeles County.[96]

He later noted:

To address these challenges, the county conducts routine list maintenance activities that identify and update invalid or inactive records while also assuring a high degree of confidence in avoiding false/positive matches that could impinge on voter's rights. That said, the county has made significant strides in enhancing and

---

[94] Testimony of Dean Logan, Transcript on Help America Vote Act, pp. 51-52.
[95] Ibid., p. 52-53.
[96] Ibid., pp. 53-54.

improving our voter file maintenance. This includes the development of a number of customized data-matching algorithms to identify potential duplicate records.[97]

Logan described the importance of the official voter file as well:

The official voter file, however, is not merely a mailing list or marketing file. There is nothing more threatening to the integrity of our democratic process than administrator disenfranchisement. And we've seen examples of incomplete data matching and purges in other states that have demonstrated that such attempts negatively impact the sense of fairness and equality that is so critical to elections.[98]

He also stated that the Department took additional steps to ensure voter data integrity:

Demonstrating our commitment to these efforts, the Department established a full-time unit within our Voter Records Research and Integrity Section to review the reports from the queries, and to perform regular and consistent voter file activities. As a result of these enhanced and customized quarries, over 82,000 records were identified for review, resulting in the cancellation of more than 37,000 records as a result of those records.[99]

Finally, Logan detailed the process for identifying and handling potentially duplicative records:

In all of these queries and list maintenance activities, records were identified in every category that looked very much to be a match. But after further research, turned out not to be duplicate records. It is a very tedious process, but we have to be careful that we are not removing records of people who are active and have the legal ability to cast a vote. The same thing is true with duplicate records.  As one example, (the query showed) two voters at the same address with the same exact date of birth. Same first name; different last name. This certainly would be a record that you would flag that looks like a duplicate. However, when we looked further, these voters had different social security numbers and different DMV records. So they are not, in fact, the same.[100]

### 3. Provisional Voting in Los Angeles County

In general, provisional ballots serve two broad purposes in California. The first– consistent with HAVA– is that it serves as a failsafe mechanism to ensure that an individual whose status as a registered voter cannot be verified is still able to cast a ballot, that is then held pending verification. The second is the use of provisional ballots to allow voters to vote at sites other than their assigned polling place.  Logan told the Committee:

Provisional ballots ensure that an individual who appears to vote and their status as a registered voter cannot be verified on the spot is still able to cast a ballot that is

---

[97] Ibid., p. 54.
[98] Ibid., pp. 58-59.
[99] Ibid., p. 56.
[100] Ibid., p. 57.

then held for processing, pending verification of their eligibility and confirmation of their registration status as part of a post- election canvas. The second, which is more unique to California or the western part of the United States, is using provisional ballots in a manner that's characterized as 'convenience voting', where registered voters appear to vote at a location other than their assigned polling place or where they've been issued a vote-by-mail ballot. They choose to go to the polling place, but then they do not have their vote-by-mail ballot. In those cases, the voters were issued provisional ballots. The latter category has resulted in a trend of increased numbers of provisional ballots in recent elections, in some cases trending at or around 10 percent of the ballots cast in the election.[101]

Logan also addressed the positive impact that changes to conditional election-day voter registration could bring for voters:

California is positioned to see improvement in this area through the authorization and implementation of conditional election day voter registration. Those services will be available to voters in the first election cycle following the implementation of the statewide database. Once that is in place, voter will have the ability to update their registration records or complete the registration process at the time of voting, thus decreasing the likelihood of casting personal ballots.[102]

### 4. Election Official Training in Los Angeles County

Training is conducted for election day workers to prepare them for the critical functions they conduct on election day. Such training must meet the needs of voters with respect to information about ballots and voting equipment, Federal and state law with respect to ensuring eligibility to vote, and equal access to voting for persons with disabilities and limited English speaking ability. Logan told the Committee:

Los Angeles County is committed to delivering effective election training to election day workers for federal, state, local and special elections. The County's training section conducts more than 500 classes at various facilities and locations throughout the county leading up to each election. Training is conducted for over 23,000 election day workers to prepare to perform the critical functions that we rely upon them for on election day.[103]

He also provided additional information about the types of training that are available:

There are several different types of training that are offered. These trainings consist of hands-on training, by presentations, scenario-based videos, written training, manuals, handouts, and job cards. And this training begins one month prior to and continues through the weekend prior to the election.[104]

---

[101] Ibid., pp. 58-59.
[102] Ibid., pp. 60-61.
[103] Ibid., p. 62.
[104] Ibid.

23

**Figure 1: Map of Los Angeles County California**



Source: Google maps

> (With respect to limited English voters), according to the 2010 U.S. Census Data, 57 percent of Los Angeles County residents speak a primary language other than English, and 26.4 percent assess their own speaking ability in English at less than very well. Under provisions of the Federal Voting Rights Act, Minority Language requirement, the county must provide written election material in 10 languages, including English and provide bilingual poller systems in at least four additional dialects.[105]

Logan also discussed the growing demographics of persons with disabilities in L.A. County:

> Additionally, based on the 2007 Los Angeles Health Surveys, 19.6 percent or 14.6 million voting-aged adults in the county reported having a disability. And residents over the age of 65 are among the fastest growing demographics in the country. Given these demographics in our jurisdiction, L.A. County in 2013 produced comprehensive reports describing the numerous services provided to voters with primary language other than English and for voters with disabilities and specific needs.[106]

---

[105] Ibid., p. 64.
[106] Ibid.

24

In addition, Los Angeles County hired IDEO to create a voting system that offers contemporary experiences and equal access for all. The County hopes to switch to the new machines in time for the 2020 presidential election. After the 2008 election drew record numbers to the polls, county election officials decided it was time to replace the county's obsolete machines. IDEO has developed a touch screen system that incorporates features familiar to voters used to scrolling and tapping.[107]

# V. Election Administration in San Diego County California

## A. Voter Responsibility of San Diego County Clerk and Registrar

The San Diego County Registrar of Voters (ROV) is entrusted with providing the means for all eligible citizens of San Diego County to exercise their right to actively participate in the democratic process. The Department works to ensure widespread, ongoing opportunities to register and vote in fair and accurate elections for all federal, state and local offices and measures. The ROV is also responsible for providing access to the information needed for citizens to engage in the initiative, referendum and recall petition processes and is the main repository for all County, school district, and special district campaign finance disclosure statements.[108]

The Census reports that in 2014, the population of persons 18 and over in the County—that is the number of persons of voting age—was 2,535,686.  Of those, 1,546,924 million (61 percent) are registered voters.  The actual voter participation rate in the county has been high in recent years. In the 2014 mid-term elections, 692,434 persons voted for a participation rate of 44.9 percent.[109] This was a noticeably higher rate than observed in the three nearby counties of Los Angeles (33.4 percent), Orange (Riverside (40.1 percent), and San Bernardino (34.4 percent).[110]

The County Registrar-Recorder is responsible for the conduct of federal, state, and local elections, as well as for the verification of initiative, referendum and recall petitions and the receipt of county, school and special district campaign financial disclosure statement. To illustrate the challenges facing the County Registrar-Recorder, in the 2014 mid-term election, the office was responsible for 1,432 voting precincts on election day and processed 91 voter petitions (2 statewide petitions, 2 local petitions, and 87 candidate petitions) and 24 ballot propositions (6 state and 18 local).[111]

Although generally holding problem-free elections, similar to many other jurisdictions, San Diego County has reported voting machine problems. In many parts of the country, voting machines in use today were purchased with HAVA funds. Inspectors and regulators have subsequently discovered dozens of security flaws in different types of machines. For example, in 2008, a Princeton University group found that it only took about seven minutes to hack into an

---

[107] Bloomberg Businessweek, L.A. tackles a national disaster: voting machines, July 13-July 19, 2015, pp. 22-3.
[108] San Diego County Registrar of Voters, http://www.sandiegocounty.gov/content/sdc/info/bythenumbers/rov.html.
[109] See Table 2.
[110] Ibid. Orange County, directly north of San Diego County had a similar participation rate of 44.9 percent.
[111] San Diego County Registrar of Voters, http://www.sandiegocounty.gov/content/sdc/info/bythenumbers/rov.html.

AVC Advantage voting machine—currently used in over 90 counties, and plant malware to steal votes from one party and give them to another.[112]

In 2007, a comprehensive California review uncovered serious weaknesses in the software architecture of a number of voting machines. One machine was the Diebold AccuVote TSX, which is currently in use in over 400 counties nationwide. San Diego County was one jurisdiction that felt the effects of that decision. Roughly 10,000 AccuVote TSX touchscreen machines were purchased by San Diego County for $25 million dollars. They are now sitting shrink-wrapped in a warehouse, and the County has since switched to optical scan ballots and has had to make the system work with a limited supply of such ballots.[113]

**Table 4: San Diego County, California—Adult Population, Registered Voters, Percent Registered Voters, Voters in 2014 Elections, 2014 Voter Participation**

|  | Number/percent |
|---|---|
| **Adult population--persons 18+ years of age** | 2,535,686 |
| **Number of 18+ population registered to vote** | 1,546,924 |
| **Number of voters in 2014 mid-term election** | 692,434 |
| **Voter participation in 2014 mid-term elections** | 44.9% |

Source: California Advisory Committee from Census data and San Diego County Recorder-Registrar data

## B. Comment on Election Administration by San Diego County Registrar

Michael Vu, Registrar-Recorder for San Diego County, told the Committee that his office, like other counties, is working with the Secretary of State to develop a reliable and efficient statewide voter database. In the meantime, the public expects the county's voter database to be accurate and up-to-date. With respect to provisional voting, state law initiated the voting provision to allow a person registered within the County the right to cast a provisional ballot anywhere within the County, which is not the case in all states.  San Diego County recruits up to 7,000 volunteers to serve as poll workers for statewide elections, and the County engages in a train-the-trainer" model to provide expert and consistent training across the County.

### 1. Establishment of a Statewide Voter Registration Database

When completed in 2016, VoteCal will replace the current Cal-Vote California voter registration database and provide a single, uniform, centralized voter registration database that meets HAVA requirements. It is anticipated that the new system will connect the Secretary of State's office and all 58 county election offices together providing a single, official statewide database of voter registration information.[114]

---

[112] Michael Keller, Aljazeera America, *Voting's Impending Crisis—with US voting machines aging, states have few funds to replace them*, at http://america.aljazeera.com/multimedia/2014/9/voting-s-impendingcrisis.html.
[113] Ibid.
[114] California Secretary of State Alex Padilla, VoteCal Project, at http://www.sos.ca.gov/elections/voter-registration/votecal-project.

VoteCal was to begin implementation in 2015 with five pilot counties (El Dorado, Mendocino, Orange, Sacramento, and Solano). The remaining counties are grouped into a series of "waves", and monthly wave deployments will occur from October 2015 to March 2016. After VoteCal is deployed to all counties and VoteCal is working correctly, VoteCal will be declared the official system of record for voter registration in the State, which is expected to occur in June 2016. Regarding VoteCal, Michael Vu told the Committee:

> The Secretary of State's team and our local election management are working in concert with San Diego County to provide the necessary support to migrate into our new Vote-Cal system. This includes ensuring the necessary hardware and software are in place and that it is well-tested to actively interact and reflect the status of every registered voter in the state. For those who are currently in the middle of their deployment, inasmuch as it is important to comply with this section of HAVA, it is equally as important that its implementation is right. So there should be caution in exercising it. The Secretary of State Padilla and his team have demonstrated that they are moving with character to achieve both goals.[115]

## 2. Duplicate Voter Registrants in San Diego County

The San Diego County Registrar-Recorder is responsible for maintaining a database of 1.4 million voter records. The number of persons in the County's database is larger than the total population of 11 states. Most of the legal obligation for list maintenance activity is covered by NVRA, not HAVA.  Michael Vu told the Committee:

> The San Diego County database of 1.4 million registered voters is… highly regulated by Federal and State laws. In fact, the majority of the list maintenance activity is covered by the National Voter Registration Act, not HAVA. And (in accordance with that act election officials are) to err on the side of keeping voters on the list of registered voters. So we are extra careful not to inadvertently disenfranchise the voter because of being overly aggressive and removing voters without going  through channels spelled out in NVRA.[116]

> On the other hand, the public and ourselves expect that our database is as up to date as possible. And so, again, we have an extensive program in place to ensure proper maintenance list efforts. These include the Secretary of State's Office sending us monthly duplicate records and deceased records for us to verify. To give you an idea of the number of records we are processing in San Diego, we analyzed a nine month window of maintenance and registration activity and over 515,000 records were received from government entities and voters during this time frame.[117]

> Our local County Health Department sends monthly and electronic lists of those that have passed away in the county for us to view and take action as appropriate. We run duplicate checks on the registration file on a quarterly basis. On a daily basis we receive information of county voters who have registered in another

---

[115] Testimony of Michael Vu, Transcript on Help America Vote Act, pp. 73-74.
[116] Ibid., p. 80.
[117] Ibid., pp. 82-83.

jurisdiction. We receive information from family members notifying us that a person is no longer a registered voter within the county.[118]

We run national change-of-address comparisons before each election in order to have the most updated information. And pursuant to NVRA, any mailed ballot or sample ballot or voter information pamphlet triggers affordable confirm process to be sent to the voter. And the voter is then placed on inactive status. Should the voter have no activity for two general elections, we are able to cancel them from the voter rolls. Finally, we receive daily Department of Motor Vehicle registration updates, and these are supplied on a weekly basis.[119]

As I have mentioned before, when a person registration to vote, there is a feedback to safeguard their right to be registered to vote and our ability to maintain the files. And this happens in every single county, across all 58 counties, when a person re-registers to vote that triggers a process of that record. We automatically provide feedback known as that voter notification card. We send it to the registered voter at their address. If that card comes back undeliverable, then we have the ability to act on it and put them on inactive status. If we do not receive that card back, they will remain on the active status.[120]

### 3. Provisional Voting in San Diego County

California was the first state in the nation to introduce the safeguard whereby a person registered within the county has the ability to cast a provisional ballot anywhere within the county and have his/her vote on count. Michael Vu told the Committee:

To give you some idea as to the numbers in San Diego County in the 2012 presidential general election, 103,004 individuals voted a provisional ballot and 87 percent or 89,686 of the ballots were partially or fully counted. In last November's 2014 gubernatorial general election 35,651 provisional ballots were cast and 93 percent or 32,967 were partially or fully counted. In both elections, the main reason for not counting the ballot was the result of individuals not being registered to vote within the county.[121]

Although provisional balloting is a safety net instituted across the country, it should be seen and used as a measure of last resort, an exception rather than the rule for a number of reasons. We highly encourage vote within their assigned precincts so they are assured they will be able to vote on all contents in which they are eligible. As Mr. Logan had mentioned, we share the same things. We want all voters to be able to cast all the content that they are eligible to. As an example, due to the number of contested political jurisdictions that overlap San Diego County, there are 569 different versions of the official ballot during the November 2014 electoral general election. The Voter who visits an unassigned voting place will most likely

---

[118] Ibid., p. 81.
[119] Ibid., p. 82.
[120] Ibid.
[121] Ibid., p. 70.

vote on a difference set of content that had she or he gone to their assigned polling place.[122]

We encourage voters to vote in their voting precincts so that they will have a good voting experience. When a voter is not voting at their assigned voting precinct, it takes more time for them to issue the ballots, and more time get their ballots counted. Additional time by coworkers to serve a voter may, in turn, contribute to longer lines at a polling place, particularly during IT voting. Finally, voters are encouraged to vote at their assigned voting place. This reduces the amount of time and cost associated with verifying and validating provisional ballot.[123]

## 4. Election Official Training in San Diego County

San Diego County recruits up to 7,000 volunteers to serve as poll workers for statewide elections. Poll workers are schooled by vetted trainers, who themselves must have successfully completed a three-week intensive course to learn all aspects of election day procedures and management practices at the polls. Michael Vu told the Committee:

In order to ensure the proper administration at the polls and to ensure that every voter has the opportunity to cast, at minimum, a provisional ballot to ensure voters have a robust coworker training program. As part of their course work, coworkers are required to take a two-hour, online training course with another two-hour onsite course with our trainers. As it gets closer to election day, we open up workshops to any coworker to hone in their skills and ask questions. In addition, each coworker receives a detailed, easy to read, and reference coworker manual so they are able to study and refer to and are able to purchase should they have any questions.[124]

---

[122] Ibid., pp. 70-71.
[123] Ibid., p. 71.
[124] Ibid., p. 79.

**Figure 2: Map of San Diego County California**



Source: Google maps

Continuing about election worker training, Michael Vu told the Committee about the County's "train-the-trainer" model approach, which provides both expert and consistent training across the County.

> Our office conducts a train-the-trainer model, where our trainers go through a three-week intensive course to learn all aspects of election day procedures and management practices at the polls. These individuals are highly skilled, many having training background themselves. The three-week train-the-trainer course includes coverage of all election day practices and scenarios and covers the use of the poll place supplies. In this manner, we are able to create consistent training across all the training teams. At the end of the training course, it is capped with a dress rehearsal. Should a team not perform to the standards expected, they may not train coworkers. It should be noted that, since these trainers know the procedures and all the poll place election materials by then, these trainers become our coworker hotline staff on election day, making it efficient to quickly answer election day procedures by poll workers.[125]

---

[125] Ibid., pp. 79-80.

# VI. Organization and Public Comment on Election Administration

Three organizations with dedicated interest in voting systems and voting integrity were invited by the California Advisory Committee to speak at the public hearing. They were the Pew Charitable Trusts, the Election Integrity Project, and Everyone Counts. The Pew Charitable Trusts publishes an *Elections Performance Index*, which analyzes 17 key indicators of election administration. The Election Integrity Project is a non-partisan election oversight organization based in California whose members observe and research election practices and report on alleged voting irregularities. Everyone Counts is an election and voting system technology company based in San Diego, California, that provides electronic election administration technology to governments and private entities.

### A. Comment on Election Administration from the Pew Charitable Trusts, Election Integrity Project, Everyone Counts, Communities Actively Living Independent and Free, and Mark Sonnenklar

#### 1. The Pew Charitable Trusts

David Becker, Director of the Election Project for Pew Charitable Trusts, was interviewed by the Committee subsequent to the public hearing. He discussed the Trusts Elections Performance Index (EPI), and the integrity of election systems generally.

> The EPI is used by Pew to evaluate key indicators of election administration, and Pew scores each state's performance by indicator and overall score. The Index itself is not an absolute score, but rather a relative measure of how states perform against each other. Pew has been issuing EPIs since 2008, and an EPI for 2014 is due to come out in the Spring of 2015. Pew releases Indices in each federal election year, so to date there have been releases for 2008, 2010, and 2012. Regarding California's low relative EIP standing in election processes in comparison to other states, the biggest thing going against the state was the lack of a look-up tool of voter rolls at the precinct level. As of 2012, precinct workers in the state did not have a look-up capability. But by 2014 that had corrected, and going forward precinct workers can look-up a voter information.[126]

> It is not possible to compare 2010 Indices with either 2008 or 2012 as 2010 measured a different election cycle, but it is appropriate to measure Indices between 2008 and 2012 to gauge changes in state performance. From that comparison, Pew concludes that California improved its election processes during that 4-year period, but still fell performance-wise compared to other states. In 2008, California ranked 47th among all states in election administration, and although in 2012 the state's EPI score increased to 54, the state's ranking fell to 49th as other states showed improvement. To that low ranking, I think California has some areas that should be further examined for inefficiencies in the administration of election processes. The classic area for attention is provisional ballots. Roughly one-half of all provisional

---

[126] David Becker, telephone interview, California Advisory Committee to U.S. Commission on Civil Rights, Sept. 17, 2015 (Record of interview on file with Western Regional Office, U.S. Commission on Civil Rights files).

> ballots nationwide are cast in California. Some of that is the result of state policy, as California state law for example allows a provisional ballot to be cast if a voter comes to the wrong precinct.[127]
> California also struggles with a fairly high percentage of provisional ballots that are rejected. One likely reason for that is the high number of "mail ballot" voters in the state.

For more than a decade, the U.S. Census Bureau's Current Population Survey has asked nonvoters why they did not submit a ballot. This indicator captures the number of people who responded that they did not cast a ballot due to an "illness or disability (own or family's)."

Voters with disabilities and permanently ill voters face unique challenges, such as inaccessible polling places and voting technology that is difficult to use. Federal law mandates that all polling places must generally be accessible to physically disabled voters. The Help America Vote Act of 2002 requires that at least one voting machine in each precinct be equipped for those voters.

---

[127] Ibid.

**Figure 3: California EPI Index Graph**



Source: CALIFORNIA EPI INDEX GRAPH FROM PEW CHARITABLE TRUST, 2014

If a person is identified as a "mail ballot" voter, on election day that person can only vote in person by delivering his or her "mail ballot" in person to the precinct. If the voter attempts to vote in person and the election officials see that the voter is a "mail ballot" voter, then his or her vote will be considered a provisional ballot. The provisional ballot will only count after the state ensures that the voter did not also cast a "mail ballot." So mail ballots drive a lot of the provisional voting observed in the state.[128]

Pew is also supportive of online voter registration processes. Online voter registration saves taxpayer dollars, increases the accuracy of voter rolls, and

---

[128] Ibid.

provides a convenient option for Americans who wish to register or update their information. Pew has analyzed online voter registration and has found zero fraud as a result of this election process. Moreover, the accuracy of voter rolls is vastly improved as data entry errors are significantly reduced. That is because the voter directly inputs the information, instead of a data entry clerk.[129]

Low voter turnout continues to be a concern, not just in California but nationwide. Preliminary data from the Election Project indicates that national turnout for the 2014 mid-term elections was below 37 percent. There is no one simple answer for low voter turnout. It is complex situation of factors that play out differently in different years and areas. But it is nevertheless thought-provoking that in 2014, half of all California voters received a "mail ballot" yet only about one-third of those persons voted. The publicizing of the Index seems to have generated conversation about addressing voter turn-out and voter integrity. Pew would like to see that conversation continue.[130]

And even though California has historically performed poorly in terms of voter turn-out and election process, the state is situated to make great strides. Across the state, there is a remarkably high quality of county recorder/registrars. The new Secretary of State has demonstrated a commitment to improving the election process in the state. And given the considerable wealth in the state, there are sizeable financial resources to allow the state to make great and quick strides to improve voting integrity.[131]

Moreover, the issues raised in HAVA reflect that the 21st century is experiencing a new era in voting.  It is becoming more common for electronic voting systems to be scrutinized for integrity and reliability. Expensive, antiquated purpose-built hardware-based systems and manual and paper processes are being transformed with systems designed to result in increased accessibility and improved accuracy for all elections, as well as enhanced security, increased auditability, and significant cost savings.

---

[129] Ibid. In January 2014, Pew released its assessment of online voter registration in a briefing paper, *Understanding Online Voter Registration* and followed with a second brief in May 2015, *Online Voter Registration—Trends in development and implementation.*
[130] Ibid.
[131] Ibid.

## 2. The Election Integrity Project

The Election Integrity Project (EIP) is a nonpartisan, citizen organization that seeks to empower "citizen volunteers, through education and training to participate actively in protecting our freedoms and way of life."[132] According to their website, EIP performs the following functions:

- Research County & State Voter Rolls.
- Educate volunteer poll workers, poll observers, and ballot processing observers in the state election codes for their election process.
- Train volunteer observers to interact lawfully with elections officials to rectify perceived inconsistencies.
- Send Position Papers to the Legislative Committees on proposed bills that impact the integrity of the election process.
- Inform citizens about impending legislation, encouraging them to communicate with their own representatives and direct their voting patterns.[133]

Linda Paine, founder and president of EIP, spoke before the Committee regarding their work to ensure the integrity of California elections. In particular, they attested to their efforts to conduct county by county research to enhance the integrity of the state voter database, and "train citizens across the state to observe polls and document whether the laws are being followed."[134] EIP established a centralized database and server, and has volunteer analysts to analyze the data collected to create a findings report that they provide to registrars.[135] In addition, EIP meets with registrars to discuss their findings.

As a result of EIP's work, Paine stated that the organization has "found hundreds of thousands of duplicates across the state. The implementation of the online voter registration noted in our research found that there were thousands of voters who registered in other counties."[136] Paine asserts that the causes of the duplicative voter registrations are faulty county operating procedures and technology. According to Linda Paine:

> Why does this happen? Because with the memorandum of agreement, the statewide voter database that California uses is a model that makes it impossible for the counties to do cross country research and for the state database to know immediately if I have registered in multiple counties. Just for clarity, we have a compliant topdown centralized database. It functions this way: If I register in L.A. County, it immediately shows up in Sacramento. And so if I have already registered in another county, it's flagged. If I'm duplicating or voting for a deceased person, it's flagged. We don't have that.[137]

---

[132] Election Integrity Project, 2016. "Who We are: Our Mission," *available at* https://www.electionintegrityproject.com/.
[133] Ibid.
[134] Testimony of Linda Paine, Transcript on Help America Vote Act, p. 165
[135] Ibid., p. 167
[136] Ibid., p.168.
[137] Ibid.

Paine provided evidence of EIP's efforts in the form of testimony emailed by several citizens, declarations from the citizens of Nevada County where there is a civil grand jury decision regarding voter irregularities, a 2014 observation report from Trinity County and L.A. County, as well as a letter to the Secretary of State, a report from the EIP Chief Analyst, a memorandum of investigation into a city county raise in San Diego Valley in L.A. County, and 12 packets of their training materials.[138]

She also spoke regarding her hope that the new Vote-Cal system would make a positive difference in the state, but cautioned that a similar system in the past did not provide the needed integrity and security in the elections.[139]  Paine suggested that citizen oversight of the Vote-Cal system and standardized pricing for purchasing voter rolls would be helpful to ensure both the continuation of EIP's work and the integrity of the voter system in California.[140]

Ruth Weiss, the San Diego Coordinator for EIP, spoke to the Committee regarding the issue of provisional ballots. First, she stated that California has a large number of provisional ballots compared to other states, and that "with all the difficulties with validating those and making sure that they're processed appropriately and that there isn't some sort of fraud involved in it, it's a big job and we're concerned about that."[141] She also cited a 2012 statistic that found that the number of provisional ballots cast in California alone was 40 percent of all the national provisional ballots cast.[142]

Weiss discussed the balance between providing provisional ballots as a protection for "voters who are the legitimate victims of error or someone who may not be able to make it back to his polling place in time to vote,"[143] but that there are also risks inherent in providing provisional ballots.  As a result of these ballots, she stated that "almost every provisional voter is going to vote out of precinct,"[144] and that poll workers are providing incorrect information to potential voters regarding when the votes will be counted. However, she found that the large number of provisional ballots was leading to large delays in publicizing the results of the elections, which in turn eroded public confidence in the election process.[145]

### 3. Everyone Counts

The Committee also heard from Lori Steele, Founder and CEO of Everyone Counts, universal voting, and the way in which voting systems are mission critical in ensuring the integrity of the voting process.  For Steele, it was important to have the requisite experts on voting processes and practices to design meaningful integrity and security measures for the voting system. According to Steele:

---

[138] *See* Ibid, p. 166.
[139] *See* Ibid, 169.
[140] Ibid.
[141] Testimony of Ruth Weiss, Transcript on Help America Vote Act, pp. 170-171.
[142] Ibid., p.171.
[143] Ibid.
[144] Ibid., p.172.
[145] Ibid., p. 175

> [W]e need to bring together experts in administrative process of elections, experts in security and technology and experts in accessibility. And we need to put all those things together into a platform that can give voters what they need and can give election administrators what they need. And Everyone Counts has been doing this for well over a decade.[146]

Steele also emphasized the links among up-to-date technology, wise spending, and integrity in the voting process:

> The Help America Vote Act resulted in $3.9 billion being spent in the United States. 3.9 billion being authorized and 3 billion being spent. There's about 800 million left somewhere in the states. Those dollars, those billions of dollars were used to buy 30- and 50-year-old technology. Those technology you read about in the newspaper that isn't that accessible and that slips votes because the screen calculated – the screen calibration is so old. And California is thinking of buying new voting systems.[147]

Steele stated that California prohibited the type of greater security that her system provides, and was even considering using mail in ballots. For Steele, use of the mail ballots may represent a lost opportunity for California's voters:

> But what if they could have better benefits? What if they could have fully accessible absentee? What if they could have fully auditable absentee? What if they could have military grade encryption of every single ballot?[148]

However, Steele posits that California law prohibits the introduction of such technology into the voting process:

> In California, you cannot. There are three lines in the code that prevent that. One says you can't use the Internet ever. One says you can't use wireless technology ever. The other one is also about wireless technology.[149]

In conclusion, she suggested that if California seeks to introduce new voting technology to the state, then the laws should be adjusted to accommodate these new measures:

> So if California is going to think about ensuring every person in California who has the right to vote has the ability to do so privately, independently and with greater security than offered in any other voting system, then California needs to think about adjusting their laws, so that federally certified voting systems can be – that provide the remote opportunities to vote and in-person opportunities to vote

---

[146] Testimony of Lori Steele, Transcript on Help America Vote Act, p. 175.
[147] Ibid., p. 134-135
[148] Ibid., p.135.
[149] Ibid.

in a state of the art way that will never reach end of life, then California need to think differently about voting systems.

### 4. Communities Actively Living Independent and Free

Lillibeth Navarro, Disability Rights Advocate and Executive Director of Communities Actively Living Independent and Free, spoke before the Committee. Her organization is a downtown Los Angeles-based social services advocacy organization for civil rights for the disabled in the context of the Americans with Disabilities Act (ADA). It offers the disability community with an "entire gamut of social services through Civil Rights Advocacy, from housing to benefits advocacy, peer counseling, information and referral, personal assistance services, physically change advocacy, assistive technology transition, and transportation, in the context of the Americans with Disabilities Act."[150]

She provided personal testimony regarding her work as a poll worker and witnessing the lack of persons with disabilities at the polls, and the physical and electronic inaccessibility of many polling locations in California.[151] She noted at least twelve studies related to improving voter access for persons with disabilities, but that this information did not always manifest itself as tangible resources and funding for disability advocacy groups to work with the government to develop and implement educational programs for the community.[152]

Ms. Navarro challenged the current state of voting accessibility for the voter with disabilities in Los Angeles, starting with wheelchair access. Though few severely disabled voters vote in person, most choosing to vote by mail (VBM), the need to have adequate handicap access for all polls remains for those who do vote in person.

Parking and pathway situations frequently deter the voter with disabilities from access, i.e., long walks after parking, obstructions, and inadequate lighting. California Advisory Committee member Javier Gonzalez noted that all facilities selected by the Los Angeles County Registrar of Voters as polling places are required to be chosen with and tested for ADA compliance.

Additionally, Ms. Navarro asked for easier access for the voter with disabilities to election education programs and computer usage (such as for the blind,) and to online information. Current electronic devices often impose discouraging obstacles to gaining voting information. With respect to the voters with intellectual disabilities, social service workers often find that important issues, when simply explained, can be comprehended. Ms. Navarro asks for more empathy and sensitivity to and for voters with disabilities and their needs by those in industry who create modern solutions. One idea she submitted is for counties to create a form of media "get-out-the-vote" Amber Alert sound or flashing light, to alert those voters that the time to vote, to have a say in government, is here.

---

[150] Testimony of Lillibeth Navarro Transcript on Help America Vote Act, p. 137.
[151] Ibid., p. 138.
[152] Ibid., pp. 138-139.

### 5. Mark Sonnenklar

Mark Sonnenklar, a Los Angeles Resident and Business Attorney, gave testimony concerning a civil rights breach (HAVA) – the fair and equal administration of justice.[153]  His testimony described what ultimately was a story of a civil rights breach (HAVA) – the fair and equal administration of justice.  The four-month episode described centered on the Los Angeles County Registrar's refusal to provide public data to a citizen's request, Mark Sonnenklar's, as legally allowed.[154] The particular public documents requested had previously been provided another organization (Election Integrity Project), upon which data EIP published a report concerning thousands of irregularities involving the L. A. County Registrar.[155] Mark Sonnenklar wished to obtain the same data provided EIP to determine if a separate analysis of the data corresponded to theirs.  After a series of delays, it seemed clear the Registrar's office hoped the request would die out.  Sonnenklar persisted, and, as of August 28, the date of the hearing, four months after his original request, finally received the data, with a cover letter signed in person by Mr. Dean Logan, the Registrar of Voters, a person who normally would not have been involved with one single citizen's request.[156]

Sonnenklar also testified that the prices quoted for providing the data were entirely arbitrary, and changed several times: Once the ROV agreed to provide the data, a $600 fee was set.  This was arbitrarily lowered by the registrar's representative to $450.[157]  When that amount was challenged as excessive by Sonnenklar, the fee was lowered to $146.[158]  When Mr. Sonnenklar then asked for the statutory justification for the calculation of the fee, he was quoted L.A. County Code Section 2.32.24, which states the fee is $54 for one CD.  That was the amount eventually set, which Sonnenklar paid.[159] He also said the Registrar of Voters told him to delete the individual voters' identifications.

Several members of the California Advisory Committee commented on several aspects of this revelation:

- Committee member Ms. Montoya raised the concern that providing the data to anyone who asks might be a breach of individual privacy.

- Committee member Ms. Jester recounted that the type of data requested is regularly provided to political consultants, as she was for many years, and there was no reason for such a delay by public officials.

Sonnenklar further expressed this opinion:

---

[153] Testimony of Mark Sonnenklar, Transcript on Help America Vote Act, p. 105-129.
[154] Ibid., pp. 109-117.
[155] Ibid.,  pp. 122-123.
[156] Ibid., p. 117.
[157] Ibid., p. 115.
[158] Ibid., p. 115-116.
[159] Ibid., p. 115. Linda Paine of EIP states in later testimony that she paid $500 for the supposedly same data.

"(I)think someone in a position of authority needs to, you know, have -- have a word with Dean Logan and make sure that his staff is responding to these requests in a timely basis. I think that's the immediate thing that needs to happen.

Committee member Betty Wilson asked Sonnenklar if he had made this request to the registrar, Mr. Logan. He stated:

You know, I don't have a personal relationship with Mr. Logan. And -- so, no.

And, finally, from Sonnenklar:

There is no coincidence in politics. And I don't think it's a surprise that I received the data finally this morning in the mail, the day that I was supposed to come and testify. So there are a lot of things about this story that I don't quite understand, you know, about the Registrar Recorder's behavior during this four-month ordeal, but one thing I can  say for sure is, they didn't want to provide me with those records. They violated the law by taking as long as they did to actually finally provide them and I think they expected me to get tired and go away. And that's why they dragged this on for as long as they did. So Section 6252(e) of the act defines a public record as, quote, "Any writing containing information relating to the conduct of the public's business that is prepared, owned, used or retained by any state or local agency regardless of physical form or characteristics.[160]

---

[160] Ibid., p. 116.

## Committee Findings and Conclusions

**Conclusions**

1. Insufficient training in election laws for poll workers and on-site election officials pursuant to witnesses Linda Paine and Ruth Weiss of the Election Integrity Project[161]; Training materials[162] fail to provide for the implementation of California Election Code §14216, voter self-identification, which states:

   "Any person desiring to vote shall announce his or her name and address in an audible tone of voice, and when one of the precinct officers finds the name in the index, the officer shall in a like manner repeat the name and address. The voter shall then write his or her name and residence address . . . ".

2. Disabled voters face unnecessary obstacles, according to testimony by Lillibeth Navarro, representative of Communities Actively Living Independent and Free;

3. VoteCal, the mandated statewide voter database, is not ready (SOS testimony);

4. Explanations about the decision-making process of the Secretary of State for potential voting system developers are required after doubts raised from materials provided by State Auditor Elaine Howle, which state:

   "The Office paid $4.6 million to develop a replacement database – Vote Cal - but terminated a critical contract because the vendor failed to provide key deliverables. In its second attempt to hire a new vendor to complete the VoteCal project, the Office appears to have limited the bidder competition to only one bidder, raising concerns for future success."[163]

5. The methodology used to report HAVA expenditures in California's spending plan has not been explained, according to the testimony of State Auditor Elaine Howle;

6. Deceased, inactive and ineligible voters remain on voter lists;

7. The delayed and multi-stage human handling of vote-by-mail ballots creates openings for tampering or mishandling, according to Ruth Weiss's testimony and EIP's written testimony;

---

[161] Linda Paine and Ruth Weiss, Election Integrity Project, Testimony before the California Advisory Committee to the U.S. Commission on Civil Rights, Transcript, Hearing on Help America Vote Act, Los Angeles, CA, Aug. 28, 2015, pp. 158-191 (hereafter referred to as Help America Vote Act (HAVA) Transcript), *available at* https://www.justice.gov/crt/text-proposed-regulations.
[162] Ibid., p. 177.
[163] Ibid., p. 46

8. In 2012, California cast forty percent of the provisional ballots in the nation.[164]  Though the official intent is to allow for convenient voting and options that support participation, inadequate poll worker training in following the law likely contributes to the indiscriminate use of provisional ballots;

9. Prohibitive costs to citizens to purchase voter roll data;

10. Indiscriminate use of Permanent Absentee Voting;

11. Statewide voting and election irregularities in many counties, both large and small, require further investigation;[165]

12. Antiquated election laws prohibit the introduction of modern voting technology, according to testimonies of SOS and Everyone Counts;

13. Inadequate utilization of online voting with military-grade encryption for military and overseas voters, according to Pew testimony;

14. Citizens have concerns about the new "Motor Voter Law "AB 1461, its implementation and confidentiality.   A good third of the eighty-plus Post-Hearing written testimonies were about this bill.


**Recommendations:**

1. Training for Election Officials and Poll Workers

   a. Include awareness and knowledge of applicable election laws (HAVA, NVRA, California Election codes, and the U.S. Constitution) and of the poll workers' authorities;
   b. Increase length of training time of election workers;
   c. Verify that an election official or poll worker completed recommended online training instruction;
   d. Establish citizen oversight ensure training materials correspond to the law;
   e. Train poll workers to follow California Election Code §14215, asking voters to state their names and addresses - in their own words -to avoid voter impersonation.

2. Citizen Oversight

---

[164] See *supra* note 5 p. 171.
[165] Testimony of Mark Sonnenklar, Business Attorney, HAVA Transcript, p. 109.

    a. Provide expert citizen election integrity oversight for the pending VoteCal statewide voter registration database;

    b. To ensure instructions to poll workers and election officials correspond to election laws, provide expert citizen oversight of training procedures and materials, and voting and election materials.

3. The Disabled Voter

    a. Legislation required to assure that current and future digital or computerized voting systems are accessible and will accommodate voters with disabilities;

    b. Poll workers shall be provided training, communication, and  accommodations for voters with disabilities;

    c. All polling sites shall be accessible to voters with disabilities.

4. Office of the Secretary of State

    a. Appoint a non-partisan citizen election integrity and oversight organization with authority to assess VoteCal, its methods, and test results;

    b. Clarify the state's current standards for voting, election processes, voting equipment and systems and assure procedures and equipment are in compliance with state and federal disability laws;

    c. Clarify the process by which the Secretary of State verifies that the person applying to vote, whether through online registration, DMV registration, or in-person registration, is eligible to vote;

    d. Inform public agencies that only those agencies mandated to examine and verify proof of citizenship shall process voter registration applications;

    e. Create and advertise the complaint procedure by which citizen complaints about the administration of elections are addressed and rectified;

    f. Recommend to the California legislature an upgrade of all coded obstacles to the modernization of California's election process and voting systems (Election Code Article 4, Sections §19217, §9217, §19250 (a),§14223 (b));

    g. Recommend each California county standardize its forms and costs for citizen organizational purchases of voter data;

    h. Verify that every poll location is accessible to voters with disabilities;

    i. Clearly state the methodology used to report prior HAVA expenditures in the HAVA spending plan.

5. County Registrars of Voters

    a. To prevent inaccurate voter turnout statistics and possible election results, follow HAVA and California Election Code procedures for the distribution of provisional ballots;

    b. To ensure  voters' privacy and ballot integrity during handling, redesign absentee ballot forms and improve current processing procedures for security;

    c.  To prevent impersonation and fraud, timely remove deceased, inactive and ineligible voters from voter lists according to HAVA's suggestions;

    d.  Establish standard fee schedules for citizen groups requesting public documents and lists;

    e.  Verify that every poll location is accessible for voters with disabilities;

    f.  In accord with election laws, train election officials and poll workers in the handling of provisional, absentee, and in-person ballots;

    g.  Clarify the procedures by which registrars of voters process and rectify election complaints;

    h.  Provide citizen oversight of training manuals and materials, poll worker training, and at election polls and voting centers;

    i.  Train poll workers and election officials in the proper use of California Election Code §14216, which, without a voter ID requirement, provides for self-identification.

6.  Upgrade Outdated Election Laws (Legislation Required)

7.  Modernization requirements -

    a.  Upgrade outdated California Election Codes (Article 4, Sections §19217, §9217, §19250 (a),and §14223 (b)):

        i.  Permit digital and telephone access for voter systems;

        ii.  Allow connectivity to the internet;

        iii.  Allow electronic transmission of election data through exterior communication networks;

        iv.  Allow wireless communications or wireless data transfers;

        v.  Allow a remote server to store any voter's identifiable selections and tabulate votes using military grade encryption;

    b.  Reconsider the requirements of federal qualification and accessible voter verified paper audit trails for voting systems;

8.  Upgrade  and revise the Military and Overseas Voter Empowerment Act of 2009 (MOVE) to incorporate military grade encryption for secure online voting;

9.  Allow poll workers to redact voters' street addresses when posting precinct voter lists near poll entrances to prevent harvesting of data used for voter impersonation.

10. California's "Motor Voter" Law – AB1461

    a.  Pass AB 2067 amending AB 1461 to –

    b.  Create a clear, mandated procedure by which the citizenship status of all potential registrants will be verified prior to uploading information to the Secretary of State;

    c.  Establish oversight provisions;

    d.  Authorize ongoing education and/ training for Department of Motor Vehicles (DMV) personnel

## Appendix I. Presenters at the Public Hearing on August 28, 2015, and Public Commenters

### A.  Invited Presenters (in order of presentation)

Elaine Howle, California State Auditor

Steve Reyes, General Counsel for Secretary Alex Padilla, Secretary of State Alex Padilla

Susan Lapsley, Secretary of State Deputy Secretary of State and HAVA Director

Dean Logan, Registrar-Recorder County Clerk for Los Angeles County

Michael Vu, Registrar-Recorder for the ~~city~~ County of San Diego

Mark Sonnenklar, Business Lawyer and Los Angeles Resident

Lori Steele, Founder and CEO of Everyone Counts

Lillibeth Navarro, Disability Rights Advocate and Executive Director of Communities Actively Living Independent and Free

Linda Paine, Co-Founder and President, Election Integrity Project, Inc.

Ruth Weiss, Director, Election Integrity Project; San Diego County Liaison,

### B.  Citizens Making Public Comments (in order of presentation)

Ana Cubas, Hermandad Mexicana Nacional

Robert Gray, Resident of the City of Compton

Lynn Boone, Resident of the City of Compton

Nancy Kremer, Resident of City of Los Angeles

Shoshana Egan, Resident of City of San Diego

David Gooding, Retired Public Employee and Resident of Hayfork Trinity County, California.

Drue Lawlor, Resident of Los Angeles County

Mary Dee Romney, Resident of the City of Pasadena, Los Angeles County

Yesenia Martinez, California Project Coordinator for the National Association of Latino Elected and Appointed Officials

Kim Castro, Resident of Fresno County

Margarita Canaba, Resident of Fresno County

Lance V. Woods, Resident of L.A. County

Nicolas Ochoa, Vietnam Veteran and Retired Law Enforcement Officer, Ventura County

Harry Gradi, Retired L.A. City Fireman, Ventura County

Ron Gerber, Resident of Oxnard, Ventura County

### C.  Summary of Post-Hearing Public Comments

| CA SAC USCCR Post-8/28/15 Hearing Testimonies: Citizens' Key Issues (approx 80 submissions) | | | | | |
|---|---|---|---|---|---|
| **Categories, Testimony #** | **Issues Raised** | **Causes** | **Impact** | **Conclusions** | **Recommendations** |
| CA Secretary of State (SOS) 52 and others | Multiple HAVA violations; non-citizen voting, No competitive bidding, VoteCal database | political will, office management, leadership | HAVA not followed. "Third World competency" | Does not follow HAVA in voter registration follow-up, other | Hold accountable to HAVA by DOJ, EIC; Reveal status/results VoteCal |
| Provisional Ballots 66, 67, 70, 71, 72, PEW | HAVA required, but statewide misuse prevalent. Non-Citizen voting | HAVA and election code ignorance. Poor training. Fraud | election outcomes, voter deprived, disenfranchised; Ineligive votes cast and counted | Biggest deterrent to Election Integrity. Training, observers needed | HAVA training, citizen oversight, SIGNATURE VERIFICATION system improvement needed |
| CA Legislature: AB 1461 "Motor Voter Law" 32 ltrs oppose | Non-citizen is given voter registration forms w/DMV application | Secretary of State, Legislature, partisan, people had no say | Voter vote disenfranchised, diluted; HAVA violation, creates havoc in election results | Chaos: No prosecution for non-citizen who votes. Violates election integrity, U. S. Election codes | Constitution violation. Change forms. Change law. |
| Vote By Mail (VBM) ballots, including Permanent VBM 48, 78 | Disenfranchises the disabled, weakest link for election integrity | Vulnerable design, overuse encouraged by SOS, parties | Opens door to misuse, impersonation,ballot dumping fraud | Current process opens door to corruption and misuse | Require Photo ID when requesting VBM ballot, re-design; use only when needed |
| Voter Rolls  2, 16, 66, 80 | Unclean, inflated; deceased vote; misuse, VBM fraud, error; PO Box addresses. | ROV omission, neglect | denies redress ability, initiative process (% of required signatures inflated) | opens door to impersonation, corruption, a direct HAVA violation | ROV performance monitored with citizen oversight |
| Student Voting (Ineligible) 82 | 600 more voted than registered; students vote twice, absentee ballots | HAVA ignorance, training failures | election outcomes, voter deprived, disenfranchised | State-wide issue is colleges are not trained in issue | HAVA training, election code training, citizen oversight |
| Electronic Election & Voting Systems | Public concerns about safety, privacy, hackability | Vulnerable old technology | Subject to human interference, but modernizing could benefit election integrity, help disabled | Future voting systems must be certified; cannot be associated w/voter lists | CA Election laws now  impede modernizing and testing: revise |
| Voting Machines, Ink-a-Vote 57, | Hackable, old technology | Can be manipulated, at site or in ROV | Doubt of voter; vote changed, outrage | Old technology, distrust by voter | Replace with modern military-grade election system |
| CA Election Code (Outdated) 59 | Need revision in order to modernize election systems | Obsolescence, legislative neglect | CA unable to modernize election and voting systems as other states have | Change election code in order to modernize" | See below |
| Bilingual Issues 74 | San Gabriel-no Hispanic translator. Other, only Cantonese speaker allowed to vote | HAVA ignorance, training failures | May deny right to vote | HAVA violation | HAVA training, election code training |
| "Covered California" 47 | Party affiliation changed w/o permission (R to D) | crime or incompetence | unknown | fraud, or data center staff - dishonest | Accountability enforced |
| Voter ID Support 2, 16, 66, 80 | Reduce fraud, impersonations | Parties divided, people support | Without: Chaos, With: More secure elections | Prevent impersonation at polls, reduce VBM, Prov fraud, | Voter ID Legislation for CA |

## Appendix II. DISSENT FROM CALIFORNIA ADVISORY COMMITTEE MEMBER

**Statement of Rachel Sigman\***
**Member, California Advisory Committee to the United States Commission on Civil Rights**
**May 8, 2017**

*\*The contents of this memo express my personal views and do not represent the views of any institution or organization with which I am affiliated.*

In June 2016, the California Advisory Committee to the United States Civil Rights Commission produced a report entitled "Voting Integrity in California: Issues and Concerns in the 21st Century." The report calls attention to a number of important issues, including the obstacles faced by voters with disabilities in exercising their voting rights, challenges of maintaining accurate voter lists and the high percentage of provisional ballots cast in California. I support the Committee's efforts to shed light on these issues, and agree wholeheartedly with the specific contents of the report that advance the mission of the U.S. Commission on Civil Rights in seeking to protect voting rights for all eligible California voters.

I have asked to abstain from the vote on this report because the facts and evidence available do not support some of the report's conclusions and recommendations. Of specific concern are the report's conclusions related to threats to voter integrity and California compliance with the Help America Vote Act (HAVA). I am not able to fully address these issues in a single page, but I wish to raise several points that I strongly believe to undermine the credibility of the report's conclusions and recommendations.

The report's conclusion that "statewide voting and election irregularities…require further investigation" – and associated conclusions and recommendations – is simply unfounded. The California Secretary of State's office already investigates many election-related complaints. A Public Records Act request by non-profit non-partisan group CALmatters showed that current cases being investigated amount to 0.001% of the more than 23 million votes cast in California's 2016 primary and general elections. Additionally, a database that tracks instances of voter fraud maintained by researchers at Arizona State University found only 56 instances in California between 2000 and 2012.[166] Such statistics are consistent with a large number of academic studies that find extremely few instances of voting irregularities across the country.[167] Moreover, there is no evidence in this academic that duplicate registrations, poll worker training or specific vote-by mail procedures lead to voting irregularities, as is suggested in the report's conclusions and recommendations. Instead, these issues tend to limit citizens' ability to vote and should therefore be addressed in ways that seek to better protect voting rights equally across the eligible voting population.

It is not clear, moreover, that the report's conclusions regarding California's HAVA compliance reflect any serious threats to voting integrity. The only reference to non-compliance comes on p.2 from an uncited study by an unnamed independent non-profit organization. The ratings cited from the Pew Charitable Trusts Election Performance Index are not related to|the application of election laws| (p.4) and the information regarding HAVA drawn from the Election Integrity Project, an organization with unknown sources of support, is based largely on anecdotal information that can not be verified.  Likewise, the report's conclusion that "VoteCal, the mandated statewide voter database is not ready" is no longer true. According to the Secretary of State's website, VoteCal has been deployed in all 58 California

---

[166] News21 "Who Can Vote: Election Fraud in America." Available at http://votingrights.news21.com/interactive/election-fraud-database/index.html, accessed May 1, 2017.
[167] For an overview and links to these studies, see the Brennan Center's webpage at http://www.brennancenter.org/analysis/debunking-voter-fraud-myth.

counties as of February 2016.[168]

I thank my fellow committee members, the Committee staff and all those who shared their views and expertise with the Committee. There are many important insights contained in the report as to how we can work together as Californians to protect voting rights more effectively across the state.

---

[168] http://www.sos.ca.gov/elections/voter-registration/votecal-project/votecal-deployment-status/, accessed May 3, 2017.

**California Advisory Committee to the**
**United States Commission on Civil Rights**



**U.S. Commission Contact**

USCCR Contact                Ana Victoria Fortes
                            Western Regional Office
                            U.S. Commission on Civil Rights
                            300 N. Los Angeles Street, Suite 2010
                            Los Angeles, CA 90012

This report can or obtained in print form or on disk in Word format from the Western Regional Office, U.S. Commission on Civil Rights, by contacting the above named Commission contact person.  It is also posted on the web-site of the Commission at www.usccr.gov.