MARK D. ROSENBAUM (CA Bar No. 59940)
mrosenbaum@publiccounsel.org
KATHRYN EIDMANN (CA Bar No. 268053)
keidmann@publiccounsel.org
JESSELYN FRILEY (CA Bar No. 319198)
jfriley@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Avenue
Los Angeles, California 90005
Telephone:     (213) 385-2977
Facsimile:     (213) 385-9089

JOHN LIBBY (CA BAR NO. 128207)
JLibby@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone:  310.312.4000
Facsimile:  310.312.4224

JON GREENBAUM (CA Bar No. 166733)
jgreenbaum@lawyerscommittee.org
EZRA ROSENBERG (D.C. Bar No. 360927)
*Pro Hac Vice* Application Pending
erosenberg@lawyerscommittee.org
POOJA CHAUDHURI (CA Bar No. 314847)
pchaudhuri@lawyerscommittee.org
BRADLEY S. PHILLIPS (CA Bar No. 85263)
bphillips@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS
1500 K Street NW
Washington, DC 20005
Telephone:     (202) 662-8600
Facsimile:     (202) 783-0857

CHRISTOPHER L. WANGER (CA Bar No.
164751)
CWanger@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
One Embarcadero Center, 30th Floor
San Francisco, California  94111
Telephone:  (415) 291-7400
Facsimile:  (415) 291-7474

Attorneys for Intervenor-Defendants,
CALIFORNIA COMMON CAUSE,  LEAGUE
OF WOMEN VOTERS OF CALIFORNIA and
COMMUNITY COALITION

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE; and CALIFORNIA REPUBLICAN PARTY<br><br>Plaintiffs,<br><br>vs.<br><br>GAVIN NEWSOM, in his official capacity as Governor of California; and ALEX PADILLA, in his official capacity as California Secretary of State,<br><br>Defendants. | Case No. 2:20-cv-01055-MCE-CKD<br><br>**NOTICE OF MOTION AND MOTION TO INTERVENE AS DEFENDANTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**FILED CONCURRENTLY WITH [PROPOSED] ANSWERS IN INTERVENTION**<br><br>**Date: July 9, 2020**<br>**Time: 2:00 pm**<br>**Courtroom: 7, 14th Floor**<br>**Judge: Hon. Morrison C. England, Jr.** |

1

## NOTICE OF MOTION AND MOTION TO INTERVENE

2      TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

3      PLEASE TAKE NOTICE that on July 9, 2020, at 2:00 p.m. or as soon thereafter as they

4   may be heard in Courtroom 7 of the above-entitled court, located at 501 I Street, Sacramento,

5   California 95814, California Common Cause, League of Women Voters of California, and

6   Community Coalition (collectively "Proposed Intervenors") will and hereby do move this Court

7   for entry of an order permitting Proposed Intervenors to intervene permissively in the above-

8   captioned matter for the purpose of defending the fundamental right to vote of their members and

9   all other California citizens.

10      This motion is made pursuant to Federal Rules of Civil Procedure Rule 24(b)(1)(B) for

11   permissive intervention on the grounds that 1) Proposed Intervenors have a claim or defense that

12   shares with the main action a common question of law or fact, 2) there exist independent grounds

13   for jurisdiction, and 3) this motion is timely.

14      This motion is based upon this Notice of Motion; the supporting Memorandum of Points

15   and Authorities; the supporting declarations of Jonathan Stein (Ex. A – hereinafter Stein Decl.),

16   Stephanie Doute (Ex. B – hereinafter Doute Decl.), and Hector Sanchez (Ex. C – hereinafter

17   Sanchez Decl.), the supporting expert declaration of Dr. Ranit Mishori (Ex. D – hereinafter

18   Mishori Decl.); the concurrently-lodged Answers in Intervention setting out the claims and

19   defenses for which intervention is sought, as required by Federal Rule of Civil Procedure 24(c);

20   all documents and pleadings on file in this action; and such other oral and documentary evidence

21   and argument as may be presented at the hearing on this motion.

22

23

24

25

26

27

28

1  Dated:  June 10, 2020

2

PUBLIC COUNSEL

3

By: /s/ Mark D. Rosenbaum (as authorized on  6/10/20)

Mark D. Rosenbaum

4

Kathryn Eidmann
Jesselyn Friley

5

610 S. Ardmore Avenue
Los Angeles, California 90005

6

Telephone:   (213) 385-2977
Facsimile:    (213) 385-9089

7

Email:         mrosenbaum@publiccounsel.org
keidmann@publiccounsel.org

8

jfriley@publiccounsel.org

9

LAWYERS' COMMITTEE FOR CIVIL RIGHTS

10

By:/s/ Jon Greenbaum (as authorized on 6/10/20)
.

11

Jon Greenbaum
Ezra Rosenberg

12

Pooja Chaudhuri
Bradley S. Phillips

13

1500 K Street NW
Washington, DC 20005

14

Telephone:   (202) 662-8600
Facsimile:    (202) 783-0857

15

Email:         jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org

16

pchaudhuri@lawyerscommittee.org
bphillips@lawyerscommittee.org

17

MANATT, PHELPS & PHILLIPS, LLP

18

By: /s/ John Libby

John Libby

19

2049 Century Park East
Suite 1700

20

Los Angeles, CA 90067
Telephone:   (310) 312-4000

21

Facsimile:    (310) 312-4224
Email:         JLibby@manatt.com

22

MANATT, PHELPS & PHILLIPS, LLP

23

Christopher L. Wanger
One Embarcadero Center, 30th Floor

24

San Francisco, California  94111
Telephone:   (415) 291-7400

25

Facsimile:    (415) 291-7474
Email:         CWanger@manatt.com

26

Attorneys for Intervenor-Defendants, CALIFORNIA
COMMON CAUSE, LEAGUE OF WOMEN

27

VOTERS OF CALIFORNIA and COMMUNITY
COALITION

28

3

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

I.    **INTRODUCTION**

3        Proposed Intervenors are nonpartisan organizations dedicated to promoting American

4    democracy and the interests of California voters.  They seek the Court's permission to intervene

5    in this matter to defend the right of their members and all California citizens to vote safely in the

6    general elections on November 3, 2020.  Proposed Intervenors, relying on the consensus of

7    public-health experts, anticipate that COVID-19 will pose a grave threat to public health in

8    November.  At the very least, no one can conceivably guarantee now that COVID-19 will *not*

9    continue to pose a serious threat, meaning that the only safe course for state officials is to act *now*

10   to take the necessary steps to simultaneously protect the public health and the right to vote in

11   November.

12       Ensuring that all eligible voters in California have the ability to vote by mail is one crucial

13   step.  Voting in person poses significant health risks, exposing voters and poll-workers to

14   infection while they stand in line, share confined spaces, touch common surfaces, and converse

15   with other people.  Poll-workers and voters are especially vulnerable because they tend to be

16   older—indeed, the majority of poll workers in 2018 were over 60.  And the risk is not limited to

17   voters and poll-workers but extends to *everyone* in their communities, workplaces, and families

18   with whom they will inevitably come into contact after Election Day.  Because the pandemic has

19   had devastating and disproportionate effects on African American and Latino individuals, voters

20   who are members of these minority groups—and their neighbors, fellow workers, and families—

21   face even greater risks.  Voting in person will, moreover, be impossible for Californians who

22   have underlying medical conditions or who, in the days leading up to the election, exhibit any of

23   the ten symptoms of COVID-19 or come into contact with a person who has the virus.  These

24   categories of voters—racial minorities and medically vulnerable individuals—are among those

25   represented by the Proposed Intervenor organizations, which are therefore particularly well-suited

26   to advancing and protecting their interests.

27       Government officials can and must ensure that the unprecedented circumstances of the

28   pandemic do not deny American citizens, particularly citizens who are African American and/or

1

1   Latino or who are medically vulnerable, the right to vote.  Plaintiffs, who include the Republican

2   National Committee and Congressman Darrell Issa, seek to enjoin California Governor Gavin

3   Newsom's executive order requiring counties to provide a mail-in ballot to every active registered

4   voter in advance of the November elections.  By asking this Court to prohibit the distribution of

5   mail-in ballots, Plaintiffs seek to place drastic restrictions on the time, place, and manner of

6   elections.  Due to COVID-19, such suppression would primarily affect people of color and

7   medically vulnerable individuals, who experience disproportionately high rates of infection,

8   illness, and death due to the pandemic and face grave risks to their health and the health of their

9   communities if they must vote in person.  Incredibly, Plaintiffs' core claim is that, by making it

10  safer for *all* California citizens—Democrats and Republicans alike—to vote, the Governor's

11  Order somehow violates the right to vote of the handful of individual Plaintiffs.

12          As organizations that serve, represent, and comprise individuals whose fundamental right

13  to vote would most certainly be impaired and whose health would most certainly be endangered

14  by a grant of the relief sought by Plaintiffs, Proposed Intervenors are critical participants in these

15  actions and are well-situated to defend the right of all California voters to cast their ballots safely.

16  They have timely moved to intervene, less than three weeks after the filing of Plaintiffs' actions.

17  The Court should grant Proposed Intervenors' motion under the standard for permissive

18  intervention.

19  **II.     FACTS**

20          **A.     The COVID-19 Pandemic Will Remain a Threat to the Safety of California**
               **Voters in November 2020**

21

22          The COVID-19 pandemic is an ongoing public-health emergency that has hit California

23  especially hard and has caused widespread disruptions in civic life.  As of June 8, over 130,000

24  Californians had tested positive for COVID-19 and almost 4,500 have died of the disease.[1]  The

25  number of weekly cases in California continues to rise, reaching 17,000 in the last week of May.[2]

26  

27  [1] *COVID-19 Updates*, CAL. DEP'T PUB. HEALTH (June 8, 2020),
    https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx.

28  [2] *COVID-19 Statewide Update*, STATE OF CAL. (June 9, 2020), https://update.covid19.ca.gov/.

2

Elderly people and people of any age who have certain underlying conditions, including high blood pressure, diabetes, chronic lung disease, severe obesity, and others, are especially likely to have prolonged serious illness or to die from the disease.  Mishori Decl. ¶¶ 10–12.  People of color have faced especially high rates of infection, complications, and death resulting from this coronavirus.[3]  *Id.* ¶¶ 15–22.  Latinos are disproportionately likely to contract the virus—in California, Latinos are 39% of the population but make up 54% of the State's coronavirus cases.  *Id.* ¶ 21.  Black Americans are similarly affected disproportionately—they represent only 5% of California's population but 10% of the State's COVID-19 deaths.  *Id.*  Nationwide, black Americans are dying at a rate almost two and a half times higher than white Americans.[4]  Low-income communities have been especially hard-hit.[5]

Doctors and public health experts have identified several reasons why this coronavirus has caused such devastation in communities of color and low-income communities.  Mishori Decl. ¶ 15.  The "social determinants of health" are conditions in a person's life that shape every aspect of their health, including their susceptibility to the severest effects of COVID-19 infection.  *Id.* ¶¶ 16–17.  In communities of color and low-income communities, the social determinants of health include reduced access to quality health care, higher prevalence of underlying chronic medical conditions, and housing challenges.  *Id.* ¶¶ 15–19.  Already predisposed to medical conditions and poor health, people of color and low-income people are also more likely to be employed in essential jobs that expose them to COVID-19, and are less likely to have access to testing for coronavirus infection.  *Id.*  These factors subject people of color and low-income people to greater

---

[3] *COVID-19 in Racial and Ethnic Minority Groups*, CTR. FOR DISEASE CONTROL AND PREVENTION (June 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html ("[C]urrent data suggest a disproportionate burden of illness and death among racial and ethnic minority groups.").

[4] *The Color of Coronavirus: COVID-19 Deaths by Race and Ethnicity in the U.S.*, APM RESEARCH LAB (May 27, 2020), https://www.apmresearchlab.org/covid/deaths-by-race.

[5] *See* Wyatt Koma et al., *Low-Income and Communities of Color at Higher Risk of Serious Illness if Infected with Coronavirus*, KAISER FAMILY FOUND. (May 7, 2020), https://www.kff.org/coronavirus-covid-19/issue-brief/low-income-and-communities-of-color-at-higher-risk-of-serious-illness-if-infected-with-coronavirus/.

1   exposure to the coronavirus, greater severity of disease, and substandard or inaccessible medical

2   care.  This confluence of longstanding disparities and injustice is killing people.

3          While the world waits for a vaccine that is certainly many months or years away, public-

4   health experts and government officials have stressed that physical distancing is necessary to

5   prevent the spread of the virus.  Mishori Decl. ¶¶ 9, 14.  After seven weeks of near-complete

6   closure, the State of California has only recently allowed the reopening of establishments like

7   shops and restaurants, only in some counties and only if they can maintain six feet of distance

8   between individuals.[6]  The effects of reopening are not yet known, but cases in California are

9   beginning to spike.  *Id.* ¶ 31.  To keep voters safe, states run by both Republican and Democratic

10  elections officials have expanded vote-by-mail options or have conducted elections entirely by

11  mail.[7]  Experts agree that this advanced planning is necessary because "we can expect that

12  coronavirus will continue to affect, sicken and kill large numbers of Americans moving forward

13  and into the fall."  *Id.* ¶ 32.

14         The 2020 primary elections have proven that in-person voting causes transmission of

15  COVID-19.  Multiple Florida poll workers tested positive for COVID-19 in the aftermath of the

16  state's in-person primary election.[8]  Chicago officials reported that a poll worker for the city's

17  March 17 election died of COVID-19 and may have exposed voters, poll workers, field

18  investigators, and cartage companies who were present at the same polling site.[9]  Following the

---

19  [6] *Order of the State Public Health Officer: May 7, 2020*, CAL. DEP'T PUB. HEALTH at 2,

20  https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20 Library/COVID-19/SHO%20Order%205-7-2020.pdf.

21  [7] Legislation in Alaska, Missouri, Ohio, South Carolina, and Utah has expanded vote-by-mail options, and bills are pending in a number of other states. Governors and Secretaries of State in

22  even more state have announced plans to expand vote by mail through other mechanisms. *See COVID-19 and Elections*, NAT'L CONF. ST. LEGISLATURES (June 1, 2020),

23  https://www.ncsl.org/research/elections-and-campaigns/state-action-on-covid-19-and-elections.aspx.

24  [8] Kent Justice & Steve Patrick, *Duval County Poll Worker Tests Positive for Coronavirus*, NEWS

25  4 JAX (Mar. 30, 2020), https://www.news4jax.com/news/local/2020/03/30/duval-county-poll-worker-tests-positive-for-coronavirus-/; David Smiley & Bianca Padró Ocasio, *Florida Held Its Primary Despite Coronavirus. Two Broward Poll Workers Tested Positive*, MIAMI HERALD (Mar.

26  26, 2020), https://www.miamiherald.com/news/politics-government/article241539451.html.

27  [9] Mary Ann Ahern, *Poll Worker at Chicago Voting Site Dies of Coronavirus, Election Officials Say*, 5 CHI. (Apr. 13, 2020), https://www.nbcchicago.com/news/local/chicago-politics/poll-

28  worker-at-chicago-voting-site-dies-of-coronavirus-election-officials-say/2255072/.

4

1  Wisconsin primary, the state's Department of Health conducted a contact-tracing analysis that

2  found that 52 persons who voted in-person tested positive for COVID-19.[10]  Mishori Decl. ¶ 49.

3  Economists found a "statistically and economically significant association between in-person

4  voting and the spread of COVID-19 two to three weeks after the election."[11]

5      The risks of in-person voting are clear to doctors and public health experts.  Hundreds of

6  voters can cycle through a polling place on Election Day, exposing poll workers and one another

7  to their respiratory droplets in confined, poorly ventilated spaces that facilitate transmission.  *Id.*

8  ¶¶ 34–39.  Poll-workers themselves are likely to be older—studies have reported that most are

9  over 60—and therefore more likely to have high-risk conditions.  *Id.* ¶ 38.  Voting machines and

10  materials exchanged among voters and poll-workers are potential sites of surface transmission.

11  *Id.* ¶¶ 40–41.  Any precautionary measures, such as disinfection of machines and surfaces

12  between each voter, are likely to slow down the voting process, which will subject voters to

13  exposure in long lines.  *Id.* ¶¶ 41–44.  Even if all voters and poll-workers followed best practices,

14  they would still face a risk of exposure.  *Id.* ¶ 45.  Asymptomatic individuals could spread the

15  disease and those with mild symptoms could decide to vote despite the risk of transmission.  *Id.*

16      Recognizing that the pandemic threatens the safety of California voters during the

17  upcoming November 2020 elections,[12] Governor Newsom took steps to protect the health of

18  Californians while preserving their opportunity to vote.  On May 8, 2020, the Governor issued

19  Executive Order N-64-20, which provides for mail-in ballots to be distributed to all active

20

21  ---

[10] Chad D. Cotti et al., The Relationship Between In-Person Voting, Consolidated Polling

22  Locations, and Absentee Voting on COVID-19: Evidence from the Wisconsin Primary 1–2 (Nat'l Bureau of Econ. Research, Working Paper No. 27187, 2020),

23  https://www.nber.org/papers/w27187.pdf.

[11] *Id.*

24

[12] Savannah Behrmann, *'Convinced': Fauci Says There Will Be Coronavirus in the Fall After*

25  *Trump Says 'It May Not Come Back'*, USA TODAY (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/22/coronavirus-dr-anthony-fauci-says-i-

26  am-convinced-second-wave/3009131001/; Kristine A. Moore et al., *COVID-19: The CIDRAP Viewpoint: The Future of the COVID-19 Pandemic*, CTR. FOR INFECTION DISEASE RESEARCH AND

27  POLICY 1, 5–6 (2020), https://www.cidrap.umn.edu/sites/default/files/public/downloads/cidrap-covid19-viewpoint-part1_0.pdf ("[T]he length of the pandemic will likely be 18 to 24 months . . .

28  .").

registered voters in advance of the November elections.[13]  The Governor issued a subsequent order on June 3, 2020, Executive Order N-67-20, which requires that counties maintain physical distancing at in-person polling locations, clarifies that voters with inactive registrations will not receive vote-by-mail ballots, and requires county elections officials to use ballot tracking and barcode systems for all vote-by-mail ballot envelopes.[14]

Doctors, public health experts, and voting rights organizations have all advocated for the distribution of mail-in ballots to all voters.[15]  Stein Decl. ¶¶ 9–13; Doute Decl. ¶ 13; Sanchez Decl. ¶¶ 10–12; Mishori Decl. ¶¶ 50–52.  According to these experts and advocates, merely providing an option for voters to request a mail-in ballot in advance is not enough to eliminate the risk of spreading the coronavirus.  *Id.*  Requesting a mail-in ballot is an insurmountable burden for voters with low literacy, limited language skills, and those with significant work and care responsibilities. Mishori Decl. ¶ 51; Stein Decl. ¶¶ 11–13; Sanchez Decl. ¶¶ 10–12. Organizations like Proposed Intervenors work hard to educate the public and help voters overcome administrative burdens to voting, but they cannot reach everyone.  Stein Decl. ¶¶ 15–16; Sanchez Decl. ¶¶ 5–8; Doute Decl. ¶¶ 11–14.  Those who plan to vote in-person may develop symptoms after the deadline to request a mail-in ballot, or even the day of the election, or may learn that they have been exposed to the virus and could be contagious.  Mishori Decl. ¶ 51.  If they do not receive a mail-in ballot in advance, these voters will have to choose between not voting and endangering their communities.  States need not put voters in this position.

**B.**     <u>**Plaintiffs Seek to Undo California's Efforts to Protect Voters**</u>

On May 21 and May 24, 2020, Plaintiffs filed two lawsuits challenging the first of Governor Newsom's executive orders about the November election.  The first action was brought by former United States Representative and current congressional candidate Darrell Issa and four

---

[13] State of Cal., Exec. Order No. N-64-20 (2020).

[14] *Id.*

[15] Letter to Members of the United States Senate and House of Representatives, Public Health Experts (May 5, 2020), https://cdn.americanprogress.org/content/uploads/2020/05/05061221/21DemocracyTeam_finalmailvotingandcovid19.pdf (signed by over 800 public health experts).

California voters ("Issa Plaintiffs") against Governor Newsom and Secretary Padilla.  The Issa

Plaintiffs allege claims under the Elections and Electors Clauses of the United States

Constitution, the Fourteenth Amendment Due Process Clause, and the *ultra vires* doctrine.  Doc.

1, No. 2:20-cv-01044 ("Issa Compl.") at 11–13.  The second action was brought by the

Republican National Committee, the National Republican Congressional Committee, and the

California Republican Party ("RNC Plaintiffs") against Governor Newsom and Secretary Padilla.

The RNC Plaintiffs allege claims under the Elections and Electors Clauses, the Fourteenth

Amendment, and the Equal Protection Clause.  Doc. 1, No. 2:20-at-00509 ("RNC Compl.") at

24–26.  Both complaints seek injunctive and declaratory relief that would prohibit the State from

implementing and enforcing Executive Order N-64-20.

Plaintiffs' allegations echo long-debunked claims that associate mail-in ballots with voter

fraud.[16]  In reality, mail vote fraud is virtually nonexistent.[17]  Millions of Americans vote by

mail—one in four voters did so in the last two federal elections.[18]  Yet an exhaustive investigation

found only 491 instances of mail vote fraud committed between 2000 and 2012, a period in which

billions of votes were cast.[19]  Polls have found that most Americans want mail-in ballots to be

sent to all active registered voters, rather than being available only upon request, in November.[20]

---

[16] *See, e.g.*, Wendy R. Weiser & Harold Ekeh, *The False Narrative of Vote-by-Mail Fraud*, BRENNAN CTR. FOR JUSTICE (Apr. 10, 2020), https://www.brennancenter.org/our-work/analysis-opinion/false-narrative-vote-mail-fraud; Matt Barretto et al., *Debunking the myth of voter fraud in mail ballots*, UCLA LPPI VOTING RIGHTS PROJECT, UNIV. N. M. CTR. FOR SOC. POLICY, UNION OF CONCERNED SCIENTISTS (Apr. 14, 2020), https://latino.ucla.edu/wp-content/uploads/2020/04/LPPI-VRP-Voter-Fraud-res.pdf.

[17] Weiser & Ekeh, *supra* note 16; Barretto, *supra* note 16.

[18] Weiser & Ekeh, *supra* note 16; *see also EAVS Deep Dive: Early, Absentee and Mail Voting*, U.S. ELECTION ASSISTANCE COMM'N (Oct. 17, 2017), https://www.eac.gov/documents/2017/10/17/eavs-deep-dive-early-absentee-and-mail-voting-data-statutory-overview.

[19] Corbin Carson, *Election Fraud in America*, NEWS21 (Aug 12. 2020), https://votingrights.news21.com/interactive/election-fraud-database/.

[20] Chris Kahn, *Most Americans, unlike Trump, want mail-in ballots for November if coronavirus threatens: Reuters/Ipsos poll*, REUTERS (Apr. 7, 2020), https://www.reuters.com/article/us-usa-election-poll/most-americans-unlike-trump-want-mail-in-ballots-for-november-if-coronavirus-threatens-reuters-ipsos-poll-idUSKBN21P3G0.

Plaintiffs' arguments are especially misguided and dangerous because they lead to the unavoidable implication that voting by mail is per se unconstitutional. Their theories for these claims rely on the assertion that making vote-by-mail available causes unconstitutional and unlawful vote dilution. Issa Compl. ¶ 49; RNC Compl. ¶¶ 159–64. But if this is true—and Proposed Intervenors adamantly assert that is it not—then California's existing vote-by-mail systems are unconstitutional.

Plaintiffs' lawsuits, if successful, would have the effect of endangering poll-workers and voters and disenfranchising California's most vulnerable voters, including African Americans, Latinos, and medically vulnerable individuals. The implications could resonate long after this election, if Plaintiffs prevail on their theory that voting by mail is per se unconstitutional. For some of the Plaintiffs, this disenfranchisement may be precisely the point.[21]

## C. Proposed Intervenors Are Organizations That Promote the Interests of Voters

Proposed Intervenors are organizations that serve, represent, and have members who are California voters. All of them have worked to engage voters leading up to the November 2020 elections and advocate in favor of sending mail-in ballots to all voters. *See* Part II.A, *supra*.

California Common Cause is a non-profit political advocacy organization and a chapter of the national Common Cause organization. Stein Decl. ¶ 2. With over 100,000 members, California Common Cause works to encourage civic engagement and public participation in democracy, to ensure that public officials and public institutions are accountable to and reflective of all people, and to implement structural changes through the American democratic process. *Id.* ¶¶ 2, 5. California Common Cause is nonpartisan and uses grassroots mobilization, community education, coalition building, legislative advocacy, and litigation to build a democracy that includes everyone. *Id.* ¶ 2 California Common Cause is working to make sure that voters in communities that vote at the lowest rates and use vote-by-mail at the lowest rates—which are also

---

[21] Plaintiff Darrell Issa alleges that he "has already had to reevaluate his electoral strategy in order to campaign in the 50th Congressional District as a result of EO N-64-20." Issa Compl. ¶ 53.

1   the communities that have been hit hardest by COVID-19—can exercise their right to vote

2   without putting their health at risk.  *Id.* ¶ 9.

3        The League of Women Voters of California is a Sacramento-based non-profit, nonpartisan

4   political organization that encourages informed and active participation in government, works to

5   increase understanding of major public policy issues, and influences public policy through

6   education and advocacy.  Doute Decl. ¶ 2.  The League runs candidate forums, provides voter

7   education, and registers voters.  *Id.* ¶ 4.  The League's 7,500  members and volunteers do

8   community outreach work and meet prospective voters at town halls and other community

9   organization meetings.  *Id.* ¶¶ 4–5.  The League also advocates for voter empowerment through

10  legislation and other policy work, including implementation of policies that empower voters.  *Id.*

11  ¶ 4.

12       Community Coalition ("CoCo") is a community-based organization that serves African

13  American and Latino communities and people living below the poverty line in South Los

14  Angeles.  Sanchez Decl. ¶ 1.  The group has over 3,500 dues-paying members and more than

15  1,000 volunteers.  *Id.* ¶ 4.  CoCo's major platforms include voter engagement, education, and

16  turnout because the organization believes that community that votes is a community that will be

17  heard.  *Id.* ¶ 5.  CoCo has mobilized voters in the historically disenfranchised South LA area to

18  exercise their right to vote.  *Id.* ¶¶ 6–7.

19       Proposed Intervenors seek permissive intervention to advocate for the interests of their

20  members and of all California voters, including their safety from COVID-19 and their ability to

21  exercise their right to vote.

22  **III.   ARGUMENT**

23       The Court should grant Proposed Intervenors permission to intervene in this action for the

24  purpose of defending Californians' right to vote and securing their safety from COVID-19.

25       **A.   Proposed Intervenors Meet the Standards for Permissive Intervention**

26       Proposed Intervenors move for permissive intervention under Federal Rule of Civil

27  Procedure Rule 24(b)(1)(B). The Ninth Circuit applies three threshold requirements to a motion

28  for permissive intervention: (1) the intervenor's claim must share a common question of law or

9

1    fact with the main action; (2) the motion must be timely; and (3) the court must have an

2    independent basis for jurisdiction over the applicant's claims. *Donnelly v. Glickman*, 159 F.3d

3    405, 412 (9th Cir. 1998).

4        All of these requirements are satisfied here. The motion is timely, and permitting

5    intervention at this early stage of the lawsuit, less than three weeks after the filing of the

6    complaints and before any briefing on a preliminary injunction, would not prejudice the parties.

7    Proposed Intervenors intend to raise questions of law with respect to the fundamental right to

8    vote, the Equal Protection Clause, and the Due Process Clause, and questions of fact related to the

9    pandemic, in-person voting, mail-in ballots, and the voters and poll-workers who are most

10   affected by the interaction among these issues.  Finally, the test for whether there is an

11   independent basis for jurisdiction is satisfied with respect to the constitutional claims that

12   Proposed Intervenors will address.

13       Rule 24 is construed liberally in favor of intervenors, and a court's decision on a motion to

14   intervene is guided primarily by practical considerations rather than technical distinctions. *Sw.*

15   *Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 817 (9th Cir. 2001).  "A liberal policy in

16   favor of intervention serves both efficient resolution of issues and broadened access to the courts.

17   By allowing parties with a *practical* interest in the outcome of a particular case to intervene, we

18   often prevent or simplify future litigation involving related issues; at the same time, we allow an

19   additional interested party to express its views before the court." *United States v. City of Los*

20   *Angeles*, 288 F.3d 391, 397-98 (9th Cir. 2002) (citation omitted).  A court is required to accept as

21   true the non-conclusory allegations made in support of an intervention motion, particularly where

22   the propriety of intervention is being determined before discovery.  *Berg*, 268 F.3d at 819-20.

23                      **1.    The Motion Is Timely**

24       Courts consider three factors in determining whether a motion to intervene is timely: (1)

25   the stage of the proceeding, (2) the prejudice to other parties, and (3) the reason for and length of

26   the delay. *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997).

27       All three factors here weigh heavily in favor of the timeliness of this motion. Proposed

28   Intervenors are moving to intervene *less than three weeks* after the actions were filed, before the

1    defendants have answered. Motions to intervene filed at significantly later stages of a suit have

2    been deemed timely. *See, e.g.*, *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d

3    893, 897 (9th Cir. 2011) (motion to intervene filed "less than three months" after suit filed and

4    "less than two weeks" after answer); *United States v. State of Oregon*, 745 F.2d 550, 552 (9th Cir.

5    1984) (granting intervention in a year-old case when the litigation was "entering a new stage").

6              There can be no prejudice to the parties, and there is no reason why permissive

7    intervention would cause any delay in resolution of the cases.  *See W. States Trucking Ass'n v*

8    *Schoorl*, No. 2:18-cv-1989-MCE-KJN, 2018 U.S. Dist. LEXIS 193481, at *3–4 (E.D. Cal. Nov.

9    13, 2018) (finding intervention timely at "the very outset of litigation").  Proposed Intervenors

10   agree to abide by the Court's scheduling order, and the Court has made no substantive rulings.

11   *See N.W. Forest Res. Council v. Glickman*, 82 F.3d 825, 837 (9th Cir. 1996); *Hazel Green Ranch,*

12   *Ltd. Liab. Co. v. United States Dept. of Int.*, No. 1:07-CV-00414-OWW-SMS, 2007 U.S. Dist.

13   LEXIS 68728, at *9 (E.D. Cal. Sep. 4, 2007).  In fact, by submitting their proposed Answer in

14   Intervention with this Motion, Proposed Intervenors will be responding ahead of the State

15   defendants.

16                    **2.    Proposed Intervenors' Claims or Defenses Share Questions of Law**
                              **and Fact with the Main Actions**
17

18             A prospective intervenor's claim or defense must raise a question of law or fact in

19   common with the main action.  *See Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 955

20   (9th Cir. 2009).  As this Court has held, "common questions of both law and fact are present"

21   when intervenors "seek to assert defenses against the Plaintiff's requested injunction, which lies

22   at the heart of th[e] matter."  *See Conservation Cong. v. United States Forest Serv.*, No. 2:16-cv-

23   00864-MCE-AC, 2018 U.S. Dist. LEXIS 10830 at *9 (E.D. Cal. Jan. 22, 2018).  Here, Proposed

24   Intervenors seek to assert defenses against Plaintiffs' claims that the State's voting system is

25   unconstitutional and the accompanying request for an injunction on the same grounds.  These

26   issues are at the heart of both matters.

27             More specifically, Proposed Intervenors intend to contribute to the Court's resolution of

28   the following questions of law and fact, all of which are common to the main actions:

- Whether Executive Order N-64-20, by requiring that all active registered voters in California receive a mail-in ballot, denies or dilutes Plaintiffs' or Plaintiffs' members' right to vote;

- Whether the burden that Executive Order N-64-20 places on Plaintiffs' or Plaintiffs' members' right to vote, if any, is outweighed by the State's justifications, including protection of the public health and all Californians' right to vote safely;

- Whether Executive Order N-64-20, by authorizing the Governor to work with the Legislature and the Secretary of State to ensure the safety of in-person voting, violates the Equal Protection Clause;

- Whether the public interest would be served or disserved by a court order enjoining Executive Order N-64-20;

Whether a voting system that allows for voting by mail is per se unconstitutional.

Proposed Intervenors satisfy the common-questions element because "the central issues [raised by their Answer] are the same [as those raised by the Complaint]." *See In re Grupo Unidos Por El Canal S.A.*, No. 14-mc-80277-JST (DMR), 2015 U.S. Dist. LEXIS 52358, at \*15–16 (N.D. Cal. Apr. 21, 2015).

### 3.    There is an independent basis for jurisdiction

The independent jurisdictional requirement for permissive intervention serves to "prevent[] the enlargement of federal jurisdiction in such cases only where a proposed intervenor seeks to bring new state-law claims." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011).  In cases where jurisdiction is based on federal questions and where the proposed intervenor is not bringing new state-law claims, "the independent jurisdictional grounds requirement does not apply to proposed intervenors." *Id.*  Proposed Intervenors do not intend to bring new state law counterclaims or cross-claims. The independent-jurisdiction element is satisfied. *Id.*

**B.     The Court Should Exercise Its Discretion to Grant Permissive Intervention**

Where a putative intervenor has met the threshold requirements for permissive intervention, the court may consider other factors in the exercise of its discretion, including "the nature and extent of the intervenors' interest" and "whether the intervenors' interests are adequately represented by other parties." *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977).  An intervenor's "greater first-hand knowledge" of a law's impact on private individuals "may support a trial judge's discretionary grant of permissive intervention." *Prete v. Bradbury*, 438 F.3d 949, 958 n.13 (9th Cir. 2006) (emphasis omitted).  Here, the equities support permissive intervention.

**1.     Proposed Intervenors Are Uniquely Positioned to Represent Voters**

Proposed Intervenors represent a broad constituency of Californian voters, including members of racial minorities, low-income voters, and others who are particularly likely to be harmed by a requirement that they vote in person in the face of the COVID-19 pandemic.  The views and circumstances of these voters cannot be represented or expressed by the four individual "voter" plaintiffs in the Issa Complaint, none of whom contributes facts other than their county of residence and intention to vote in the November elections.  *See* Issa Compl. ¶¶ 7-10.  By representing a broad swath of voters, including those at greatest risk of infection, complications, and death from COVID-19, Proposed Intervenors are well positioned "to assist this court's comprehension of the facts and applicable law."  *See Lennar Mare Island, LLC v. Steadfast Ins. Co.*, No. 2:12-cv-01282-KJM-KJN, 2016 U.S. Dist. LEXIS 139383, at *15-17 (E.D. Cal. Oct. 5, 2016).

The interests of Proposed Intervenors and their members cannot be fully represented by the other parties in this case.  While the State and Proposed Intervenors "may share the same 'ultimate objective'" of defending the mailing of ballots to all registered voters, their interests "are neither 'identical' nor 'the same'"—in fact, they may be "in some respects adverse." *Cal. Dump Truck Owners Ass'n v. Nichols*, 275 F.R.D. 303, 308 (E.D. Cal. 2011) (quoting *Berg*, 268 F.3d 810, 823 (9th Cir. 2001)).  The Executive Order at issue states that it was enacted to further the rights of all voters and to keep them safe; but, as defendants in these actions, the State

13

Defendants are differently situated than the Proposed Intervenors.  In designing and implementing rules about the time, place, and manner of elections, the State must take into account factors in addition to public health and Californians right to vote, including the State's economy, administrative concerns, and the State's relationships with counties.  Proposed Intervenors do not share these additional constraints: their sole objective here is to protect the rights of their members and all California voters to cast their ballots and to do so safely.  *See Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1190 (9th Cir. 1998) (affirming grant of motion to intervene because proposed intervenors' interests were "potentially more narrow" than the "interests of the public at large").

## 2. Courts Routinely Grant Intervention to Voters and Voter Organizations in Analogous Cases

The Eleventh Circuit has granted intervention as of right (not merely permissive, as is sought here) to voters and voter organizations in closely analogous circumstances.  In *Meek v. Metro. Dade Cty.*, 985 F.2d 1471 (11th Cir. 1993), voters and voter organizations sought to intervene as of right as defendants alongside the County defendants in a Voting Rights Act case. *Id.* (abrogated on other grounds by *Dillard v. Chilton County Comm'n*, 495 F.3d 1324 (2007). The district court denied intervention, but the Eleventh Circuit reversed, writing:

> We disagree with the district court's conclusion THAT the county defendants were adequate representatives of the intervenors because they had identical interests.  The intervenors sought to advance their own interests in achieving the greatest possible participation in the political process.  Dade County, on the other hand, was required to balance a range of interests likely to diverge from those of the intervenors.  For example, the County Commissioners had to consider the overall fairness of the election system to be employed in the future, the expense of litigation to defend the existing system, and the social and political divisiveness of the election issue.  In addition, the County Commissioners were likely to be influenced by their own desires to remain politically popular and effective leaders.  These divergent interests created a risk that Dade County might not adequately represent the applicants.

*Id.*, at 1478.

Similarly, in *Miller v. Blackwell*, 348 F.Supp.2d 916 (S.D. Ohio 2004), the court granted intervention as of right, as defendants, to individuals seeking to defend state and county procedures governing pre-election challenges to voters' registrations. In granting intervention, the court found that the intervenors had "interests divergent from those of the County Boards of

14

Elections and Secretary of State Blackwell," in that "[t]he latter seek an efficient and accurate electoral process revolving around Ohio election laws," while "[the intervenors] are concerned primarily with maintaining a process by which to challenge the eligibility of registered voters prior to the election in order to prevent possible dilution of their own votes." *Id.*, at 918 n.3; *see also Cal. Dump Truck Owners Ass'n v. Nichols*, 275 F.R.D. at 308 (finding that non-profit organization's interests were not identical to public agency because although both aimed to promote health and protect the environment, the non-profit was "not required to balance any economic impact" against its objectives).

Here, Proposed Intervenors do not seek intervention as of right, but only permissive intervention, making the holdings of these courts even more powerful precedent for the granting of this motion.  As this Court has held, "ensuring that all competing interests implicated" by a lawsuit are heard "will contribute to the just and equitable resolution of this case." *Pac. Rivers Council v. United States Forest Serv.*, No. CIV. S. 05-0953 MCE GGH, 2005 U.S. Dist. LEXIS 25136, at *5-6 (E.D. Cal. Oct. 19, 2005).

### 3.   Proposed Interveners Will Assist the Court by Asserting Constitutional Rights on Behalf of Those Who Hold Those Rights

Finally, Proposed Intervenors' participation can aid the Court to resolve this matter expeditiously by clearly articulating the constitutional issues on behalf of voters.  *See Earth Island Inst. v. United States Forest Serv.*, No. 2:05-cv-1608-MCE-GGH, 2006 U.S. Dist. LEXIS 66758, at *6 (E.D. Cal. Sep. 8, 2006).   Though the State can identify constitutional arguments involving the right to vote, the State does not hold that right.  The federal courts, through standing doctrine and other bedrock legal principles, have long stood for the proposition that the people who are most impacted by the central issues of a case should be the ones to litigate it.  Proposed Intervenors represent precisely those people who, absent the opportunity to vote by mail, will be confronted with the most perilous choice between exercising their right to vote and risking their health and that of their families, neighbors, and fellow workers.  Proposed Intervenors will depart from the State's defense by advocating for voters' constitutional rights on behalf of the very people who hold those rights.

1

## IV.    **CONCLUSION**

2          Proposed Intervenors respectfully request that this Court grant them permission to

3     intervene.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO INTERVENE
Case No. 2:20-cv-01055-MCE-CKD

1    Dated:  June 10, 2020               PUBLIC COUNSEL

2

3  By: /s/ Mark D. Rosenbaum (as authorized on  6/10/20)
                     Mark D. Rosenbaum
                     Kathryn Eidmann

4                       Jesselyn Friley
                     610 S. Ardmore Avenue

5                       Los Angeles, California 90005
                     Telephone:   (213) 385-2977

6                       Facsimile:    (213) 385-9089
                     Email:        mrosenbaum@publiccounsel.org

7                                   keidmann@publiccounsel.org
                                 jfriley@publiccounsel.org

8

9       LAWYERS' COMMITTEE FOR CIVIL RIGHTS

10  By:/s/ Jon Greenbaum (as authorized on 6/10/20)
           .

11                       Jon Greenbaum
                     Ezra Rosenberg

12                       Pooja Chaudhuri
                     Bradley S. Phillips

13                       1500 K Street NW
                     Washington, DC 20005

14                       Telephone:   (202) 662-8600
                     Facsimile:    (202) 783-0857

15                       Email:        jgreenbaum@lawyerscommittee.org
                                 erosenberg@lawyerscommittee.org

16                                   pchaudhuri@lawyerscommittee.org
                                 bphillips@lawyerscommittee.org

17       MANATT, PHELPS & PHILLIPS, LLP

18  By: /s/ John Libby
                     John Libby

19                       2049 Century Park East
                     Suite 1700

20                       Los Angeles, CA 90067
                     Telephone:   (310) 312-4000

21                       Facsimile:    (310) 312-4224
                     Email:        JLibby@manatt.com

22

23       MANATT, PHELPS & PHILLIPS, LLP
                     Christopher L. Wanger

24                       One Embarcadero Center, 30th Floor
                     San Francisco, California  94111

25                       Telephone:   (415) 291-7400
                     Facsimile:    (415) 291-7474

26                       Email:        CWanger@manatt.com

27       Attorneys for Intervenor-Defendants, CALIFORNIA
     COMMON CAUSE, LEAGUE OF WOMEN

28       VOTERS OF CALIFORNIA and COMMUNITY
     COALITION