1    XAVIER BECERRA
     Attorney General of California
2    BENJAMIN M. GLICKMAN
     Supervising Deputy Attorney General
3    JAY C. RUSSELL
     Deputy Attorney General
4    JOHN W. KILLEEN, State Bar No. 258395
     Deputy Attorney General
5     1300 I Street, Suite 125
      P.O. Box 944255
6     Sacramento, CA 94244-2550
      Telephone: (916) 210-6045
7     Fax: (916) 324-8835
      E-mail: John.Killeen@doj.ca.gov
8    *Attorneys for Defendants Gavin Newsom
     and Alex Padilla*

9

10                IN THE UNITED STATES DISTRICT COURT

11               FOR THE EASTERN DISTRICT OF CALIFORNIA

12

13

14

| | |
|---|---|
| 15  **REPUBLICAN NATIONAL COMMITTEE; NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE; and CALIFORNIA REPUBLICAN PARTY,** | No. 2:20-cv-01055-MCE-CKD |
| 16 | |
| 17                                    Plaintiffs, | **OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| 18 | |
| 19                        v. | Date:       July 16, 2020 |
|  | Time:       10:00 a.m. |
| 20  **GAVIN NEWSOM, in his official capacity as Governor of California; and ALEX PADILLA, in his official capacity as California Secretary of State,** | Dept:       Courtroom 7, 14th Floor |
| 21 | Judge:      The Honorable Morrison C. England |
| 22 | Trial Date:  None Set |
|  | Action Filed: 5/24/2020 |
| 23                               Defendants. | |

24

25

26

27

28

# TABLE OF CONTENTS

                                                                          **Page**

Introduction ................................................................................................ 1

Relevant Facts .......................................................................................... 2

     I.     California's Long History of Voting by Mail ........................................ 2

     II.     California Law Contains Numerous Safeguards to Prevent Voter Fraud .............. 3

     III.     The COVID-19 Pandemic and California's Response ............................... 4

     IV.     The COVID-19 Pandemic and Californians' Ability to Vote ...................... 6

     V.     AB 860 .......................................................................................... 8

     VI.     The Implementation of AB 860 ......................................................... 9

     VII.     This Lawsuit and Motion for Preliminary Injunction ........................... 10

Legal Standard ......................................................................................... 10

Argument ................................................................................................. 10

     I.     Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims ...................... 11

         A.     The Relevant Claims Are Moot ............................................ 11

         B.     Even if the Relevant Claims Were Not Moot, Plaintiffs Would Be Unlikely to Succeed on the Merits ........................................ 13

             1.     The Merits of Plaintiffs' Claims Turn on State Law ..................... 13

             2.     Because Plaintiffs' Claims Turn on State Law, Those Claims Are Barred by Sovereign Immunity .............................. 14

             3.     State Law Authorized the Governor's Order ............................... 14

     II.     The Remaining Factors Weigh Heavily Against Issuance of a Preliminary Injunction ...................................................................................... 19

Conclusion .............................................................................................. 20

i

**TABLE OF AUTHORITIES**

**Page**

CASES

*Alliance for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011)..................................................................10

*Am. Diabetes Ass'n v. United States Dep't of the Army*
938 F.3d 1147 (9th Cir. 2019)..................................................................11

*Anderson v. Celebrezze*
460 U.S. 780 (1983)...............................................................................16

*Arc of California v. Douglas*
757 F.3d 975 (9th Cir. 2014)...................................................................11

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*
135 S. Ct. 2652 (2015).....................................................................13, 19

*Bd. of Trustees of Glazing Health & Welf. Trust v. Chambers*
941 F.3d 1195 (9th Cir. 2019)..................................................................12

*Birkenfeld v. City of Berkeley*
17 Cal.3d 129 (1976).............................................................................16

*Bunker Ltd. P'ship v. United States*
820 F.2d 308 (9th Cir. 1987)...................................................................11

*Cal. Corr. Peace Officers Ass'n v. Schwarzenegger*
163 Cal. App. 4th 802 (2008).............................................................14, 16

*Cuesnongle v. Ramos*
835 F.2d 1486 (1st Cir. 1987)..................................................................14

*Drakes Bay Oyster Co. v. Jewell*
747 F.3d 1073 (9th Cir. 2014)..................................................................19

*Hunter v. Hamilton Cty. Bd. of Elections*
635 F.3d 219 (6th Cir. 2011)..............................................................15, 16

*League of Women Voters of Cal. v. McPherson*
145 Cal. App. 4th 1469 (2006).................................................................16

*Lockyer v. City & Cty. of San Francisco*
33 Cal.4th 1055 (2004)..........................................................................15

*Macias v. California*
10 Cal.4th 844 (1995)............................................................................15

ii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Marine Forests Soc'y v. California Coastal Comm'n*
   36 Cal.4th 1 (2005) ........................................................................15

*Martin v. Mun. Court*
   148 Cal. App. 3d 693 (1983).............................................................16

*Massingill v. Dep't of Food & Agric.*
   102 Cal.App.4th 498 (2002)..............................................................16

*Paher v. Cegavske*
   No. 3:20-cv-00243-MMD-WGC (D. Nev. Apr. 30, 2020), 2020 WL 2089813.........13, 20

*Peace & Freedom Party v. Shelley*
   114 Cal. App. 4th 1237 (2004)...........................................................3

*Pennhurst State Sch. & Hosp. v. Halderman*
   465 U.S. 89 (1984) .........................................................................14

*Rosemere Neighborhood Ass'n v. EPA*
   581 F.3d 1169 (9th Cir. 2009) ...........................................................12

*S. Bay United Pentecostal Church v. Newsom*
   No. 19A1044, 2020 WL 2813056 (U.S. May 29, 2020)..........................5, 18, 20

*Save Our Heritage Org. v. City of San Diego*
   28 Cal.App.5th 656 (2018)................................................................17

*Short v. Brown*
   893 F.3d 671 (9th Cir. 2018).............................................................2

*Smiley v. Holm*
   285 U.S. 355 (1932) .......................................................................13

*Smith v. Univ. of Wash.*
   233 F.3d 1188 (9th Cir. 2000)...........................................................12

*Superior Court v. Cty. of Mendocino*
   13 Cal.4th 45 (1996) ......................................................................15

*Vasquez v. Rackauckas*
   734 F.3d 1025 (9th Cir. 2013) ..........................................................14

*Vikco Ins. Servs., Inc. v. Ohio Indem.*
   Co., 70 Cal. App. 4th 55 (1999).........................................................16

iii

## TABLE OF AUTHORITIES
### (continued)

Page

*West Coast Seafood Processors Ass'n v. Nat'l Resources Def. Council*
   643 F.3d 701 (9th Cir. 2011)...................................................................12

*Winter v. Nat'l Resources Defense Council, Inc.*
   555 U.S. 7 (2008) ...................................................................10, 19

STATUTES

Elections Code
   § 1500.......................................................................................15
   § 2220........................................................................................3
   § 2221........................................................................................3
   § 2226........................................................................................3
   § 2226(a)(2).................................................................................3
   § 3001........................................................................................2
   § 3003........................................................................................2
   § 3006........................................................................................2
   § 3007.8......................................................................................2
   § 3013........................................................................................3
   § 3014........................................................................................3
   § 3015........................................................................................4
   § 3016........................................................................................4
   § 3017(c)....................................................................................3
   § 3019........................................................................................4
   § 3019.7......................................................................................3
   § 3101 *et seq.* ............................................................................2
   § 3200........................................................................................2
   §§ 4000–4007..............................................................................15
   § 4005........................................................................................3
   § 12000......................................................................................15
   § 14310......................................................................................4

Government Code
   § 8550 et seq. .............................................................................14
   § 8558.......................................................................................16
   § 8558(b)....................................................................................16
   § 8567.......................................................................................16
   § 8571.............................................................................5, 14, 15, 16
   § 8627...............................................................................5, 15, 16
   § 8629.......................................................................................15
   § 8657(a)................................................................................5, 14

OTHER AUTHORITIES

60 California Opinion of the Attorney General 99 (1977)...................................17

# TABLE OF AUTHORITIES
## (continued)

**Page**

Assembly Bill 860 ................................................................................8

California Code of Regulations, Title 2
    § 20108.1(l) ...............................................................................3
    § 20108.18 .................................................................................3

Executive Orders of the Governor of California
    B-43-17 ...................................................................................17
    N-25-20 .....................................................................................5
    N-33-20 .....................................................................................5
    N-64-20 ............................................................................ *passim*
    N-64-20 ...................................................................................10
    N-67-20 ..........................................................................8, 9, 10
    S-17-09 ...................................................................................17
    S-19-09 ...................................................................................17
    W-29-92 ..................................................................................17
    W-69-93 ..................................................................................17

Gardner, Lee, Willis, & Glionna, *In Georgia, Primary Day Snarled by Long Lines,*
    *Problems With Voting Machines – a Potential Preview of November*, Wash.
    Post. (June 9, 2020) ...................................................................7

Senate Bill 423 ...................................................................................8

Shafer, *Trump Sees Voter Fraud, But Elections Chiefs in Red Counties Do Not,*
    KQED (June 18, 2020) ..............................................................4

Situation Report, << https://www.who.int/docs/default-
    source/coronaviruse/situation-reports/20200623-covid-19-sitrep-
    155.pdf?sfvrsn=ca01ebe_2 >> ...................................................5

Taryn Luna, *Increases in Coronavirus Cases and Hospitalizations Tell "Sobering
    Story," Newsom Says*, L.A. Times (June 22, 2020) ........................6

Viebeck, Gardner, Simmons, & Larson, *Long Lines, Anger and Fear of Infections:
    Wisconsin Proceeds With Elections Under Court Order*, Wash. Post (Apr. 7,
    2020) .....................................................................................6

# INTRODUCTION

Acutely aware of the need to protect Californians from the COVID-19 pandemic—and of the prospect that the COVID-19 pandemic will remain ongoing during the November 2020 election—the California Legislature, Governor Gavin Newsom, and Secretary of State Alex Padilla have been working in concert to ensure that all Californians who are registered to vote can safely do so this November. In May, key Members of the Legislature—the Chairs of the Senate and Assembly committees responsible for elections legislation—asked the Governor to act by Executive Order to ensure that "all voters be mailed a ballot for this November's election." Two days later, the Governor issued Executive Order N-64-20 (the Executive Order at issue in this litigation), which does exactly that. As contemplated in the Legislative Chairs' letter, and in the text of Executive Order N-64-20, the Legislature subsequently enacted (and the Governor signed) AB 860, which enshrines this requirement in state statute.

Following the enactment of AB 860, Plaintiffs' motion for a preliminary injunction is moot, and should be denied on that basis. Executive Order N-64-20 no longer has any effect on the November election: AB 860 ratifies and supersedes Executive Order N-64-20 in all relevant respects. There is no effective relief for the Court to grant here: no matter what action the Court might take regarding Executive Order N-64-20, vote-by-mail ballots will still be sent to every registered active voter in California under AB 860.

Even if Plaintiffs' motion was not moot, it would fail on the merits. Under the Elections and Electors Clauses, a legislature may delegate a portion of its authority over elections. The California Legislature has delegated broad emergency powers to the Governor, including the power to ensure safe and fair elections in an emergency. Executive Order N-64-20 was a proper exercise of that delegated authority. As the Legislative Chairs urged the Governor, counties needed specific direction immediately to be able to prepare in time for the election and allow millions of California voters to vote without problem; without timely preparation, California counties could not complete the many steps necessary to ensure safe access to the vote in November. Precisely because of the press of time amidst a continuing emergency impacting the entire state in unprecedented ways, it was not only proper but essential for the Governor to use his

1

1   longstanding emergency authority to protect rights integral to democracy while simultaneously

2   protecting Californians from further harm from the COVID-19 pandemic.

3                              **RELEVANT FACTS**

4   **I.   CALIFORNIA'S LONG HISTORY OF VOTING BY MAIL**

5         For nearly 40 years, California voters have been able to request a vote-by-mail ballot for

6   any reason. *See* Decl. of Jana M. Lean ("Lean Decl."), ¶¶ 1-9; Cal. Elec. Code §§ 3001, 3003,

7   3006, 3007.8, 3101 *et seq.* (military and overseas voters), 3200 (permanent vote-by-mail voters).

8   In the November 2016 presidential election, approximately 59 percent of all votes cast in

9   California were by mail. *See* Lean Decl., ¶ 3. In the November 2018 midterm election,

10  approximately 65 percent of all votes cast in California were by mail. *Id.* And in the March 3,

11  2020 primary election, approximately 72 percent of all votes cast in California were by mail. *Id.*

12        Building on this long tradition of access to voting by mail, in 2016, California enacted the

13  Voter's Choice Act ("VCA"). *See* Lean Decl., ¶ 10. The VCA created an all-mailed ballot

14  election system that would be gradually rolled out throughout the State. *Id.*; *see Short v. Brown*,

15  893 F.3d 671, 674 (9th Cir. 2018) (upholding the constitutionality of the VCA). Under the VCA,

16  any California county may opt into an all-mailed election procedure. *See* Lean Decl., ¶ 11. By

17  2020, fifteen counties containing over 10 million registered active voters had elected or were

18  required to conduct their general elections under the VCA. *See* Lean Decl., ¶ 12. Under this

19  procedure, a ballot is mailed to every registered active voter twenty-nine days before the election

20  date. *Short*, 893 F.3d at 674 (citing Cal. Elec. Code § 4005(a)(8)(A)). "A voter may cast a

21  completed ballot in one of three ways: by (1) mailing it in; (2) depositing the ballot at a

22  designated 'ballot dropoff location' (a large locked mailbox); or (3) turning in the ballot at a "vote

23  center" (a voting-resource hub that replaces traditional polling places)." *Id.* (citing Cal. Elec.

24  Code § 4005(a)(1)–(2)). "The voter may cast his ballot by mail or at a dropoff location as soon as

25  he receives it." *Id.*

26        Between individuals requesting ballots and jurisdictions conducting all-mailed ballot

27  elections, for the November 2020 presidential election, counties were already preparing to mail

28

1    out approximately 16.4 million ballots to registered active voters—approximately 80 percent of

2    all registered active voters.  *See* Lean Decl., ¶ 13.

3    **II.    CALIFORNIA LAW CONTAINS NUMEROUS SAFEGUARDS TO PREVENT VOTER FRAUD**

4          As voting by mail has expanded, California has implemented protections to ensure the

5    integrity of its voting system:

6          ***List Maintenance.***  Federal and state law require ongoing maintenance of State and local

7    voter rolls.  *See* Lean Decl., ¶¶ 17-18; Cal. Code Regs. tit. 2, § 20108.18 (prescribing

8    requirements for the official statewide voter registration list in the "Calvoter" system).

9          ***Active Voters.***  County officials mail election materials only to "active" voters, not to voters

10   who are eligible to vote but who are on the "inactive" list.  *See* Lean Decl., ¶¶ 19-20; Cal. Elec.

11   Code § 2226(a)(2); *see generally Peace & Freedom Party v. Shelley*, 114 Cal. App. 4th 1237,

12   1241-42 (2004) (describing inactive voter list).  An "'[i]nactive voter'" means a voter for whom a

13   county elections office receives information and/or an undeliverable/returned election mailing

14   (such as a voter information guide or vote-by-mail ballot) indicating the voter no longer lives at

15   that address.  Cal. Elec. Code §§ 2220, 2226.  "Per California Elections Code sections 2221 and

16   2226, such inactive registrants retain the legal right to vote, but need not be mailed election

17   material."  Cal. Code Regs. tit. 2, § 20108.1(l).  "Further, inactive voters who do not vote in two

18   consecutive Federal general elections are subject to cancellation of their voter registration

19   pursuant to [federal law]." *Id.*

20         ***Ballot Identification and Tracking.***  Every vote-by-mail envelope has a unique barcode.

21   *See* Lean Decl., ¶ 21.  County officials are responsible for keeping track of every vote-by-mail

22   ballot.  *Id.*; *see* Cal. Elec. Code §§ 3017(c), 3013, 3014.  The Secretary of State also offers a

23   statewide system for voters to track and receive notifications on the status of their vote-by-mail

24   ballots.  *See* Lean Decl., ¶ 21; Cal. Elec. Code § 3019.7.

25         ***Election Day Procedures.***  Residents who have received a vote-by-mail ballot can return

26   ballots by mail, or they can drop them off at a polling place or drop box.  *See* Cal. Elec. Code

27   § 4005.

28

If vote-by-mail voters appear at their designated polling place on Election Day, or appear at a vote center or the regular or satellite office of their elections official where voting is permitted on or before Election Day, the roster will indicate that they are vote-by-mail voter. *See* Lean Decl., ¶ 22. These voters cannot cast a non-provisional ballot unless they surrender their vote-by-mail ballot or unless the elections official can ensure that their vote-by-mail ballot has not been cast. *Id.*; *see* Cal. Elec. Code § 3015.

Alternatively, if vote-by-mail voters appear at their designated polling place on Election Day without a vote-by-mail ballot in hand, if the official cannot ensure that voters' vote-by-mail ballots have not been cast, or if the voters cannot be found on the roster, the voters will be allowed to cast a provisional ballot. *See* Cal. Elec. Code §§ 3016, 14310. Provisional ballots are maintained separately, counted last, compared against lists of vote-by-mail voters who have cast a mail ballot, and subject to signature verification and comparison. *See* Lean Decl., ¶ 23.

***Signature Verification.*** Every vote-by-mail ballot envelope must be signed. *See* Lean Decl., ¶ 24; Cal. Elec. Code § 3019. Every signature then is checked against the signature in the county's records. *Id.* If an elections official determines that the signatures do not compare or a signature is missing from the envelope, a voter is given an opportunity to cure the defect. *Id.* If the voter fails to do so, the ballot is not counted. *Id.*

As one county elections official recently observed, between tracking of individual ballots, verification of individual signatures, and the other safeguards that exist, "it's damn near impossible" to commit a material amount of voter fraud using vote-by-mail ballots in California.[1] Historically, there is no evidence of significant levels of voter fraud related to vote-by-mail ballots in California, or anywhere else. *See* Declaration of John W. Killeen, Exs. A-E.

### III.   THE COVID-19 PANDEMIC AND CALIFORNIA'S RESPONSE

California, like the rest of the world, is in the throes of a public health emergency unlike anything seen in at least a century. COVID-19 is "a novel severe acute respiratory illness that has

---

[1] Shafer, *Trump Sees Voter Fraud, But Elections Chiefs in Red Counties Do Not*, KQED (June 18, 2020) << https://www.kqed.org/news/11824704/trump-sees-voter-fraud-but-election-chiefs-in-red-counties-do-not >> (last accessed June 23, 2020).

4

1  killed thousands of people in California and more than 100,000 nationwide." *S. Bay United*

2  *Pentecostal Church v. Newsom*, No. 19A1044, 2020 WL 2813056, at *1 (U.S. May 29, 2020)

3  (Roberts, C.J., concurring).[2] "At this time, there is no known cure, no effective treatment, and no

4  vaccine." *Id.* "Because people may be infected but asymptomatic, they may unwittingly infect

5  others." *Id.*; *see* Declaration of James Watt, ¶¶ 10-15 (describing dangers of COVID-19).

6        California recognized early that COVID-19 had the potential to spread rapidly throughout

7  the State. In early December 2019, California began working closely with the national Centers

8  for Disease Control and Prevention, the United States Health and Human Services Agency, and

9  local health departments to monitor and plan for the potential spread of COVID-19 to the United

10  States. *See* Request for Judicial Notice ("RJN"), Ex. 1 (Governor's Proclamation of State of

11  Emergency). To prepare for and respond to suspected or confirmed cases of COVID-19 in

12  California, and to implement measures to mitigate the spread of COVID-19, the Governor

13  proclaimed a State of Emergency on March 4, 2020. *Id.*

14        The proclamation of a State of Emergency empowered the Governor to exercise his powers

15  under the Emergency Services Act. As a matter of California state law, those powers are

16  sweeping: among other things, the Governor may issue orders with "the force and effect of law,"

17  Cal. Gov't Code § 8657(a); may suspend "any regulatory statute" or any "statute prescribing the

18  procedure for conduct of state business," *id.* § 8571; and may "exercise . . . all police power

19  vested in the state"—including using the State's police power to "promulgate, issue, and enforce

20  such orders and regulations as he deems necessary," *id.* § 8627.

21        The Governor proceeded to wield these broad, state-law emergency powers to protect

22  Californians' health and safety. On March 12, 2020, through Executive Order N-25-20, Governor

23  Newsom directed all residents to heed any orders and guidance of state and local public health

24  officials. *See* RJN, Ex. 2. The following week, on March 19, 2020, he issued Executive Order N-

25  33-20, which again directed Californians to heed the State Public Health Officer's orders—

26

27      [2] As of June 23 in the United States alone, COVID-19 had infected more than two million
people and caused the deaths of around 120,000 people. Coronavirus disease 2019 (COVID-19)
28  June 23 Situation Report, << https://www.who.int/docs/default-source/coronaviruse/situation-
reports/20200623-covid-19-sitrep-155.pdf?sfvrsn=ca01ebe_2 >> (last accessed June 23, 2020)

5

1  including a State Public Health Officer order that (at the time) generally required Californians to

2  stay home except for essential needs. *See* RJN, Ex. 3; https://covid19.ca.gov/stay-home-except-

3  for-essential-needs.

4        Despite these aggressive measures, COVID-19 remains a serious threat.  Indeed,

5  hospitalizations related to COVID-19 have increased by 16% over the last two weeks.[3]  Although

6  the future course of the COVID-19 pandemic cannot be known with certainty, state, national, and

7  international projections reflect ongoing danger from the pandemic throughout the remainder of

8  this year, and experts believe that COVID-19 will remain a threat to public health during the

9  November 2020 election. *See* Watt Decl., ¶¶ 23-24.

10       The COVID-19 pandemic may affect the November 3, 2020 presidential election in several

11  ways: Depending on the seriousness of the outbreak in November, it may prevent elections

12  officials, poll workers and voters from being physically present at polling places. *See* Watt Decl.,

13  ¶¶ 16-18; Lean Decl., ¶¶ 27-28.  It may also force local elections officials to offer fewer in-person

14  polling locations. *See* Watt Decl., ¶¶ 16-18; Lean Decl., ¶¶ 27-28.  Moreover, even if California

15  continues to make significant progress and the pandemic is under relative control by November,

16  highly vulnerable voters may need to avoid polling places, and others may still be inclined to

17  avoid in-person polling places even if the risk of COVID-19 transmission is relatively low. *See*

18  Watt Decl., ¶¶ 16-18; Lean Decl., ¶¶ 27-28.

19  **IV.   THE COVID-19 PANDEMIC AND CALIFORNIANS' ABILITY TO VOTE**

20       Given the prospect that COVID-19 will remain a threat to public health during the

21  November 2020 election, California officials have been working together to ensure that

22  Californians are able to exercise their right to vote in that election while also preserving public

23  health and safety.[4]  On May 6, California Senator Tom Umberg and California Assemblymember

---

24       [3] *See* Taryn Luna, *Increases in Coronavirus Cases and Hospitalizations Tell "Sobering
25  Story," Newsom Says*, L.A. Times (June 22, 2020)
     <<https://www.latimes.com/california/story/2020-06-22/newsom-coronavirus-masks-reopening-
26  hospitalizations-rise>> (last accessed June 23, 2020).

27       [4] Other states' experiences have underscored the need for California to prepare as fully as
     possible to hold the November election during the COVID-19 pandemic. *See, e.g.*, Viebeck,
28  Gardner, Simmons, & Larson, *Long Lines, Anger and Fear of Infections: Wisconsin Proceeds*

1    Marc Berman—the Chairs of the committees responsible for elections legislation in the California

2    State Senate and Assembly, respectively—sent a letter to Governor Newsom, requesting that the

3    Governor act in concert with them to ensure a safe election in November.  *See* RJN, Ex. 4.

4         The Legislative Chairs informed Governor Newsom that they were "announcing a

5    legislative package today to ensure a safe and fair election" in light of the uncertainties

6    surrounding the COVID-19 pandemic.  RJN, Ex. 4.  Among other things, that legislative package

7    included a requirement that "all voters be mailed a ballot for this November's election."  *Id.*  As

8    an interim measure, the Legislative Chairs asked Governor Newsom to "issue an Executive Order

9    immediately to formalize that requirement until the pending legislation can be enacted."  *Id.*  The

10   Legislative Chairs stressed that immediate action was necessary given the nature of county

11   elections officials' preparations for the November election: "Immediate action by Executive

12   Order will allow counties to begin the procurement of equipment and materials to allow for every

13   Californian to receive a mail ballot."  *Id.*

14        Two days later, Governor Newsom issued Executive Order N-64-20 on May 8.  *See* RJN,

15   Ex. 5.  The Order directed that, among other things:

16       [C]ounty elections officials shall transmit vote-by-mail ballots for the November 3,
         2020 General Election to all voters who are, as of the last day on which vote-by-mail
17       ballots may be transmitted to voters in connection with that election, registered to
         vote in that election. As set forth in this paragraph, every Californian who is eligible
18       to vote in the November 3, 2020 General Election shall receive a vote-by-mail ballot.

19   *Id.* at 2.  Executive Order N-64-20 acknowledged that the Governor was working in concert with

20   the Legislature and the Secretary of State, and contemplated that this cooperative effort would

21   culminate in legislation:

22       My Administration continues working in partnership with the Secretary of State and
         the Legislature on requirements for in-person voting opportunities and on how other
23       details of the November election will be implemented. Nothing in this Order is
         intended, or shall be construed, to limit the enactment of legislation on that subject.
24

25   *With Elections Under Court Order*, Wash. Post (Apr. 7, 2020) <<
     https://www.washingtonpost.com/politics/long-lines-form-in-milwaukee-as-wisconsin-proceeds-
26   with-elections-under-court-order/2020/04/07/93727b34-78c7-11ea-b6ff-597f170df8f8_story.html
     >> (last accessed June 23, 2020); Gardner, Lee, Willis, & Glionna, *In Georgia, Primary Day*
27   *Snarled by Long Lines, Problems With Voting Machines – a Potential Preview of November*,
     Wash. Post. (June 9, 2020) << https://www.washingtonpost.com/politics/voting-june-9-
28   primaries/2020/06/09/df6b8aa2-a9e7-11ea-a9d9-a81c1a491c52_story.html >> (last accessed June
     23, 2020).

7

1    *Id.* Executive Order N-64-20 also acknowledged that California counties would need further

2    clarity regarding in-person voting requirements and other details of the November election by the

3    end of May. *See* RJN Ex. 5 at 2. Indeed, on May 27, the Legislative Chairs unveiled

4    legislation—Senate Bill 423 ("SB 423")—addressing those very issues. *See* RJN, Ex. 6. On June

5    3, Governor Newsom issued Executive Order N-67-20, which specified in-person voting

6    requirements and other requirements consistent with SB 423. *See* RJN, Ex. 7.[5] Executive Order

7    N-67-20 also reaffirmed Executive Order N-64-20, and confirmed that Executive Order N-64-20

8    had not suspended state law concerning inactive voters:

9        [A]ll Californians who are registered (and otherwise eligible) to vote in the

10        November 3, 2020 General Election shall receive vote-by-mail ballots. Consistent with Elections Code section 2226, this provision is not intended, and shall not be construed, to mean that voters in an inactive voter registration status shall receive

11        vote-by-mail ballots in connection with the November 3, 2020 General Election.

12    *Id.* at 2. Finally, like Executive Order N-64-20, Executive Order N-67-20 again emphasized the

13    partnership between the Legislature, the Governor, and the Secretary of State and made clear that

14    "[n]othing in this Order is intended, or shall be construed, to limit in any way the enactment of

15    legislation concerning the November 3, 2020 General Election." *Id.* at 4.

16    **V.    AB 860**

17        Meanwhile, the Legislative Chairs (Senator Umberg and Assemblymember Berman)

18    advanced the legislative package they had promised. Assembly Bill 860 ("AB 860") (Berman)

19    and SB 423 (Umberg)[6] are congruent with Executive Order N-64-20 and Executive Order N-67-

20    20; upon enactment, they will essentially ratify and supersede Governor Newsom's Executive

21    Orders by directing that vote-by-mail ballots be sent to all eligible California voters in November

22    and specifying other requirements (such as requirements for in-person voting opportunities) for

23    the conduct of the election. *See* RJN, Exs. 6 (SB 423), 8 (AB 860).

24

---

25        [5] As should be obvious from this chain of events, there is no merit to the RNC Plaintiffs

26    suggestion that Executive Order N-67-20 was issued "in response to this litigation." RNC Mem. at 3 n.1.

27        [6] SB 423, which involves aspects of the November 2020 election other than the

28    requirement that all registered active voters receive a vote-by-mail ballot, is pending in the Assembly Committee on Elections and Redistricting as of June 23.

1    On June 18, the Legislature passed AB 860; that same day, the Governor signed AB 860

2 into law.  *See* RJN, Ex. 8.  AB 860 passed with overwhelming, bipartisan support: 68

3 Assemblymembers, including Members of both parties, voted in favor of the legislation.  *See*

4 RJN, Ex. 9.  Only 5 Members voted against it.  *Id.*

5    AB 860 supersedes Executive Order N-64-20's requirement (reiterated in Executive Order

6 N-67-20) that all registered, active voters receive vote-by-mail ballots in November.  In AB 860,

7 the Legislature found that "it is uncertain whether by [the November 3 election] the COVID-19

8 pandemic will have subsided and what social distancing guidelines will remain in place.  Even if

9 the pandemic has subsided by the time of the election, many voters may nonetheless be

10 uncomfortable with in-person voting because of health concerns."  RJN, Ex. 8 at 4.  The

11 Legislature further found that "[m]ailing every voter a ballot for the November 2020 statewide

12 election is an important step in promoting resilience in the state's elections and ensuring that

13 every California voter will have the opportunity to fill out their ballot in a safe manner."  *Id.*  The

14 Legislature then directed that county elections officials mail a ballot to every registered voter for

15 the November 3 election.  *Id.* at 4-5.

16 **VI.    THE IMPLEMENTATION OF AB 860**

17    As noted above, approximately 80 percent of registered active voters in California were

18 already set to receive vote-by-mail ballots for the November 2020 election.  *See* Lean Decl., ¶ 13.

19 The practical effect of AB 860 is to require county elections officials to send vote-by-mail ballots

20 to the approximately 4.2 million remaining registered, active voters in California.  *See* Lean

21 Decl., ¶ 15.

22    These vote-by-mail ballots will be subject to the same safeguards as any other vote-by-mail

23 ballot, including tracking and signature verification.  *See supra* Section II.  Also consistent with

24 current law, counties may not mail ballots to voters who are on inactive lists.  *See* RJN, Ex. 8 at 4

25 ("nothing in this act is intended . . . to mean that a voter with an inactive voter registration status

26 shall receive a vote by mail ballot for the November 3, 2020 statewide general election.")

27 Inactive voters can receive a mail ballot by affirmatively taking some action to signal that they

28 are active, including by requesting a vote-by-mail ballot.  *See* Lean Decl., ¶ 20.  Or these voters

9

1   can still use whatever in-person polling places are available on November 3 to cast an in-person

2   ballot. *Id.*

3   **VII.  THIS LAWSUIT AND MOTION FOR PRELIMINARY INJUNCTION**

4       On May 24, Plaintiffs filed this lawsuit.  The operative complaint challenges only the first

5   Executive Order N-64-20, not Executive Order N-67-20 or AB 860.  Plaintiffs allege that by

6   using Executive Order N-64-20 to require that all registered active voters receive a vote-by-mail

7   ballot in November, Governor Newsom violated the Elections and Electors Clauses of the United

8   States Constitution.  *See* Compl. at 24.  Plaintiffs also allege that by expanding voting by mail in

9   California—to make it safe for people to vote in November—Executive Order N-64-20

10  "facilitates fraud and other illegitimate voting practices, and therefore violates the Fourteenth

11  Amendment to the U.S. Constitution." *Id.* at 25.  Finally, Plaintiffs allege a violation of the Equal

12  Protection Clause. *Id.*

13                          **LEGAL STANDARD**

14      A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

15  clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat'l Res. Defense Council,*

16  *Inc.*, 555 U.S. 7, 22 (2008).  To make this showing, plaintiffs must establish that they are likely to

17  succeed on the merits, that they are likely to suffer irreparable harm absent preliminary relief, that

18  the balance of equities favors them, and that an injunction would be in the public interest. *Id.* at

19  20; *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

20                          **ARGUMENT**

21      Plaintiffs have not met their burden of demonstrating entitlement to a preliminary

22  injunction.  First, they cannot demonstrate the requisite likelihood of success on the merits of

23  their claims.  Plaintiffs' claims under the Elections Clause and Electors Clause are moot because

24  the California Legislature has enacted AB 860, which requires that all registered, active voters

25  receive a vote-by-mail ballot in November.  Plaintiffs ask the Court to enjoin Executive Order N-

26  64-20.  Such an injunction would be futile because AB 860 will expand voting by mail regardless,

27  and in exactly the way that Executive Order N-64-20 would have done.

28

1    Even if their motion was not moot, Plaintiffs' claims would still lack merit because the

2  Executive Order is a constitutional exercise of the Governor's emergency powers to combat the

3  COVID-19 pandemic, as delegated to him by the Legislature under California's Emergency

4  Services Act.

5    Second, the balance of harms and the public interest also weigh decisively against

6  Plaintiffs.  Whatever injury Plaintiffs might suffer as a result of the expansion of voting by mail—

7  and it is not clear what that injury might be—is far outweighed by the need to provide millions of

8  California voters with the option to avoid a polling place during a once-in-a-century pandemic.

9  **I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS**

10    Plaintiffs "are seeking a preliminary injunction based only on their claims under the

11  Elections and Electors Clause."  RNC Mem. at 10 n.3.  Because Plaintiffs are unlikely to prevail

12  on the merits of these two claims, their motion should be denied.

13    **A.    The Relevant Claims Are Moot**

14    Following the enactment of AB 860, the claims relevant here—Plaintiffs' claims for

15  injunctive relief under the Elections and Electors Clauses—are moot.  Plaintiffs contend that

16  California may not send vote-by-mail ballots to California voters without action by the

17  Legislature.  Even if that argument were correct (as discussed in Part I.B, *infra*, it is not), it is now

18  beside the point: the Legislature, by enacting AB 860, has acted to ensure that vote-by-mail

19  ballots will be sent to California voters.

20    A claim for injunctive relief becomes moot "when the issues presented are no longer 'live'

21  or the parties lack a legally cognizable interest in the outcome." *Am. Diabetes Ass'n v. United

22  States Dep't of the Army*, 938 F.3d 1147, 1152 (9th Cir. 2019) (quotation omitted).  This occurs,

23  for example, "[w]here new legislation represents a complete substitution for the law as it existed

24  at the time of" the controversy. *Bunker Ltd. P'ship v. United States*, 820 F.2d 308, 312 (9th Cir.

25  1987).  That is what has happened here: AB 860 has (as expected and intended by the Legislative

26  Chairs and the Governor) ratified and superseded Executive Order N-64-20.  And because

27  Executive Order N-64-20 has been superseded by AB 860, "there is nothing left to enjoin," *Arc of

28  California v. Douglas*, 757 F.3d 975, 982 (9th Cir. 2014).  California voters will receive vote-by-

11

1    mail ballots under AB 860 regardless of any action the Court might take here.  Under these

2    circumstances, there is no effective relief for the Court to grant: "a new statutory enactment has

3    removed the basis or need for relief," rendering this controversy moot.  *Smith v. Univ. of Wash.*,

4    233 F.3d 1188, 1195 (9th Cir. 2000).

5         No mootness exception applies here.  The voluntary-cessation doctrine is not implicated

6    here, because AB 860 was not enacted "in response to pending litigation."  *Rosemere*

7    *Neighborhood Ass'n v. EPA*, 581 F.3d 1169, 1173 (9th Cir. 2009).  On the contrary, the

8    correspondence from the Legislative Chairs to the Governor, the text of Executive Order N-64-

9    20, and the legislative history of AB 860 all make clear that the Legislature and the Governor

10   expected and intended the enactment of AB 860 long before this litigation was filed.  But even if

11   the voluntary-cessation doctrine were otherwise implicated here, "legislative actions should not

12   be treated the same as voluntary cessation of challenged acts by a private party," and the

13   enactment of AB 860 would be sufficient to moot this controversy.  *Bd. of Trustees of Glazing*

14   *Health &Welf. Trust v. Chambers*, 941 F.3d 1195, 1999 (9th Cir. 2019) (en banc).  Nor, by the

15   same token, have Plaintiffs shown that this controversy is capable of repetition, yet evading

16   review: there is no realistic prospect that AB 860 will be repealed, and Plaintiffs cannot otherwise

17   show that the challenged Executive Order—an emergency measure issued in response to a once-

18   in-a-century public health crisis—will be repeated.[7]

19        Accordingly, the enactment of AB 860 has rendered Plaintiffs' request for injunctive relief

20   under the Elections and Electors Clauses moot.

21   / / /

22

23   / / /

24

25        [7] There is no realistic possibility that the Legislature would repeal AB 860 before
     November: large, bipartisan majorities of the California Legislature supported AB 860.  *See* RJN,
26   Ex. 9.  And the "speculative possibility" that the Governor might issue similar Executive Orders
     for this or future elections is insufficient to defeat mootness.  *See West Coast Seafood Processors*
27   *Ass'n v. Nat'l Resources Def. Council*, 643 F.3d 701, 705 (9th Cir. 2011); *Bd. of Trs. of the*
     *Glazing Health & Welfare Trust*, 941 F.3d at 1199 ("reasonable expectation of reenactment . . .
28   must be founded in the record, rather than on speculation alone").

**B.      Even if the Relevant Claims Were Not Moot, Plaintiffs Would Be Unlikely to Succeed on the Merits**

Even if this Court were to reach the merits of Plaintiffs' Elections and Electors Clause claims (which it should not), Plaintiffs' request for a preliminary injunction should be denied, because Plaintiffs have not shown a likelihood of success on the merits.

**1.      The Merits of Plaintiffs' Claims Turn on State Law**

"The dominant purpose of the Elections Clause"—and, analogously, the Electors Clause— "was to empower Congress to override state election rules, not to restrict the way States enact legislation." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2672 (2015). In this context, as elsewhere, "it is characteristic of our federal system that States retain autonomy to establish their own governmental processes." *Id.* at 2673. Accordingly, for purposes of the Elections Clause (and similarly the Electors Clause), the term "Legislature" does "not mean the representative body alone." *Id.* at 2666. Instead, the term "Legislature" "calls for the exercise of lawmaking authority," *id.* at 2668 n.17, which is "to be performed in accordance with the State's prescriptions for lawmaking," *id.* at 2668.

Those state-law prescriptions may include, for example, the delegation of legislative or quasi-legislative authority to officials in a state's Executive Branch. *See, e.g., Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC (D. Nev. Apr. 30, 2020), 2020 WL 2089813, *8 (determining that the Nevada Legislature delegated its authority under the Elections Clause to the Secretary of State "to adopt regulations to carry out the state's election laws"). Such officials may specifically include the Governor: "Whether the Governor of [a] state," in this context, "shall have a part in the making of state laws, is a matter of state polity"—i.e., a matter of state law. *Smiley v. Holm*, 285 U.S. 355, 368 (1932).

The merits of Plaintiffs' Elections and Electors Clause claims thus turn on whether, as a matter of state law, California law authorized the Governor to issue Executive Order N-64-20.

/ / /

/ / /

/ / /

13

### 2. Because Plaintiffs' Claims Turn on State Law, Those Claims Are Barred by Sovereign Immunity

Because the merits of Plaintiffs' claims turn on a question of state law, those claims are barred by sovereign immunity. "A federal court's grant of relief against state officials on the basis of state law . . . conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Thus, "[a] federal court may not grant injunctive relief against state officials on the basis of state law." *Vasquez v. Rackauckas*, 734 F.3d 1025, 1041 (9th Cir. 2013) (citing *Pennhurst*, 465 U.S. at 106).

It does not matter that Plaintiffs cloak the state-law question here in the guise of the federal Elections and Electors Clauses. As the cases above demonstrate, sovereign immunity bars all claims brought "on the basis of" state law—regardless of the way in which those claims are ultimately framed. Thus, under *Pennhurst*, federal courts may adjudicate claims for injunctive relief only if those claims are "brought exclusively under federal law." *Cuesnongle v. Ramos*, 835 F.2d 1486, 1497 (1st Cir. 1987). Here, however, the heart of Plaintiffs' claims is a state-law issue—whether Executive Order N-64-20 was authorized by California law. Because Plaintiffs' claims are premised on—that is, brought "on the basis of"—an alleged violation of state law, those claims are barred by sovereign immunity.

### 3. State Law Authorized the Governor's Order

Even if the Court were to reach the merits of the state-law issue at the heart of this case (which it should not do), Executive Order N-64-20 was consistent with state law.

As a matter of California law, the California Legislature has authorized the Governor to wield wide-ranging authority—including quasi-legislative authority—during emergencies like the COVID-19 pandemic. California's Emergency Services Act, Cal. Gov't Code § 8550 et seq., "confers upon the Governor broad powers to deal with such emergencies." *Cal. Corr. Peace Officers Ass'n v. Schwarzenegger*, 163 Cal. App. 4th 802, 811 (2008). In particular, under the Emergency Services Act, the Governor may issue orders with "the force and effect of law," Cal. Gov't Code § 8657(a); may suspend "any regulatory statute" or any "statute prescribing the procedure for conduct of state business," *id.* § 8571; and may even "exercise . . . all police power

14

1    vested in the state"—using the State's police power to "promulgate, issue, and enforce such

2    orders and regulations as he deems necessary," *id.* § 8627.  Through this broad grant of authority,

3    the Emergency Services Act centralizes the State's powers in the hands of the Governor—

4    reflecting California's determination that "[a] public emergency is not a time for uncoordinated,

5    haphazard, or antagonistic action." *Macias v. California*, 10 Cal. 4th 844, 858 (1995).[8]

6         Executive Order N-64-20 fits comfortably within this broad grant of authority.  Most

7    notably, the Order may be understood as a suspension of "any limitation on the distribution of

8    vote-by-mail ballots in Elections Code sections 1500 and 4000–4007." RJN, Ex. 5 at 2.  So

9    understood, the Order falls squarely within Government Code section 8571: the provisions of the

10   Elections Code are both regulatory statutes and statutes prescribing procedures for the conduct of

11   state business.  The State's administration of elections—which are organized under state law

12   (including, for example, state laws providing that elections be proclaimed by the Governor, *see*

13   Cal. Elec. Code § 12000) and conducted by officials of the State and its subdivisions, pursuant to

14   their state-law authority—is quintessentially state business. *Cf. Hunter v. Hamilton Cty. Bd. of*

15   *Elections*, 635 F.3d 219, 244 (6th Cir. 2011) ("States are primarily responsible for regulating

16   federal, state, and local elections") (quotation omitted).  The procedures set forth in the California

---

17       [8] There is no merit to any suggestion that the Emergency Services Act contravenes the
California Constitution's separation of powers. As an initial matter, in contrast to Congress's

18   powers under the U.S. Constitution, "it is well established that the California Legislature
possesses *plenary* legislative authority except as specifically limited by the California

19   Constitution." *Marine Forests Soc'y v. California Coastal Comm'n*, 36 Cal.4th 1, 31 (2005).
And the California Constitution does not specifically limit the Legislature's authority in any

20   respect relevant here.  On the contrary, even outside the emergency context, "the separation of
powers doctrine" under the California Constitution "does not create an absolute or rigid division

21   of functions." *Lockyer v. City & Cty. of San Francisco*, 33 Cal.4th 1055, 1068 (2004).  In the
emergency context, in particular, California law preserves even greater flexibility for the political

22   branches of state government. *See Macias*, 10 Cal.4th at 858 ("Defining the locus of power and
responsibility during 'conditions of disaster or . . . extreme peril to life, property, and the

23   resources of the state' is a task for which the Legislature is peculiarly well suited, and the State is
the natural and logical repository of such power and responsibility. In the Emergency Services

24   Act . . . the Legislature has provided a clear framework of authority.").
    Underscoring the lack of a separation-of-powers problem here, the Emergency Services

25   Act provides that the Legislature may terminate a state of emergency proclaimed under the Act.
*See* Cal. Gov't Code § 8629. This kind of checks-and-balances interrelationship is consistent

26   with the structure and purpose of the California Constitution's separation of powers. *See, e.g.,*
*Superior Court v. Cty. of Mendocino*, 13 Cal.4th 45, 53 (1996) ("Such interrelationship, of course,

27   lies at the heart of the constitutional theory of 'checks and balances' that the separation of powers
doctrine is intended to serve.").

28

---

1   Elections Code are therefore procedures for the conduct of state business within the scope of

2   Government Code section 8571.  Moreover, as just noted, states are responsible for "regulating"

3   elections.  *See, e.g., Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (recognizing "the state's

4   important regulatory interests"); *Hunter*, 635 F.3d at 244.  California courts have repeatedly

5   described provisions of the Elections Code as "regulatory."  *See, e.g., League of Women Voters of*

6   *Cal. v. McPherson*, 145 Cal. App. 4th 1469, 1483 n.12 (2006) (describing the purpose of

7   amendments to the Elections Code as "clarify[ing] the regulatory election process"); *Vikco Ins.*

8   *Servs., Inc. v. Ohio Indem.* Co., 70 Cal. App. 4th 55, 63 (1999) (listing the Elections Code among

9   examples of "regulatory statute[s]" that, as a matter of California law, do not necessarily give rise

10  to a private right of action for damages).  In this light, the provisions of the Elections Code may

11  be understood as both regulatory statutes and statutes prescribing procedures for the conduct of

12  state business, and therefore subject to suspension under Government Code section 8571.[9]

13      The Governor's authority in this area is further buttressed by additional provisions of the

14  Emergency Services Act, which empower the Governor to wield the police power of the State to

15  issue orders with the force of law.  *See* Cal. Gov't Code §§ 8567, 8627.  As a matter of California

16  law, "[t]he police power is the power of sovereignty or power to govern—the inherent reserved

17  power of the state to subject individual rights to reasonable regulation for the general welfare."

18  *Massingill v. Dep't of Food & Agric.*, 102 Cal.App.4th 498, 504 (2002) (internal quotations

19  omitted).  In other words, the "police power" is "plenary authority to govern" within the relevant

20  jurisdiction's geographic limits.  *Candid Enterprises, Inc. v. Grossmont Union High Sch. Dist.*, 39

21  Cal. 3d 878, 885 (1985).  In this light, as a matter of state law, the Emergency Services Act has

---

22  [9] There is no merit to any effort to quibble with the form of the Executive Order.  Contrary
    to the Plaintiffs' suggestion, *see* RNC Mem. at 13, the Governor was not required to make an
23  "extreme peril" finding under Government Code section 8558 in Executive Order N-64-20.
    Rather, that finding was required—and was made, *see* RJN Ex. 1—at the time of the initial
24  emergency proclamation. *See* Cal. Gov't Code § 8558(b); *Martin v. Mun. Court*, 148 Cal. App.
    3d 693, 697-98 (1983).  Nor does the Emergency Services Act prescribe any additional
25  procedures beyond those used by the Governor here. *Cf. Cal. Corr. Peace Officers Ass'n v.*
    *Schwarzenegger*, 163 Cal. App. 4th at 820 (rejecting efforts to interpose additional procedural
26  requirements into the Emergency Services Act where "there is no language in the Emergency
    Services Act" that imposes such requirements).  And even if there were any such additional
27  procedural requirements here (which there are not), California courts have construed the
    Emergency Services Act to allow findings required under the Act to be made implicitly. *See id.*

28

long been understood to confer upon the Governor the power to issue orders with the force of law, even in the absence of additional statutory authority.  *See, e.g.*, 60 Cal. Op. Att'y Gen. 99 (1977) (concluding that, under the Emergency Services Act, the Governor had the authority to order mandatory water rationing, even in the absence of specific statutory authority).[10]

Indeed, California's Emergency Services Act has long been understood to empower the Governor to suspend provisions of the State's Elections Code and modify the State's elections procedures—and the California Legislature has acquiesced in that understanding.  By the time Governor Newsom took office, three of California's last four governors—Governors Wilson, Schwarzenegger, and Brown—had used their authority under the Emergency Services Act to issue Executive Orders suspending various provisions of the Elections Code.  *See* RJN, Exs. 10 (EO W-29-92 (Wilson)), Ex. 11 (EO W-69-93 (Wilson)), Ex. 12 (EO S-17-09 (Schwarzenegger)), Ex. 13 (EO S-19-09 (Schwarzenegger)), Ex. 14 (EO B-43-17 (Brown)).  Perhaps most relevant here, in 2017, Governor Brown issued Executive Order B-43-17, which (in Paragraph 6) empowered the County of Sonoma to conduct a special election "wholly by mail," and suspended contrary provisions of the Elections Code.  RJN, Ex. 14.

Moreover, the Legislature has not restricted this longstanding use of the Emergency Services Act to suspend provisions of the State's Elections Code and modify the State's elections procedures.  The Legislature has accepted this use of the Emergency Services Act—which, as a matter of state law, is a strong indication that this use of the Emergency Services Act is correct.  *See Save Our Heritage Org. v. City of San Diego*, 28 Cal.App.5th 656, 668 (2018) ("The Legislature is presumed to be aware of a long-standing administrative practice.  If the Legislature, as here, makes no substantial modifications to the statute, there is a strong indication that the administrative practice is consistent with the legislative intent." (alterations and internal quotation marks omitted)).

---

[10] Plaintiffs misleadingly cite a California Attorney General Opinion for the proposition that the Governor "is not empowered, by executive order or otherwise, to amend the effect of, or to qualify the operation of existing legislation."  RNC Mem. at 11 (citing 63 Cal. Op. Att'y Gen. 583 (1980)).  That Attorney General Opinion did not involve the Emergency Services Act or a proclaimed emergency under the Act, and is not relevant to the Governor's powers under the Emergency Services Act.

1    The context in which this litigation has arisen—an unprecedented public health

2  emergency—further counsels against concluding, in federal court, that the chief executive of a

3  state has exceeded his powers as a matter of state law.  "Our Constitution principally entrusts 'the

4  safety and health of the people' to the politically accountable officials of the States 'to guard and

5  protect.'"  *S. Bay United Pentecostal Church v. Newsom*, No. 19A1044, 2020 WL 2813056, at *1

6  (U.S. May 29, 2020) (Roberts, C.J., concurring) (quoting *Jacobson v. Massachusetts*, 197 U.S.

7  11, 38 (1905)).  "When those officials 'undertake to act in areas fraught with medical and

8  scientific uncertainties,'"—as the Governor and other California officials have here—"their

9  latitude 'must be especially broad," and should not lightly "be subject to second-guessing" by the

10  federal judiciary.  *Id.* (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)).

11    But Plaintiffs ask this Court to engage in precisely that kind of second-guessing: the RNC

12  Plaintiffs, in particular, essentially ask this Court to contradict California's determination that the

13  provisions of Executive Order N-64-20—since enacted through AB 860—are necessary

14  responses to the COVID-19 pandemic.  *See* RNC Mem. at 13–14.  But the State must prepare for

15  the November election now, while COVID-19 remains a serious threat.  *See* Lean Decl., ¶¶ 26-29.

16  Thus, waiting to issue Executive Order N-64-20 was not an option: when the Order was issued,

17  immediate action by the Executive was necessary to "allow counties to begin the procurement of

18  equipment and materials to allow for every Californian to receive a mail ballot."  RJN, Ex. 4; *see*

19  Lean Decl., ¶ 26.  Moreover, the evidence confirms the wisdom of the State's decision to prepare

20  for the November election as though COVID-19 will still be a significant threat.  *See* Watt Decl.,

21  ¶¶ 23-24. And even if the wisdom of that decision were not otherwise apparent, the law compels

22  deference to the State's decisions here, which are made to protect public health in the face of

23  medical and scientific uncertainty.  *See S. Bay United Pentecostal Church*, 2020 WL 2813056, at

24  *1 (Roberts, C.J., concurring).

25    For all of these reasons—the text of California's Emergency Services Act, prior Governors'

26  longstanding practice of using their powers under the Emergency Services Act to suspend

27  provisions of California's Elections Code and alter California's elections procedures (combined

28  with the California Legislature's acquiescence in that practice), and the deference due to state

18

1   officials' use of their state-law powers to respond to the current public health emergency—

2   Executive Order N-64-20 was authorized by California law.  And, because the Executive Order

3   was authorized under California law, there is no violation of the Elections or Electors Clauses.

4   **II.   THE REMAINING FACTORS WEIGH HEAVILY AGAINST ISSUANCE OF A PRELIMINARY INJUNCTION**

5

6        Plaintiffs' motion fails for an additional, independent reason.  To obtain a preliminary

7   injunction, Plaintiffs must show that they will suffer irreparable harm, that the balance of equities

8   weighs in their favor, and that an injunction is in the public interest.  *Winter*, 555 U.S. at 20;

9   *Padilla v. Immigration & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020) ("Where the

10  government is a party to a case in which a preliminary injunction is sought, the balance of the

11  equities and public interest factors merge.").  Plaintiffs do not—and cannot—make this showing.

12       For the same reasons that this case is now moot, *see supra*, Section I.A, Plaintiffs will not

13  suffer irreparable harm in the absence of a preliminary injunction.  Whether or not the Court

14  issues the requested injunction, AB 860 will still require that all registered active voters receive a

15  vote-by-mail ballot.  Moreover, even assuming Plaintiffs could somehow assert injury on behalf

16  of the California Legislature—*but see Ariz. State Legislature*, 135 S. Ct. at 2663–64—there is no

17  such injury here, where the Legislature has (through AB 860) embraced the provisions of the

18  Executive Order.  And, contrary to Plaintiffs' arguments, there is no evidence that California's

19  vote-by-mail plan—announced well in advance by Executive Order N-64-20, and reaffirmed by

20  the enactment of AB 860—will confuse voters.

21       Nor is there is any merit to Plaintiffs' characterization of the Executive Order as a "radical,

22  abrupt, and complex" change to election laws.  *See* RNC Mem. at 17.  Eight out of 10 eligible

23  voters were already scheduled to receive mail ballots this November, and the additional vote-by-

24  mail ballots will be subject to all the safeguards that currently apply to mail ballots in California.

25  *See* Lean Decl., ¶¶ 13-15, 16-24.  Plaintiffs raise the specter of voter fraud, but support it with no

26

27

28

19

1    evidence.  Indeed, what evidence exists demonstrates the opposite: that incidents of voter fraud

2    related to the use of vote-by-mail ballots are exceedingly rare.[11]  *See* Killeen Decl., Exs. A-E.

3         By contrast, particularly given the ongoing threat posed by the COVID-19 pandemic—and

4    the prospect that that threat will endure through November—the public interest and balance of the

5    equities tilt strongly in favor of deferring to state officials' response to that pandemic.  *See S. Bay*

6    *United Pentecostal Church*, 2020 WL 2813056, at *1 (Roberts, C.J., concurring).  Likewise,

7    given the COVID-19 pandemic, the public interest and balance of the equities also strongly favor

8    providing more ways for Californians to vote, not fewer.  *See Paher*, 2020 WL 2089813, at *12

9    ("It is clear that as triggered by the uncertainties of COVID-19, the public's interests align with

10   the Plan's all-mail election provisions.")

11                                          **CONCLUSION**

12        For these reasons, Plaintiffs' motion for preliminary injunction should be denied.

13

14   Dated:  June 25, 2020                         Respectfully Submitted,

15                                                 XAVIER BECERRA
                                                   Attorney General of California
16                                                 BENJAMIN M. GLICKMAN
                                                   Supervising Deputy Attorney General
17                                                 JAY C. RUSSELL
                                                   Deputy Attorney General
18

19                                                 */s/ John W. Killeen*
                                                   JOHN W. KILLEEN
20                                                 Deputy Attorney General
                                                   *Attorneys for Defendants Gavin Newsom*
21                                                 *and Alex Padilla*

22   SA2020301369
     34142565_5.docx
23

24

25

26

27   _____
       [11] As the Secretary of State explains, Plaintiffs' allegations about the state of California's
28   voter rolls are based on outdated or inaccurate information.  *See* Lean Decl., ¶¶ 17-18.

                                                  20

# CERTIFICATE OF SERVICE

Case Name: **Republican National
Committee, et al. v. Gavin
Newsom, et al.**

No.   **2:20-cv-01055-KJM-CKD**

I hereby certify that on <u>June 25, 2020</u>, I electronically filed the following documents with the
Clerk of the Court by using the CM/ECF system:

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be
accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true
and correct and that this declaration was executed on <u>June 25, 2020</u>, at Sacramento, California.

| Tracie L. Campbell | */s/ Tracie Campbell* |
|:---:|:---:|
| Declarant | Signature |

SA2020301369
34189972.docx